# Exhibit 23

The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

DATE FILED: April 11, 2024
CASE NUMBER: 2022CA843

SUMMARY
April 11, 2024

## 2024COA35

**No. 22CA0843, *Coomer v. Donald J. Trump for President, Inc.*
— Courts and Court Procedure — Regulation of Actions and
Proceedings — Action Involving Exercise of Constitutional
Rights — Anti-SLAPP; Torts — Civil Conspiracy — Defamation
— Intentional Infliction of Emotional Distress**

Applying the anti-SLAPP statute, § 13-20-1101, C.R.S. 2023, a

division of the court of appeals concludes that the plaintiff has

established a reasonable likelihood of success on his claims for

defamation and intentional infliction of emotional distress arising

out of statements by various defendants that the plaintiff

(1) asserted on a conference call in September 2020 that he had

"made sure" then-President Trump was not going to win the 2020

presidential election and (2) took steps to interfere with the election

results.  The division concludes that, accepting the plaintiff's

evidence as true, the plaintiff has shown a reasonable likelihood

that each defendant made these statements, that the statements were false, and that the defendants made them with actual malice.

The division concludes that the plaintiff has not established a reasonable likelihood of success on his conspiracy claim because the plaintiff presented no evidence of an agreement to defame him.

The division affirms the district court's denial of the special motions to dismiss the plaintiff's claims for defamation and intentional infliction of emotional distress.  It reverses the denial of the special motions to dismiss the plaintiff's conspiracy claim as to certain defendants (those who challenge that ruling on appeal).

COLORADO COURT OF APPEALS                    **2024COA35**

---

Court of Appeals Nos. 22CA0843 & 22CA0879
City and County of Denver District Court No. 20CV34319
Honorable Marie Avery Moses, Judge

---

Eric Coomer, Ph.D.,

Plaintiff-Appellee,

v.

Donald J. Trump for President, Inc.; Sidney Powell; Sidney Powell, P.C.; Joseph Oltmann; FEC United; Shuffling Madness Media, Inc., d/b/a Conservative Daily; James Hoft; TGP Communications, LLC, d/b/a The Gateway Pundit; Michelle Malkin; Eric Metaxas; and Defending the Republic, Inc.,

Defendants-Appellants.

---

ORDER AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE SCHOCK
Navarro and Kuhn, JJ., concur

Announced April 11, 2024

---

Cain & Skarnulis PLLC, Charles J. Cain, Zachary Bowman, Bradley A. Kloewer, Salida, Colorado; RechtKornfeld PC, Thomas M. Rogers III, Mark Grueskin, Andrew E. Ho, Denver, Colorado, for Plaintiff-Appellee

Campbell Killin Brittan & Ray, LLC, John S. Zakhem, Andrew C. Nickel, Denver, Colorado, for Defendant-Appellant Donald J. Trump for President, Inc.

Arrington Law Firm, Barry K. Arrington, Denver, Colorado; Kennedys CMK LLP, Marc S. Casarino, Wilmington, Delaware, for Defendants-Appellants Sidney Powell and Sidney Powell, P.C.

Harris, Karstaedt, Jamison & Powers, P.C., Jamey W. Jamison, Mark A. Sares, Dino G. Moncecchi, Englewood, Colorado, for Defendants-Appellants Joseph

Oltmann, FEC United, and Shuffling Madness Media, Inc., d/b/a Conservative Daily

Law Offices of Randy B. Corporon, Randy B. Corporon, Aurora, Colorado; Burns Law Firm, Jonathon Burns, St. Louis, Missouri, for Defendants-Appellants James Hoft and TGP Communications, LLC, d/b/a The Gateway Pundit

Patterson Ripplinger, P.C., Franklin D. Patterson, Gordon A. Queenan, Greenwood Village, Colorado, for Defendant-Appellant Michelle Malkin

Gordon & Rees LLP, John R. Mann, Thomas B. Quinn, Margaret L. Boehmer, Denver, Colorado, for Defendant-Appellant Eric Metaxas

Dymond Reagor, PLLC, Michael W. Reagor, Christopher P. Seerveld, Greenwood Village, Colorado, for Defendant-Appellant Defending the Republic, Inc.

¶ 1     In the wake of the 2020 presidential election, certain members of the media and political figures began circulating claims of election irregularities.  One strand of those claims centered on the plaintiff, Eric Coomer, who was then an employee of Dominion Voting Systems, Inc. (Dominion), a company that provided election technology and support services throughout the country.  The core of the allegations was that, on a supposed "Antifa" conference call in late September 2020, a person purported to be Coomer said he had "made sure" then-President Donald J. Trump was "not going to win" the election.  Coomer denies ever being on such a call or making such a statement, and there is no evidence that he (or anyone else) took any action to undermine the election results.

¶ 2     Coomer sued several individuals and entities who shared reports of his alleged statement on the internet and in other media, asserting claims for defamation, intentional infliction of emotional distress, and civil conspiracy.  Those claims come before us in a preliminary posture under Colorado's anti-SLAPP[1] statute, section 13-20-1101, C.R.S. 2023.  Under that statute, we do not decide

---

[1] "SLAPP" stands for "strategic lawsuit against public participation." *Salazar v. Pub. Tr. Inst.*, 2022 COA 109M, ¶ 1 n.1.

whether Coomer will prevail on his claims. Nor do we determine who is telling the truth about what occurred. Instead, the sole question we must answer is whether Coomer has done enough to pursue his claims further. To do so, he must establish a reasonable likelihood — not a certainty — that he will prevail on each of those claims. The district court concluded that Coomer had met this burden with respect to all claims against all defendants.

¶ 3     We conclude that Coomer has met his burden with respect to his claims for defamation and intentional infliction of emotional distress. Considering each defendant's statements separately, we conclude that each defendant made statements that could reasonably be understood to communicate that (1) Coomer asserted on a conference call that he had made sure President Trump was not going to win the election, and (2) Coomer in fact took steps to interfere with the election. We further conclude that Coomer has presented sufficient evidence at this preliminary stage to establish a reasonable likelihood of showing that those statements were false and that defendants made them with actual malice — that is, with knowledge they were false or with reckless disregard for their truth.

¶ 4    We reach a different conclusion as to Coomer's civil conspiracy claim — at least with respect to the defendants who challenge that claim on appeal.  Because Coomer has presented no evidence of an agreement to defame him or inflict emotional distress upon him, he has not shown a reasonable likelihood of prevailing on this claim.

¶ 5    We also conclude that the district court erred by addressing Coomer's likelihood of prevailing on his request for an injunction in its order denying defendants' special motions to dismiss because an injunction is a *remedy*, not an independent cause of action that is subject to dismissal under the anti-SLAPP statute.  But because a request for injunctive relief is not the proper subject of an anti-SLAPP motion to dismiss, the district court's denial of the special motions to dismiss that relief was correct on other grounds.

¶ 6    We therefore affirm the denial of the special motions to dismiss the defamation claim, with the exception of two tweets that we conclude are protected under the Communications Decency Act (CDA), 47 U.S.C. § 230.  We also affirm the denial of the motions to dismiss the claim for intentional infliction of emotional distress and the request for injunctive relief.  We reverse the denial of the motion to dismiss the conspiracy claim as to the defendants who challenge

that ruling on appeal (as detailed below).  We remand for the district court to consider certain defendants' requests for attorney fees and costs, and for further proceedings consistent with this opinion.[2]

## I.    Background

¶ 7    Coomer is the former Director of Product Security and Strategy at Dominion.  Dominion provided voting technology and support services to at least thirty different states in connection with the 2020 presidential election.  Defendants are podcasters, talk show hosts, political commentators, bloggers, attorneys, and associated entities who generally questioned the validity of the 2020 presidential election results.  More specifically, defendants are:

- Joseph Oltmann, the co-host of the Conservative Daily podcast, along with a nonprofit corporation Oltmann founded, FEC United, and a media corporation he owns, Shuffling Madness Media, Inc., d/b/a Conservative Daily (collectively, the Oltmann Defendants);

---

[2] This action has been stayed as to defendant Rudolph Giuliani because he filed for bankruptcy while the appeal was pending.  *See* 11 U.S.C. § 362(a).  This opinion, including the disposition, is thus limited to the appeals of the other defendants.

- Michelle Malkin, the host of #MalkinLive, a program previously broadcast on YouTube, and Sovereign Nation, a television program that previously ran on Newsmax;

- James Hoft, the founder, editor-in-chief, and contributing author of The Gateway Pundit website, along with the company that operates the website, TGP Communications, LLC (collectively, the Hoft Defendants);

- Eric Metaxas, the host of The Eric Metaxas Radio Show, a radio program and podcast that is broadcast on various platforms and published on YouTube;

- Sidney Powell, an attorney who became associated with President Trump's reelection campaign in the weeks following the 2020 election, along with Powell's law firm, Sidney Powell, P.C. (collectively, the Powell Defendants), and a nonprofit corporation Powell founded, Defending the Republic, Inc. (DTR); and

- Donald J. Trump for President, Inc. (the Trump Campaign or the Campaign), an organization supporting the reelection efforts of President Trump.

### A.    Oltmann's Account

¶ 8    The statements underlying Coomer's claims all stem from an

account first shared by Oltmann on the Conservative Daily podcast

days after Joseph Biden, Jr., was declared the winner of the 2020

presidential election.  On November 9, 2020, Oltmann asserted that

"the election was rigged" and called Dominion "a fraudulent

company that is out to destroy our republic."  He then recounted an

alleged conference call he claimed to have infiltrated weeks earlier.

¶ 9    Oltmann introduced the show by stating,

> We're going to expose someone inside of
> Dominion Voting Systems specifically related
> to Antifa and related to someone that is so far
> left and is controlling elections, and his
> fingerprints are in every state.
>
> . . . .
>
> The conversation will be about a man named
> Eric Coomer.  C-O-O-M-E-R.

¶ 10    After describing Coomer's role with Dominion, Oltmann

relayed that, weeks before the election, he had been able to listen in

on an Antifa conference call.  As told by Oltmann, "a person who

called himself Eric was on the call."  As "Eric" was speaking,

> [s]omebody interrupts, "Who's Eric?"  Someone
> else enters, "Eric is the Dominion guy, right?"
> . . . and everyone's like, "Oh, oh, he's a

> Dominion guy, okay." So, "Go ahead," came
> from somebody else.
>
> So . . . somebody actually interrupts. First he
> says, "What are we going to do if effing Trump
> wins, right?" As in somebody's frustrated and
> they're . . . talking on this call. And ["Eric"]
> responds, and I'm paraphrasing this, right,
> "Don't worry about the election. Trump is not
> going to win. I made effing sure of that, ha-ha-
> ha-ha." And everyone's like, "Yeah." And then
> somebody else responds, "Effing right," right?

¶ 11    Oltmann went on to explain how he came to believe that the

"Eric" on the call was Coomer, based primarily on Coomer's social

media posts, which included anti-Trump messages and a so-called

"Antifa manifesto." He also said that he thought "Eric's" voice was a

"match" to Coomer's voice in other videos he had heard, but he

"[couldn't] be sure." In the end, Oltmann encapsulated his account:

> Let me put this all together for you guys. So,
> you have a guy that is actually going to an
> Antifa meeting that tells somebody else that,
> [supposedly] . . . he's got the election in hand.
>
> . . . .
>
> It's not admitting [Dominion is] vulnerable, it's
> actually creating the vulnerability so that it
> can actually be manipulated. And that's what
> happened here . . . . You have a guy that
> literally is a fanatic. . . . Three weeks before
> the election he's getting on the phone and he's
> saying very clearly that, I have it handled. And
> he runs product strategy and security.

7

¶ 12    Oltmann then went further and explicitly accused Coomer of

interfering with the election:

> [Coomer] has to answer for this stuff that he is
> interfering with the American vote.  He's
> interfering with the election.
>
> . . . .
>
> [T]here's somebody that says none of this is a
> smoking gun. . . .  You're wrong.  You're
> absolutely wrong. . . .  I'm going to say this
> very clearly.  There's more to be had.
>
> . . . .
>
> [I]t's not the one event that it is a smoking
> gun, it's the fact that this is the guy
> responsible for most of the elections across the
> United States.

¶ 13    Oltmann repeated these accusations against Coomer on his

podcast over the next three days, reiterating his account of the

conference call and describing Coomer as "dangerous":

> [T]he guy that knows nuclear physics, and that
> actually is coding, is probably one of the most
> dangerous people in the world.  That's why I
> know, if you look at everything, that Eric is
> involved.  I'm not guessing that he's involved, I
> know he's involved in this.  And that's why as
> he starts talking about things, as we start
> hearing about Eric Coomer in the media, he's
> hiding right now. . . .  He is literally scared for
> his life, because what we're talking about
> people, is sedition. . . .  We are talking about
> people going to prison for the rest of their lives,

and, or being sentenced to death.  When you interfere with the country's election, when you put your finger on the scale of the voting of the people, the American voice, you are subject to being put to death.

### B.    CISA Joint Statement

¶ 14    On November 12, 2020, the Cybersecurity & Infrastructure Security Agency (CISA) released a joint statement from the executive committees of the Election Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Council, which addressed the "many unfounded claims and opportunities for misinformation about the process of [United States] elections."  That joint statement concluded as follows:

> The November 3rd election was the most secure in American history.  Right now, across the country, election officials are reviewing and double checking the entire election process prior to finalizing the result.
>
> . . . *There is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised.*
>
> Other security measures like pre-election testing, state certification of voting equipment, and the U.S. Election Assistance Commission's (EAC) certification of voting equipment help to build additional confidence in the voting systems used in 2020.

### C. Publication of Oltmann's Account in Other Media

¶ 15     Notwithstanding the CISA statement, Oltmann's account of the alleged conference call — now pinpointed to the week of September 27, 2020 — began to pick up steam with other media.

¶ 16     On November 13, 2020, Oltmann appeared on Malkin's YouTube program, #MalkinLive.  Malkin introduced her program by announcing that she would be "bringing [the audience] information that is so vital to understanding the systemic stealing of our election."  She invited Oltmann to explain "what [he had] discovered about Dominion, and one figure, very key figure in particular."

¶ 17     Oltmann proceeded to describe the alleged conference call similarly to how he had described it on his own show.  He also explained how he had found Coomer by Googling "Eric, Dominion, Denver, Colorado," and how, six weeks later in the wake of the election, he had concluded that the "Eric" on the conference call was Coomer, based in large part on Coomer's social media posts.

¶ 18     After Oltmann had completed his account, Malkin responded to "underscore that . . . the market share of Dominion is why this reaches from conspiracy theory to conspiracy truth."  Oltmann agreed, declaring, "It is truth, a hundred percent truth.  I mean, I'm

betting everything on it."  Malkin closed the interview by urging her audience to follow Oltmann on social media "for all the latest on Eric Coomer" and Dominion, stating, "[T]he truth will get out there. The truth just wants to be free, just like American citizens."

¶ 19     After the show, Malkin posted several links to the interview on social media, describing it as Oltmann "speak[ing] out" about Dominion and "Antifa radical Eric Coomer."  In the posts, Malkin noted that Coomer was "VP of strategy/security" and a "major shareholder" of Dominion, and she asked, "What are they trying to hide?"  Malkin continued to share the Oltmann interview on social media in multiple tweets over the next week, each of which tagged Coomer and stated that he had been "exposed" by Oltmann.

¶ 20     The same day of the Malkin interview, Oltmann's account was picked up by Hoft and The Gateway Pundit.  That day, The Gateway Pundit published an article by Hoft with the headline, "Dominion Voting Systems Officer of Strategy and Security Eric Coomer Admitted in 2016 Vendors and Election Officials Have Access to Manipulate the Vote."  That article cited alleged election-related computer glitches and wrote that Oltmann had done a "deep dive

11

on Eric Coomer[,] who is responsible for the strategy and security of Dominion," and discovered anti-Trump social media posts.

¶ 21    The next day, Hoft wrote another Gateway Pundit article, which reported that Coomer was "participating in Antifa calls."  In that article, Hoft cited Oltmann's interview with Malkin and relayed Oltmann's account of the alleged September 2020 conference call. The article repeated Oltmann's statement that "Eric (the Dominion guy)" said, "Don't worry about the election, Trump's not gonna win. I made f*cking sure of that!"  It went on to explain that Oltmann's investigation after the call caused him to "c[o]me upon" Coomer.

¶ 22    On November 16, 2020, Hoft interviewed Oltmann about the call.  He introduced the interview by stating that Oltmann "was on an Antifa line where they were speaking with Eric Coomer."  Later in the interview, after Oltmann had given his account of the call, including the statement he attributed to Coomer, Hoft said, "You have information that's truthful that should be released . . . you're exposing absolute fraud."  Hoft published the audio of this interview on The Gateway Pundit, along with an article about the interview.

¶ 23    On November 24, 2020, Metaxas invited Oltmann to share his story on the Eric Metaxas Radio Show.  Oltmann repeated his now-

familiar account of the alleged September conference call — his infiltration of the call; the statement by "Eric, the Dominion guy" of "Don't worry about the election.  Trump's not going to win.  I've made effing sure of that"; and Oltmann's internet research that led him to believe "Eric" was Eric Coomer — before concluding with his assertion that there had been "massive" fraud in the 2020 election.

¶ 24    At one point during the interview, Metaxas asked Oltmann to confirm that the person who made the statement was in fact Coomer: "So this guy, Eric Coomer, this genius you discover was the guy who said on this Antifa call, 'Don't worry about Trump, there's no way he's going to win'?"  Oltmann said that it was. Metaxas said he was "exercised" by "the idea that anyone would dare try to mess with our elections," and that is why he was "glad to be speaking with [Oltmann] and getting this information out."

¶ 25    Metaxas asked Oltmann, "Eric Coomer, has he gone into hiding? . . .  Does he know he's going to go to prison for the rest of his life?"  Oltmann said Coomer had "disappeared" and continued: "Why if there is no fraud against the American people has Eric Coomer disappeared? . . .  So this isn't all made up.  This isn't hyperbole that we're just throwing out there.  This is absolute fact."

¶ 26    Metaxas then closed the show by calling Coomer's conduct

"extremely criminal":

> [T]here's levels of stupidity and evil and we
> know that not everybody is on the same level,
> that there are some people that they just hate
> Trump but then there are other nefarious
> actors like Mr. Coomer . . . . What we're
> talking about is evil.  In fact, let's just say this.
> It's extremely criminal and these folks know
> they're going to go to jail for the rest of their
> lives.  Doesn't matter how rich or smart they
> are, that they are in the process of being
> caught thanks to God because you were just —
> you just stumbled across this.

¶ 27    After the interview, Metaxas posted a link to the interview on

his social media page, along with the message, "Today Joe Oltmann

explained how after infiltrating Antifa he bumped into someone

working w/them named Eric [C]oomer — who was the head of

Security and Safety at #Dominion — and who PROMISED the Antifa

folks that 'effing' Trump WOULD NOT WIN!  Please [retweet]."

¶ 28    Malkin interviewed Oltmann again on November 28, 2020, this

time on her Sovereign Nation show on Newsmax, in a segment she

said was focused on "hacking the vote."  After introducing the show

by asking "who has control over our elections," Malkin asked

Oltmann to tell her audience "who exactly Eric Coomer is and why

it matters in these ongoing battles against election fraud."  Oltmann responded that Coomer "has the ability to put his finger on the scale and has, I believe, put his finger on the scale of the election across our country."  From there, the interview followed the same pattern as the other interviews, with Oltmann sharing his account.

¶ 29    Malkin then expounded, "[T]he reason why this is so alarming — and it's obvious, but it should be spelled out — is that this is one of the highest ranking officials at Dominion Voting Systems, which has penetrated our election system across the country."  Malkin acknowledged that "at this point, at least publicly, there's no evidence that Eric Coomer made good on his threat."  But she asserted that Coomer's patents and experience "certainly suggest[] that he has the ability to carry out on his threat or this braggadocio that [Oltmann] heard directly on this Antifa phone call."

¶ 30    Over the next month, and continuing after this lawsuit was filed, Oltmann continued to discuss Coomer, the alleged conference call, and Oltmann's contention that Coomer had interfered with the election on his Conservative Daily podcast and other media platforms.  The Gateway Pundit also published a few additional articles discussing Coomer and alleged election irregularities.

15

D.    The Trump Campaign and the Powell Defendants

¶ 31    Meanwhile, Oltmann's account of the alleged September call made its way to those in President Trump's orbit.  Oltmann explained in his interview with Metaxas that he had been in touch with the Trump Campaign and "in constant contact with the Trump attorneys," including Powell.  He also said that he had signed an affidavit attesting to "all of the information" he was describing.

¶ 32    On November 14, 2020, the Trump Campaign circulated an internal memorandum addressing the "internet rumor that [Coomer] has ties to Antifa."  The memo concluded that "there is no evidence that Eric Coomer is a supporter of Antifa in any way."

¶ 33    On November 17, 2020, Eric Trump, President Trump's son and someone the Campaign called a "surrogate speaker," shared on social media a Gateway Pundit article that quoted Coomer's alleged statement on the September call, along with the message, "Eric Coomer — Dominion Vice President of U.S. Engineering — 'Don't worry about the election, Trump's not gonna win.  I made f*cking sure of that!'"  A few days later, President Trump himself tweeted a link to a segment on One America News Network called

16

"Dominion-izing the Vote."  That segment included an interview with Oltmann in which Oltmann repeated his claims about Coomer.

¶ 34    On November 19, 2020, the Trump Campaign held a press conference to provide an update on its legal challenges to the election results.  Rudolph Giuliani spoke first, introducing himself and Sidney Powell as two of the "senior lawyers" representing President Trump and the Trump Campaign.[3]  After running through a litany of allegations of election fraud, Giuliani asked Powell to describe what he called "another totally outrageous situation."

¶ 35    Powell spoke about Dominion and Smartmatic, another company she said was responsible for the software used in computerized voting systems.  She then turned to Coomer:

> [O]ne of the Smartmatic patent holders, Eric Coomer I believe his name is, is on the web as being recorded in a conversation with Antifa members, saying that he had the election rigged for Mr. Biden.  Nothing to worry about here.  And he was going to — they were going to "F" Trump.  His social media is filled with hatred for the President, and for the United States of America as a whole . . . .

---

[3] As noted above, we do not consider Coomer's claims against Giuliani because this action is stayed as to Giuliani.  But Giuliani's statements are nevertheless relevant to the extent Coomer asserts that Giuliani was speaking as an agent of the Trump Campaign.

¶ 36    Later in the press conference, Giuliani returned to the topic of

Coomer:

> [B]y the way, the Coomer character, who is
> close to Antifa, took off all of his social media.
> Ah-ah, but we kept it, we've got it.  The man is
> a vicious, vicious man . . . and he specifically
> says that they're going to fix this election. . . .
>
> This is real.  It is not made up.  [T]here's
> nobody here that engages in fantasies.  I've
> tried a hundred cases.  I've prosecuted some of
> the most dangerous criminals in the world.  I
> know crimes.  I can smell them.  You don't
> have to smell this one.  I can prove it to you
> eighteen different ways. . . .

¶ 37    The day after the press conference, Powell addressed the

accusations against Coomer in two separate interviews, one on

Newsmax and one on Fox News.  In the first, Powell engaged in the

following exchange with the interviewer, Howie Carr:

> Carr: Let me ask you about this guy Eric
> Coomer.  He works for Dominion . . . .  He's
> the one who was allegedly . . . on a conference
> call or something, a Zoom with Antifa.  And he
> said, supposedly, don't worry about Trump,
> I've already made sure he's going to lose the
> election.  Is that true, for starters?
>
> Powell: Yes.
>
> Carr: It's true.  You have that?
>
> Powell: It's true.  We have an affidavit to that
> effect and I think we have a copy of the call.

18

¶ 38    In the second interview that day, Powell announced, "We've got Eric Coomer . . . admitting on tape that he rigged the election for Biden and hated Trump.  We've got their social media posts.  We've got all kinds of evidence that is mathematically irrefutable."

¶ 39    Before the November 19 press conference, the Trump Campaign had filed lawsuits in Pennsylvania and Michigan challenging the election results in those states.  In the days and weeks after the press conference, Powell filed four more lawsuits — in Michigan, Georgia, Wisconsin, and Arizona — on behalf of other individual plaintiffs.  Neither of the Trump Campaign's lawsuits referred to Coomer.  Powell's complaints, however, referred to Coomer and cited his alleged statement on the September call, as told by Oltmann.  None of the lawsuits was successful.

¶ 40    On December 14, 2020, the Electoral College voted and officially confirmed the result of the election, with now-President Biden receiving 306 electoral votes and President Trump receiving 232.  On January 7, 2021, the electoral votes were certified, and Biden was confirmed as the President-elect of the United States.

### E.    Coomer's Complaint

¶ 41     On December 22, 2020, Coomer filed this lawsuit, asserting claims against defendants for defamation, intentional infliction of emotional distress, and civil conspiracy, and seeking damages and injunctive relief.  (Coomer later amended his complaint to add DTR as a defendant.)  The claims centered on Oltmann's account of the September 2020 conference call and the other defendants' dissemination of that narrative, as detailed above.  Coomer alleged that, through their statements, defendants had made Coomer the "face" of a false "national conspiracy to fraudulently elect the President of the United States," thus causing "immense injury" to his reputation, professional standing, safety, and privacy.

¶ 42     More specifically, Coomer alleged that Oltmann and the other defendants made false defamatory statements by asserting that Coomer (1) was on the alleged conference call; (2) said on that call that he "made sure" President Trump would not win reelection; and (3) in fact took action to subvert the 2020 presidential election.  He alleged that "the dissemination of these false claims" constituted extreme and outrageous conduct that had caused him severe emotional distress by, among other things, subjecting him to an

"onslaught of harassment and credible death threats." And he alleged that defendants had conspired to engage in such conduct.

¶ 43　　In the complaint, Coomer denied (1) having any knowledge of the alleged Antifa conference call; (2) participating in such a call; (3) making the statements Oltmann claimed he made; or (4) taking any action to subvert the results of the presidential election.

F.　　Defendants' Special Motions to Dismiss

¶ 44　　All defendants filed special motions to dismiss under the anti-SLAPP statute. *See* § 13-20-1101(3)(a). The precise arguments made by each defendant differed somewhat, but all argued that Coomer could not show actual malice because defendants did not know their statements were false or entertain serious doubts as to their truth. Several defendants asserted that their statements were protected statements of opinion. And others claimed that their statements were protected by the litigation privilege or the CDA.

¶ 45　　Defendants also argued that Coomer had not shown a reasonable likelihood of success on his non-defamation claims for many of the same reasons and a few others. They argued that Coomer could not show extreme or outrageous conduct, as

21

necessary for his intentional infliction of emotional distress claim,

or a meeting of the minds, as necessary for his conspiracy claim.

¶ 46    In support, the Powell Defendants and the Trump Campaign

each submitted an affidavit signed by Oltmann on November 13,

2020, in which Oltmann gave his account of an "Antifa meeting"

that was consistent with his public statements.  He stated that "[o]n

or about the week of September 27, 2020, [he] was able to attend

an Antifa meeting" where the following conversation occurred:

> Someone identified as "Eric" began to speak.
> Someone asked who Eric was, and someone
> else replied "he is the Dominion guy"
> [paraphrased].
>
> Eric then began to speak after being told to
> continue, but was interrupted and asked by
> someone, "What are we going to do if Trump
> wins this fucking election?"
>
> Eric responded, "Don't worry about the
> election.  Trump is not going to win.  I made
> fucking sure of that.  Hahaha[.]"

¶ 47    The affidavit then described how Oltmann determined that the

"Eric on the conference call" was Coomer, based on a "simple

[G]oogle search: [k]eywords: 'Eric,' 'Dominion,' 'Denver Colorado,'"

and a review of Coomer's social media posts reflecting "Anti-Trump

rhetoric."  Oltmann also explained that he did not initially believe

the person on the call was Coomer until he learned days after the election that Coomer was a "spokesperson" for Dominion.

¶ 48     Malkin, Hoft, and Powell also submitted their own affidavits attesting that they had no reason to disbelieve Oltmann's account.

### G.     Coomer's Response and Opposing Declarations

¶ 49     Over defendants' objections, the district court allowed Coomer to conduct specified discovery, including a three-hour deposition of each defendant and limited requests for production.

¶ 50     After conducting that discovery, Coomer filed an omnibus response to all defendants' special motions to dismiss, arguing that (1) the anti-SLAPP statute did not apply; and (2) even if it did, he had established a reasonable likelihood of success on his claims.

¶ 51     Coomer attached his own declaration in support.  In that affidavit, Coomer attested that he was not on the alleged conference call in September 2020, did not make the statement defendants had attributed to him, and did not seek to interfere with the outcome of the presidential election.  More specifically, he declared:

> [The] statements made by Oltmann about me
> are false.  I did not take any action to subvert
> the 2020 Presidential election.  I did not
> participate in a scheme to change votes from
> one candidate to another and am aware of no

23

such election-rigging activity. I did not participate in an Antifa conference call or boast about my supposed ability to rig the election. . . .

. . . .

In my position with Dominion Voting Systems, I did not have the capacity to manipulate or alter in any way either the Dominion voting machines used during the 2020 Presidential election or the Dominion source code that those machines employed. Numerous layers of review, security, encryption, and other checks and balances exist between individual Dominion employees, like myself, and the products that Dominion provides to its clients. As a result of the numerous safety protocols in place, many of which are required by statute, I did not have the ability to alter the results of the 2020 Presidential election in any way.

. . . .

I have never stated that I had the ability or the desire to affect the outcome of an election. In fact, I have often made the exact opposite statement publicly, and privately during routine conversations. I have never even joked about the ability to affect the outcomes of free and fair elections.

¶ 52    Coomer also attached a declaration from Heidi Beedle,

someone Oltmann had identified in his affidavit as a potential

participant in the alleged conference call. Beedle stated in her

24

declaration that she was not aware of any "Antifa call" that occurred in mid to late September 2020.  Nor did she know Coomer.

¶ 53    And Coomer submitted a declaration from Auontai Anderson, someone who *did* participate in a Zoom conference call in late September 2020 with other "Denver activists," albeit not one he associated with Antifa.  Anderson explained that "[d]uring that call, no one mentioned 'Eric from Dominion,' and [he is] not familiar with anyone who would meet that description."  He further attested that he did not know Coomer and had never before heard his name.

H.    Order Denying Defendants' Special Motions to Dismiss

¶ 54    The district court held a two-day hearing on defendants' motions, at which the parties presented argument and summaries of the evidence in support of their respective claims and defenses.

¶ 55    After the hearing, the district court issued a written order denying defendants' special motions to dismiss in their entirety.  The court agreed with defendants that the anti-SLAPP statute applied because defendants' statements about Coomer involved matters of public concern.  But it concluded that Coomer had established a reasonable likelihood of prevailing on his claims.

## II.    Scope of Appeal

¶ 56    We begin by clarifying that this appeal is limited to the district court order denying defendants' special motions to dismiss.

¶ 57    In their original opening brief, the Oltmann Defendants (and another defendant who is no longer a party to this appeal) challenged various discovery orders in addition to the order denying the special motions to dismiss.  A motions division of this court ruled that "[t]he appeal is limited to the district court order on the special motion to dismiss" because "the other issues appellants have raised in the briefs are not final, appealable orders."  The motions division therefore struck the Oltmann Defendants' opening brief and ordered them to file an amended opening brief "limited to the district court order on the special motion to dismiss."[4]

---

[4] Coomer filed a motion requesting an award of attorney fees and costs against the Oltmann Defendants as a sanction for challenging these other interlocutory orders in their original opening brief. (Coomer also requested sanctions against the defendant who is no longer a party to this appeal.  That portion of the motion is moot.) We deny Coomer's motion.  Although we do not approve of the Oltmann Defendants' attempt to raise issues beyond the scope of this appeal, we cannot conclude that their doing so was so frivolous as to warrant sanctions under C.A.R. 38(b).  *See Glover v. Serratoga Falls LLC*, 2021 CO 77, ¶ 70 (noting that the purpose of an award of attorney fees under C.A.R. 38(b) is to deter egregious conduct).

¶ 58     The Oltmann Defendants filed an amended opening brief but continue to argue that the district court erred by (1) allowing Coomer to conduct discovery before ruling on the special motions to dismiss and (2) ordering Oltmann to disclose the identity of the person who allegedly assisted him in gaining access to the "Antifa call."  The Hoft Defendants also assert that the district court erred by granting Coomer discovery and denying them reciprocal discovery.  We agree with the motions division that these interlocutory orders are not properly before us in this appeal.

¶ 59     As a general rule, our jurisdiction is limited to "appeals from final judgments."  § 13-4-102(1), C.R.S. 2023; *see also Wilson v. Kennedy*, 2020 COA 122, ¶¶ 5-7; C.A.R. 1(a)(1).  The anti-SLAPP statute provides an exception for "an order granting or denying a special motion to dismiss."  § 13-20-1101(7); *see also* § 13-4-102.2, C.R.S. 2023.  But nothing in that statute extends that exception to other interlocutory orders.  And we cannot expand the scope of our jurisdiction beyond that specified by the legislature.  *Wilson*, ¶ 6.  We therefore lack jurisdiction in this appeal to review any order other than the order denying the special motions to dismiss.

### III.   Anti-SLAPP Legal Principles

¶ 60    The purpose of Colorado's anti-SLAPP statute is to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government," and, at the same time, to preserve the right to "file meritorious lawsuits for demonstrable injury."  § 13-20-1101(1)(b); *see also Gonzales v. Hushen*, 2023 COA 87, ¶ 19.  The statute seeks to balance these often competing interests by creating a mechanism to "weed[] out, at an early stage, nonmeritorious lawsuits brought in response to a defendant's petitioning or speech activity."  *Tender Care Veterinary Ctr., Inc. v. Lind-Barnett*, 2023 COA 114, ¶ 12.

¶ 61    That mechanism — a special motion to dismiss — allows for the early dismissal of any claim arising from an act "in furtherance of" a person's constitutional right of petition or free speech "in connection with a public issue," unless the plaintiff establishes "a reasonable likelihood" of prevailing on the claim.  § 13-20-1101(3)(a); *see also L.S.S. v. S.A.P.*, 2022 COA 123, ¶ 18.

¶ 62    The resolution of such a motion requires a two-step analysis. *Anderson v. Senthilnathan*, 2023 COA 88, ¶ 10.  First, the court must determine whether the defendant has made a threshold

showing that the anti-SLAPP statute applies — "that is, whether the claims arise from the defendant's exercise of free speech or right to petition in connection with a public issue." *Id.*; *see also* § 13-20-1101(2)(a), (3)(a). Second, if the defendant meets that threshold, the burden shifts to the plaintiff to establish a reasonable likelihood of prevailing on the claim. *See Anderson*, ¶ 10; § 13-20-1101(3)(a).

¶ 63    At the second step, the court must consider the pleadings and supporting and opposing affidavits to determine "whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." *L.S.S.*, ¶ 23 (citation omitted); *see also* § 13-20-1101(3)(b). In making this determination, the court may not weigh the evidence or resolve factual conflicts. *Rosenblum v. Budd*, 2023 COA 72, ¶ 24. Instead, it must assess whether the facts in the affidavits submitted by the plaintiff, "if true, establish a reasonable likelihood of proving each claim under the applicable burden of proof." *Id.* If the plaintiff meets this burden, the court must deny the motion to dismiss. *Id.* at ¶ 25. Otherwise, the claim must be dismissed. *Anderson*, ¶ 10.

¶ 64     We review an order granting or denying a special motion to dismiss de novo, applying the same two-step analysis as the district court. *Salazar v. Pub. Tr. Inst.*, 2022 COA 109M, ¶ 21.

¶ 65     When the district court issued its order in this case, there was not yet any published case in Colorado applying the anti-SLAPP statute, which had become law less than three years earlier. *See id.* (first published Colorado anti-SLAPP case issued in September 2022). But our case law has developed substantially since then — including since the parties filed their appellate briefs.[5] Perhaps unsurprisingly then, the parties dispute various legal principles, and several defendants raise arguments concerning the *manner* in which the district court resolved their motions. Thus, before we address the substance of Coomer's claims, we pause to highlight a few foundational legal principles governing anti-SLAPP review.

---

[5] In addition, because California has a substantially similar anti-SLAPP statute, "we look to California case law for guidance in construing and applying section 13-20-1101," C.R.S. 2023. *Tender Care Veterinary Ctr., Inc. v. Lind-Barnett*, 2023 COA 114, ¶ 16.

A.    Plaintiff's Evidence Accepted as True

¶ 66    First, in determining whether a plaintiff has met their burden at the second step of the anti-SLAPP analysis, we must accept the plaintiff's evidence as true.  *See L.S.S.*, ¶ 23; *Gonzales*, ¶¶ 21, 80.

¶ 67    Several defendants cite *Salazar* for the proposition that we do not "accept the truth of [plaintiff's] *allegations*."  *Salazar*, ¶ 21 (emphasis added).  And Coomer asserts that *Salazar* is inconsistent with *L.S.S.*  But we do not view these principles as inconsistent.

¶ 68    Unlike a C.R.C.P. 12(b)(5) motion, we do not "accept the factual allegations in the complaint as true."  *Salazar*, ¶ 15. Instead, to defeat an anti-SLAPP motion, the plaintiff generally must go further and present *evidence* establishing a reasonable likelihood of success.  *See L.S.S.*, ¶ 23 (describing this step as "a summary judgment-like procedure in which the court reviews the pleadings and the evidence").  That evidence can — and typically will — come in the form of an affidavit.  § 13-20-1101(3)(b).  But once affirmed in an affidavit, the plaintiff's assertions are no longer mere allegations; they are evidence.  And that evidence must be accepted as true. *L.S.S.*, ¶ 23; *see also Collins v. Waters*, 308 Cal. Rptr. 3d 326, 334 (Ct. App. 2023) (noting that court "must accept the plaintiff's

evidence fully," despite the defendant's argument that the plaintiff "is so disreputable that she could not believe anything he said").

¶ 69     In other words, while we do not necessarily accept the plaintiff's *allegations* as true, we do accept as true the plaintiff's *evidence*. *See Wilson v. Cable News Network, Inc.*, 444 P.3d 706, 715 (Cal. 2019) (noting that the court must accept as true the evidence favorable to the plaintiff, but "we have never insisted that the complaint's allegations be given similar credence").[6]

### B.     No Factfinding

¶ 70     Relatedly, in resolving a special motion to dismiss, "the district court does not make factual findings." *Salazar*, ¶ 19.  Nor does it "weigh the evidence or resolve factual conflicts." *Rosenblum*, ¶ 24.

¶ 71     Thus, although the district court labeled a portion of its order "findings of fact," we reject Coomer's suggestion that we should review those so-called factual findings for clear error. *See Salazar*, ¶ 19.  To the extent certain defendants argue that the district court

---

[6] In *Rosenblum v. Budd*, 2023 COA 72, ¶ 24, the division stated that a court must assume the truth of the plaintiff's "factual assertions." We read this to mean the factual assertions in the plaintiff's affidavit, not the allegations in the complaint — particularly given the division's citation to *Salazar* for this point. *See Salazar*, ¶ 21 (noting that we do not "simply accept the truth of the allegations").

*did* make improper factual findings, any such error is harmless because our review is de novo. *Id.* at ¶ 21; *see also* C.A.R. 35(c). In conducting that review, we will disregard any such factual findings.

¶ 72    Some defendants contend that our obligation to consider "opposing affidavits" means that we *should* weigh the evidence. *See* § 13-20-1101(3)(b). But as set forth above, when there is a factual conflict, we accept the plaintiff's evidence as true. *L.S.S.*, ¶ 24. We assess the defendant's evidence "only to determine if it defeats the plaintiff's claim as a matter of law." *Id.* at ¶ 23 (citation omitted).

### C.    No Credibility Determinations

¶ 73    Just as a court may not make factual findings in resolving an anti-SLAPP motion, it may not make credibility determinations. *L.S.S.*, ¶ 48. Indeed, the principles noted above — that we accept the plaintiff's evidence as true and do not weigh the evidence — leave the court with no credibility determinations to make. *See id.*

¶ 74    Several defendants assert that the district court made improper credibility findings. And to the extent it made findings as to the credibility of the evidence submitted in connection with the parties' anti-SLAPP briefing, we agree. We will disregard any such credibility findings and refrain from making any of our own. *See*

C.A.R. 35(c); *cf. L.S.S.*, ¶ 46 (concluding that district court's application of an erroneous burden of proof did not lead to an erroneous result where correct burden was applied on appeal).

¶ 75    But evidence bearing on the reliability of a defendant's source of information, known to the defendant *at the time of the statement*, may be relevant to actual malice — that is, whether the defendant knew the statement was false or entertained serious doubts as to its truth.  *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 157-58 (1967) (holding that evidence was sufficient to support a finding of actual malice where there were reasons to question the source's reliability); *Creekside Endodontics, LLC v. Sullivan*, 2022 COA 145, ¶¶ 37-38, 44 (holding that the plaintiff could not show actual malice where the defendant's statements were based on the professional opinions of three dentists).  Thus, to the extent the district court made determinations as to the reliability of Oltmann's account *at the time of defendants' statements*, based upon the evidence presented by the parties, those were not credibility findings.  They were a part of the substantive legal analysis as to whether Coomer had established a reasonable likelihood of prevailing on his claims.

### D.    Prima Facie Showing

¶ 76    A plaintiff does not need to prove their case at the anti-SLAPP

stage.  Nor do we (or the district court) decide whether the plaintiff

will ultimately prevail — much less *has* prevailed — on their claims.

*See Salazar*, ¶ 46.  Rather, a plaintiff's burden is to make "a prima

facie showing" of evidence that — if later presented at trial — is

reasonably likely to sustain a favorable judgment.  *L.S.S.*, ¶ 42.

And our role is limited to determining whether the plaintiff has met

this threshold burden.  *Id.* at ¶ 23.  If the plaintiff overcomes this

initial hurdle, the case proceeds as normal and this "early screening

determination" has no further effect on the case.  *Salazar*, ¶ 46.

¶ 77    Although we stated this point above, we reiterate it here

because several defendants argue that Coomer failed to present

clear and convincing evidence to support his claims.  That is not the

standard.  Instead, at this preliminary stage, a plaintiff must show

only a reasonable likelihood that they *will* be able to meet their

burden of proof at trial.  *Rosenblum*, ¶ 24.  Where, as here, a

plaintiff is "pursuing a defamation claim that will ultimately require

proof of actual malice by clear and convincing evidence, . . . the

plaintiff must establish a *probability* that they *will* be able to

35

produce clear and convincing evidence of actual malice at trial."
*L.S.S.*, ¶ 42 (emphasis added).  If the plaintiff meets this burden,
the ultimate determination must be made by a jury.  *Id.* at ¶ 44.

### E.    Evidence That May Be Considered

¶ 78    In resolving an anti-SLAPP special motion to dismiss, the
court "shall consider the pleadings and supporting and opposing
affidavits."  § 13-20-1101(3)(b).  The evidence in those affidavits
may be considered if "it is reasonably possible the proffered
evidence . . . will be admissible at trial."  *Sweetwater Union High
Sch. Dist. v. Gilbane Bldg. Co.*, 434 P.3d 1152, 1163 (Cal. 2019); *cf.
USA Leasing, Inc. v. Montelongo*, 25 P.3d 1277, 1278 (Colo. App.
2001) (noting that a supporting affidavit "must contain evidentiary
material that would be admissible as part of the affiant's testimony
if the affiant was in court and testifying on the witness stand").

¶ 79    No party argues that the court may *only* consider affidavits,
and we decline to impose such a limitation in this case.  *See, e.g.*,
*Creekside Endodontics*, ¶ 41 (considering patient notes and email
communication); *L.S.S.*, ¶ 47 (identifying various categories of
evidence presented).  *But see Salazar*, ¶ 40 ("A challenge under the
anti-SLAPP statute . . . only allows the court to consider the

36

pleadings and supporting and opposing affidavits . . . .").  Indeed, both Coomer *and* several defendants presented evidence beyond affidavits.  At a minimum, when a court allows specified discovery, *see* § 13-20-1101(6), such an order necessarily implies that the parties may present evidence obtained through that discovery.

¶ 80    But several defendants assert, with varying degrees of development, that the district court improperly relied on inadmissible evidence.  The most developed of these assertions — advanced by the Oltmann Defendants — concerns three expert declarations, which the Oltmann Defendants contend contained legal conclusions, went beyond the declarants' areas of expertise, and relied on undisclosed facts.  We need not decide the admissibility of these declarations because we do not rely on them.

¶ 81    The Oltmann Defendants also challenge the admissibility of the lay declarations submitted by Coomer, on the ground that they had no notice of or opportunity to cross-examine the declarants.  But nothing in the anti-SLAPP statute requires such notice or cross-examination as part of the anti-SLAPP proceedings.  *See* § 13-20-1101(6) (providing that discovery is generally stayed pending a

ruling on the motion).  Rather, if the motion is denied, cross-examination can occur later — in a deposition or at trial.

¶ 82    The Oltmann Defendants' challenge to more than thirty exhibits identified only by exhibit number is undeveloped, as is the Hoft Defendants' challenge to the district court's purported reliance on extensive, but unspecified, "inadmissible evidence."[7]  We thus do not consider these arguments.  *See Woodbridge Condo. Ass'n v. Lo Viento Blanco, LLC*, 2020 COA 34, ¶ 41 n.12 ("We don't consider undeveloped and unsupported arguments."), *aff'd*, 2021 CO 56.

## IV.    Reasonable Likelihood of Prevailing

¶ 83    Coomer does not dispute the district court's conclusion that defendants' statements satisfy the first step of the anti-SLAPP analysis — more specifically, that they were made "in connection with a public issue" and in furtherance of defendants' constitutional right of petition or free speech.  § 13-20-1101(3)(a).  We therefore do not address that first step and move directly to the second —

---

[7] The Hoft Defendants assert that they "adopt and incorporate" arguments in the brief of another appellant (who is no longer a party to this appeal) on this issue and others.  Because "a party may not both file a separate brief and incorporate by reference the brief of another party," C.A.R. 28(h), we will only consider arguments developed by the Hoft Defendants in their own briefs.

whether Coomer established a reasonable likelihood of prevailing on

his claims.  *See Gonzales*, ¶ 22; *Creekside Endodontics*, ¶ 29.

## A.    Defamation

¶ 84    The thrust of Coomer's defamation claim is that each

defendant made statements perpetuating the false claim that

Coomer (1) said on the September 2020 conference call that he

intended to subvert the presidential election and (2) did in fact

subvert the presidential election.[8]  Defendants' arguments overlap

and diverge in various respects, but in general, they assert that

Coomer did not show a reasonable likelihood of proving, by clear

and convincing evidence, that (1) their statements were defamatory;

(2) their statements were false; or (3) they acted with actual malice.

### 1.    Legal Principles

¶ 85    Defamation is "a communication that holds an individual up

to contempt or ridicule thereby causing [that individual] injury or

damage."  *Keohane v. Stewart*, 882 P.2d 1293, 1297 (Colo. 1994).

To prevail on a claim of defamation, a plaintiff generally must prove

---

[8] Coomer also repeatedly cites defendants' alleged statements that
he "participated in an Antifa call."  But as we understand Coomer's
claims, those claims are not based on his mere participation in the
call but rather what defendants claimed he said on that call.

four elements: (1) a defamatory statement concerning the plaintiff;

(2) publication; (3) fault amounting to at least negligence; and

(4) either actionability of the statement irrespective of special

damages or the existence of special damages.  *Rosenblum*, ¶ 38.

¶ 86    But when, as here, the statement involves a matter of public

concern, three heightened standards apply.  *L.S.S.*, ¶ 36.  First, the

plaintiff must prove the falsity of the statement by clear and

convincing evidence, rather than by a mere preponderance.  *Id.*

Second, the plaintiff must prove by clear and convincing evidence

that the speaker acted with actual malice.  *Id.*  Third, the plaintiff

must prove actual damages, even if the statement is defamatory per

se.  *Id.*  Because Coomer does not challenge the district court's

conclusion that the statements in this case involve a matter of

public concern, he must satisfy these heightened burdens.[9]  *See id.*

at ¶ 38 (assuming statements involved matters of public concern

---

[9] The Hoft Defendants assert that the district court erred by
concluding that Coomer was not a public figure.  But the same
heightened standards apply to cases involving public figures and
matters of public concern.  *See Diversified Mgmt., Inc. v. Denver
Post, Inc.*, 653 P.2d 1103, 1106 (Colo. 1982).  Because there is no
dispute that the statements in this case involve matters of public
concern, we need not decide whether Coomer is a public figure.

where plaintiff did not dispute that they did); *Lawson v. Stow*, 2014

COA 26, ¶ 18 (explaining that a matter is generally of public

concern when it "embraces an issue about which information is

needed or is appropriate" or when "the public may reasonably be

expected to have a legitimate interest" in it) (citation omitted).

¶ 87    Clear and convincing evidence is "evidence that is highly

probable and free from serious or substantial doubt." *Destination

Maternity v. Burren*, 2020 CO 41, ¶ 10 (citation omitted).  But again,

that is the burden a plaintiff must ultimately meet at trial.  At this

early stage, Coomer need only show "a reasonable probability that

he *will* be able" to prove falsity and actual malice by clear and

convincing evidence at trial.  *Rosenblum*, ¶ 40 (emphasis added).[10]

## 2.    Defamatory Statements

¶ 88    There is no dispute about *what* defendants said in this case.

Those statements were all either recorded or written, and the record

contains transcripts of most of the recorded statements and copies

---

[10] The anti-SLAPP statute uses the phrase "reasonable likelihood,"
§ 13-20-1101(3)(a), while our case law sometimes uses the phrase
"reasonable probability," *e.g.*, *Rosenblum*, ¶ 40.  Except when
quoting prior cases, we will adhere to the language of the statute.
But the two phrases are synonymous in this context.  *Salazar*, ¶ 23.

of the written ones.  But defendants dispute the district court's

characterization of those statements and their defamatory nature.

### a.    Statements in Question

¶ 89    The district court concluded that Coomer had sufficiently

shown that each defendant stated, in substance, that (1) Coomer

participated in an Antifa conference call;[11] (2) Coomer said on the

call that he intended to subvert the presidential election; and

(3) Coomer did subvert the results of the election.  Defendants

argue that the court erred by lumping all defendants together and

making generalizations about the "substance" of their statements

rather than analyzing what each defendant actually said.

¶ 90    We agree with defendants that it is important to consider each

defendant's statements independently and avoid generalizing them

for the sake of expediency.  But we are not limited to viewing

discrete sentences or words in isolation.  Instead, we must consider

each defendant's statements in context to determine how a

reasonable person would have understood them.  *See Anderson*,

---

[11] As noted above, *supra* n.8, we do not consider the statements
that Coomer participated in an Antifa conference call as an
independent basis of Coomer's claims, separate from defendants'
statements about what Coomer supposedly said on that call.

¶¶ 39, 47; *Rosenblum*, ¶ 43.  Statements may, alone or in combination, "reasonably be interpreted to communicate an idea" that they do not spell out expressly.  *Rosenblum*, ¶ 43; *see also Keohane*, 882 P.2d at 1302-03 (explaining that a factual assertion may be implied); *Billauer v. Escobar-Eck*, 305 Cal. Rptr. 3d 273, 286 (Ct. App. 2023) ("[I]t is not the literal truth or falsity of each word or detail used in a statement which determines whether or not it is defamatory," but "whether the 'gist or sting' of the statement is true or false, benign or defamatory, in substance.") (citation omitted).

¶ 91    We therefore begin by separately considering each defendant's statements.  Although the wording of those statements varies, we conclude that each defendant made statements that could reasonably be interpreted as asserting that Coomer said on a conference call that he had made sure President Trump was not going to win the election.  *See Rosenblum*, ¶¶ 43-44.  We further conclude that each defendant made statements, either express or implied, that Coomer took steps to undermine the election results.[12]

---

[12] By identifying specific statements made by each defendant, we do not intend to suggest that Coomer's claim is limited to those statements.  We simply conclude that those statements are sufficient to establish a reasonable likelihood that Coomer will

i.    Oltmann Defendants

¶ 92    The Oltmann Defendants do not dispute that Oltmann made

the statements Coomer claims he did or that his statements can be

attributed to the other Oltmann Defendants.  As just a small

sampling, Oltmann said on his November 9, 2020, Conservative

Daily podcast that (1) he was "going to expose someone," later

identified as Coomer, who "is controlling elections"; (2) a person

identified as "Eric, the Dominion guy" said on the conference call,

"Don't worry about the election.  Trump is not going to win.  I made

effing sure of that"; (3) Oltmann determined the "Eric" on the call

was Coomer; and (4) Coomer was "interfering with the election."

¶ 93    Over the next month (and beyond), Oltmann repeated these

and similar statements, underscoring them with expressions of

certainty that Coomer — not just someone named "Eric" — had

---

prevail on his claims.  Absent a specific challenge, we need not
separately parse each statement by each defendant.  *See Park v.
Nazari*, 311 Cal. Rptr. 3d 557, 564 n.5 (Ct. App. 2023) (holding that
when an anti-SLAPP motion seeks to strike the entire complaint,
"the court can properly deny the motion . . . so long as the court
concludes the complaint presents at least one claim that does not
arise from anti-SLAPP protected activity").  We express no opinion
as to any additional statements we do not address below.

made the alleged statement on the conference call and had in fact interfered with the election.  These statements included:

- "I'm not guessing that [Coomer is] involved, I know he's involved in this. . . .  When you interfere with the country's election, when you put your finger on the scale of the voting of the people, the American voice, you are subject to being put to death."

- "It is truth, a hundred percent truth."

- "[T]his isn't all made up.  This isn't hyperbole that we're just throwing out there.  This is absolute fact."

- "[Coomer] has the ability to put his finger on the scale and has, I believe, put his finger on the scale of the election across our country."

- "[Coomer] could put his finger firmly on the American voice and tip the scale of the election very easily.  And frankly . . . he was doing it."

ii.  Malkin

¶ 94    On her November 13, 2020, broadcast of #MalkinLive, Malkin asked Oltmann to give his account of the September conference call, which she characterized as "information that is so vital to

45

understanding the systemic stealing of our election."  After Oltmann

had finished that account, she said that "the market share of

Dominion is why this reaches from conspiracy theory to conspiracy

truth."  She also said that Coomer was "cheerleading calls for Antifa

types" and that Oltmann "got to hear the unhinged rantings of this

lunatic in charge of security at Dominion Voting Systems."  Then,

after the show, Malkin posted several links to the interview along

with messages indicating, among other things, that Coomer had

been "exposed" by Oltmann.  These statements "could reasonably

be interpreted to communicate" that Coomer had made the

statement Oltmann had just described.  *Rosenblum*, ¶ 43.

¶ 95    Malkin contends that she did not say Coomer in fact subverted

the election, pointing to her disclaimer in her second interview that

"there's no evidence that Eric Coomer made good on his threat" — a

disclaimer she qualified with the two-part caveat, "at this point, at

least publicly."  But in that same interview, Malkin tied Coomer to a

segment focused on "hacking the vote," said that Coomer "matters

in these ongoing battles against election fraud," and immediately

followed the disclaimer with the assertion that Coomer "ha[d] the

ability to carry out on this threat . . . that [Oltmann] heard directly."

46

¶ 96      Given this context, Malkin's disclaimer is not dispositive.  *See*
Restatement (Second) of Torts § 563 cmt. c (Am. L. Inst. 1977) ("A
conditional or alternative statement may be defamatory if,
notwithstanding its conditional or alternative form it is reasonably
understood in a defamatory sense."); *Damon v. Moore*, 520 F.3d 98,
107 n.5 (1st Cir. 2008) ("While disclaimers are not a bad practice,
the non-defamatory character of a statement will rarely depend
solely on the presence or absence of one.").  Notwithstanding that
disclaimer, a jury could reasonably interpret Malkin's statements,
in combination, to imply that Coomer had taken steps to undermine
the election results.  *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1,
21 (1990) (holding that a reasonable fact finder could conclude that
nine passages in a newspaper column "impl[ied] an assertion that
[the plaintiff] perjured himself").  Moreover, the disclaimer expressly
reasserted that Coomer had *threatened* to influence the election.

### iii.   Hoft Defendants

¶ 97    The Hoft Defendants published articles that included the
following statements, among others: (1) "Anti-Trump Dominion
Voting Systems Security Chief Was Participating in Antifa Calls";
(2) Oltmann "infiltrated Antifa" and heard "Eric (the Dominion guy)"

say "Don't worry about the election, Trump's not gonna win.  I made f*cking sure of that"; (3) Oltman investigated "Eric from Dominion" and "came upon Eric Coomer"; and (4) Coomer and Dominion had allegedly threatened lawsuits against media "who dare to speak out against their alleged massive national (and possibly international) scheme to allegedly rig our alleged elections."  They also published several articles discussing Coomer in the context of claims about vulnerabilities in Dominion software and alleged "vote switching."

¶ 98    The Hoft Defendants also published the audio of Hoft's interview with Oltmann, in which Hoft said explicitly that Coomer was on the call Oltmann described, that Oltmann's information was "truthful," and that Oltmann was "exposing absolute fraud."

¶ 99    Contrary to the Hoft Defendants' argument that Coomer did not plead the allegedly defamatory statements with sufficient specificity, the operative complaint quotes several of these statements directly and identifies others by citation to the articles in which they appear.  Although a defamation claim "requires a certain degree of specificity," *Corporon v. Safeway Stores, Inc.*, 708 P.2d 1385, 1390 (Colo. App. 1985), the plaintiff is not required to quote each defamatory statement verbatim in its entirety.

¶ 100    The Hoft Defendants assert that they never said Coomer

"rigged the election" but only that someone identified as Coomer

said, "Trump is not gonna win.  I made f-ing sure of that."  Notably,

the Hoft Defendants do not dispute that they asserted that Coomer

*said* he made sure President Trump was not going to win, even

though they were repeating Oltmann's account.  *See Anderson*,

¶¶ 38-47 (suggesting that a report of allegations may be an

assertion of the allegations themselves where context indicates the

speaker endorses their truth); *Dixon v. Newsweek, Inc.,* 562 F.2d

626, 631 (10th Cir. 1977) ("[T]he republication of false defamatory

statements is as much a tort as the original publication.").

¶ 101    As to whether the Hoft Defendants said Coomer subverted the

election, we agree they did not do so explicitly.  And their repeated

use of the word "alleged" when referring to Coomer's "scheme" to

"rig" our elections arguably cuts against such an assertion.  *See*

*Anderson*, ¶ 44.  On the other hand, in context, the repeated use of

the word "alleged" — including in reference to "our alleged elections"

— could be seen as tongue in cheek.  Moreover, that statement

followed several other Gateway Pundit articles discussing Coomer

in the context of alleged election fraud, as well as Hoft's statement that

49

Oltmann was "exposing absolute fraud."  Given this context, we cannot foreclose a reasonable likelihood that a jury could interpret these statements as assertions that Coomer had in fact engaged in a "scheme" to "rig" the election.  *See Milkovich*, 497 U.S. at 21.

### iv.    Metaxas

¶ 102    Like Malkin, Metaxas gave Oltmann a platform to share his account of the September 2020 call.  Metaxas then confirmed that account: "So this guy, Eric Coomer, this genius you discover was the guy who said on this Antifa call, 'Don't worry about Trump, there's no way he's going to win'?"  Although framed as a question, this statement — viewed in the context of the entire interview — could reasonably be interpreted as an assertion that Coomer had made the claimed statement, particularly when Metaxas knew Oltmann would confirm it.  *See Keohane*, 882 P.2d at 1302 ("A question . . . though not phrased in the form of a declaration of fact, may imply the existence of a false and defamatory fact.").

¶ 103    Metaxas then went further, suggesting that Coomer had in fact improperly influenced the election results:

- "Eric Coomer is the director of strategy and security for Dominion Voting Systems. . . .  [T]hat guy is all in for

50

Antifa, wants to do anything he can with his tremendously powerful position to make sure Donald Trump is not elected.  He effectively succeeds . . . ."

- "[T]he idea that anyone would dare try to mess with our elections . . . I cannot think of anything more despicable . . . so that's why I'm so glad to be speaking with you and getting this information out."

- "Does [Coomer] know he's going to go to prison for the rest of his life?"

- "[T]here are other nefarious actors like Mr. Coomer . . . . What we're talking about is evil. . . .  It's extremely criminal and these folks know they're going to go to jail for the rest of their lives."

¶ 104    Metaxas later posted a link to the interview with a message stating, this time explicitly, that "Eric [C]oomer . . . PROMISED the Antifa folks that 'effing' Trump WOULD NOT WIN!"

51

### v.    Powell Defendants

¶ 105    Powell[13] said explicitly at the November 19 press conference that "Eric Coomer . . . is on the web as being recorded in a conversation with Antifa members, saying that he had the election rigged for Mr. Biden.  Nothing to worry about here.  And he was going to — they were going to 'F' Trump."  In an interview the next day, she repeated that accusation: "We've got Eric Coomer . . . admitting on tape that he rigged the election for Biden . . . ."  And in another interview, she confirmed the interviewer's question that Coomer "was allegedly . . . on a conference call . . . with Antifa" and "said, supposedly, don't worry about Trump, I've already made sure he's going to lose the election," responding, "It's true.  We have an affidavit to that effect and I think we have a copy of the call."

¶ 106    The Powell Defendants contend that Powell was merely stating that there were reports that Coomer had made the statements, not that he had actually made them.  But this characterization is belied by Powell's statements themselves, as well as their context.  Powell

---

[13] Sidney Powell, P.C. does not make any arguments distinct from Powell, nor does it dispute that the relevant statements by Powell may be imputed to it.  We therefore assume that they can.

did not simply say others had said it; she said she had a recording of Coomer's statements.  And when the interviewer used the words "allegedly" and "supposedly," Powell did not.  She said the allegations were "true" and then reinforced that assertion by citing the affidavit and again suggesting there was a recording.  Notably, Oltmann acknowledged from the outset that there is no recording of the call, and the record contains no evidence of any such recording.

¶ 107    We also think that Powell's statements — made in the context of her claims that the election had been "rigged" — could reasonably be understood as assertions that Coomer interfered with the election results.  She did not just say Coomer made the comment attributed to him; she said he "admitt[ed] on tape that he rigged the election."  She then immediately followed that statement by claiming to have "all kinds of evidence that is mathematically irrefutable" — thus indicating not only that Coomer had "admitted" to "rigging" the election, but that she could prove he had done so.

### vi.    Trump Campaign

¶ 108    The Trump Campaign does not dispute that Giuliani's statements at the November 19, 2020, press conference may be imputed to it.  Giuliani introduced himself at that press conference

as part of the legal team representing President Trump and the
Trump Campaign.  *See* Restatement (Second) of Agency § 254 (Am.
L. Inst. 1958) ("A principal is subject to liability for a defamatory
statement by . . . [an] agent if the agent was authorized, or . . .
apparently authorized to make it."); *Am. Soc'y of Mech. Eng'rs, Inc.
v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982) ("[I]f an agent is guilty
of defamation, the principal is liable so long as the agent was
apparently authorized to make the defamatory statement.").

¶ 109   Giuliani explained that the purpose of the press conference
was to present evidence of alleged election irregularities.  One of
those pieces of "evidence" was Oltmann's account of Coomer's
statements.  After Powell relayed that account, Giuliani reiterated
that Coomer "specifically says that they're going to fix the election."
He followed that statement by asserting that there had been a
"crime" and that he could "prove" President Trump won the election.
These statements — indisputably attributable to the Campaign —
can reasonably be understood to assert that Coomer (1) said he was
"going to fix the election" and (2) actually took steps to do so.

¶ 110   The Trump Campaign contends that Powell's statements
cannot be imputed to it because Powell was not acting as its agent

when she made the statements.  We conclude that there is a

reasonable likelihood a jury could find otherwise.  Five days before

the press conference, President Trump posted on social media:

> I look forward to Mayor Giuliani spearheading
> the legal effort to defend OUR RIGHT to FREE
> and FAIR ELECTIONS!  Rudy Giuliani, Joseph
> diGenova, Victoria Toensing, *Sidney Powell*,
> and Jenna Ellis, a truly great team . . . .

(Emphasis added.)  Then, at the beginning of the press conference,

Giuliani introduced Powell as one of the "senior lawyers"

representing President Trump *and* the Trump Campaign.

¶ 111    The Trump Campaign argues that Giuliani's and President

Trump's statements cannot establish agency because they were not

"principals" of the Campaign.  In support, it cites century-old case

law for the proposition that a putative agent's *own* declarations are

not admissible to prove agency in the absence of other evidence.

*See Modoc Gold Mining Co. v. Skiles*, 13 Colo. App. 293, 294, 57 P.

190, 190 (1899); *Am. Nat'l Bank of Sapulpa v. Bartlett*, 40 F.2d 21,

23 (10th Cir. 1930).  *But see Zambruk v. Perlmutter 3rd Generation

Builders, Inc.*, 32 Colo. App. 276, 279, 510 P.2d 472, 474 (1973)

("Although it is true that an agency relationship cannot be

established *solely* from the assertion of authority by an alleged

55

agent, . . . [a]gency may be established by the conduct of the principal *and* the alleged agent.") (emphasis added).

¶ 112    This confuses the issue.  The principal is the Trump Campaign.  *See* Restatement (Second) of Agency § 1 ("The one for whom action is to be taken is the principal.").  As agents of the Trump Campaign, Giuliani and President Trump could speak and act on its behalf.  *See Dworkin, Chambers & Williams, P.C. v. Provo*, 81 P.3d 1053, 1058 (Colo. 2003) ("By definition, an agent is one with authority to 'act on behalf of . . . and bind' a principal.") (citation omitted).  So Giuliani's and President Trump's statements that Powell was an attorney for the Campaign *were* statements of the principal.  *See Dall. Creek Water Co. v. Huey*, 933 P.2d 27, 41 (Colo. 1997) ("[A] corporation can only act through its agents, and their acts within the scope of their authority are the acts of the corporation.") (citation omitted).  Coomer does not rely solely, if at all, on the putative agent's (Powell's) own declarations of agency.

¶ 113    Indeed, it is the Trump Campaign that relies on Powell's own declarations, citing her deposition testimony that she did not appear at the press conference on behalf of the Trump Campaign, and that, although she and Giuliani were "essentially aligned," she

56

was "pursuing [her] own path."  The Campaign also cites its own deposition testimony, and that of Giuliani, denying that Powell had been an attorney for the Campaign.  These post hoc denials may create a factual dispute.  But that is a dispute we cannot resolve at this stage.  *See Rosenblum*, ¶ 24.  In light of the statements above, Coomer has made a "prima facie showing" that, at the time of the November 19 press conference and her interviews the next day, Powell was acting as an agent of the Trump Campaign.  *L.S.S.*, ¶ 42.

¶ 114      Finally, the Trump Campaign asserts that, even if Powell was its agent at some point, that agency terminated on November 22, 2020, when Giuliani and another lawyer for the Campaign, Jenna Ellis, publicly stated that Powell "is not a member of the Trump legal team."  *See* Restatement (Second) of Agency § 118 ("Authority terminates if the principal . . . manifests to the other dissent to its continuance.").  We need not decide this issue because Coomer does not seek to impute to the Trump Campaign any statements made by Powell on or after November 22, 2020.

### vii.    DTR

¶ 115      DTR makes a different argument than the other defendants. Its sole argument is that it cannot be liable for Powell's statements

— the only alleged basis for liability — because it was formed after those statements were made. While Powell's statements were made on November 19 and 20, 2020, DTR presented evidence that it was not incorporated until December 1, 2020. Thus, DTR contends that it cannot be deemed to have made the statements attributed to it.

¶ 116    This argument has substantial force on the merits. *See Coopers & Lybrand v. Fox*, 758 P.2d 683, 685 (Colo. App. 1988) ("One cannot act as the agent of a nonexistent principal."); *Miser Gold Mining & Milling Co. v. Moody*, 37 Colo. 310, 315, 86 P. 335, 337 (1906) (holding that corporation could not be bound by acts occurring when it was "not yet in existence"). But there are two problems with us considering the argument in this appeal.

¶ 117    First, we question whether DTR's argument may even be raised in an anti-SLAPP motion. Consistent with the anti-SLAPP statute's purpose of encouraging and safeguarding constitutional rights, the statute applies only when the defendant makes a prima facie showing that the cause of action arises from an "act of *that person* in furtherance of the person's right of petition or free speech." § 13-20-1101(3)(a) (emphasis added); *see also Salazar*,

¶ 21.  It is not clear, then, that a defendant may invoke the special procedures of that statute when it denies engaging in any such act.

¶ 118    Second, even if DTR could have made this argument in its anti-SLAPP motion, it did not.  To the contrary, that motion effectively assumed DTR's vicarious liability for Powell's statements and asserted that those statements were not actionable.  It was not until DTR's reply that it first asserted that the statements were made before it existed or that it presented evidence to that effect.  We ordinarily will not consider issues raised for the first time in a reply brief before the district court.  *See Grohn v. Sisters of Charity Health Servs. Colo.*, 960 P.2d 722, 727 (Colo. App. 1998).

¶ 119    DTR contends that it was not required to raise the issue in its motion because it was Coomer's burden to show a reasonable likelihood of prevailing on his claim, which he could do only if he first showed DTR existed when the statements were made.  But a plaintiff's burden does not require the plaintiff to anticipate and respond to arguments a defendant does not make — particularly where, as here, the special motion to dismiss appears to concede the issue.  *See Salazar*, ¶ 34 (holding that the defendant did not preserve an argument that the plaintiff had to show actual malice).

¶ 120    We decline to exercise our discretion to consider this
unpreserved argument.  *See Farmer v. Colo. Parks & Wildlife
Comm'n*, 2016 COA 120, ¶ 19.  Coomer did not have an opportunity
to brief the merits of the argument in the district court and,
contrary to DTR's contention that it involves a pure issue of law,
Coomer's response on appeal presents arguable factual disputes as
to whether DTR ratified or otherwise adopted Powell's earlier
statements after it was incorporated.  *See Knox v. First Sec. Bank of
Utah*, 196 F.2d 112, 116 (10th Cir. 1952).  Under these
circumstances, we do not think it would be appropriate to address
this argument for the first time on appeal.  *See Salazar*, ¶ 35.

¶ 121    Because DTR does not challenge the district court's denial of
its anti-SLAPP motion to dismiss on any other grounds, the order is
affirmed as to DTR.  This does not, however, preclude DTR from
asserting this argument in an appropriate motion on remand.

b.    Defamatory Nature

¶ 122    We have concluded that each defendant made statements that
could reasonably be understood to communicate that (1) Coomer
said on a September 2020 conference call that he made sure
President Trump would not win the election, and (2) Coomer took

steps to undermine the election results.  We next conclude that there is a reasonable likelihood a jury could find these statements were defamatory, in that they "tend[ed] to so harm [Coomer's] reputation . . . as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Arrington v. Palmer*, 971 P.2d 669, 671 (Colo. App. 1998).  A statement is defamatory if it "prejudice[s] the plaintiff in the eyes of a substantial and respectable minority of the community."  *Id.*

¶ 123    No defendant disputes that a statement that Coomer in fact interfered with the election would be defamatory.  To the extent such a statement imputes a criminal offense, as several defendants' statements did expressly, it is defamatory per se.  *Id.*; *see also Keohane*, 882 P.2d at 1304 ("[A]ccusations of criminal activity, 'even in the form of opinion, are not constitutionally protected.'") (citation omitted).  Even if it did not, such an accusation could undoubtedly harm Coomer's reputation, prejudice him in the eyes of the community, and hold him up to contempt or ridicule, as evidenced by the death threats and harassment Coomer says he experienced.  *See Keohane*, 882 P.2d at 1297; *Arrington*, 971 P.2d at 671.

¶ 124    Several defendants contend that a statement that Coomer said he "made sure" President Trump was not going to win the election is not defamatory because it could mean something innocuous like donating to the Biden campaign or encouraging people not to vote for President Trump.  But this argument ignores the context of the statements.  Defendants were not discussing this story in the context of political activism; they were discussing it in the context of claims of election fraud.  In that context, a statement that Coomer had "made sure" President Trump was not going to win could mean only that he had taken steps to subvert the election results.

¶ 125    Some defendants — for example, the Powell Defendants and the Oltmann Defendants — connected these dots explicitly by paraphrasing Coomer's alleged quote accordingly.  Others left the meaning of Coomer's reported statement implicit.  Either way, there is a reasonable likelihood that a jury could conclude that, even if Coomer did not follow through on his supposed guarantee, the claim that he had *made* such a statement was itself defamatory.

¶ 126    Several defendants also dispute the defamatory nature of statements that Coomer participated in an Antifa conference call, particularly when Coomer himself had posted a self-styled "public

statement from 'Antifa'" on his social media page.  We agree that it is a closer call whether merely stating that Coomer had participated in an Antifa call would alone be defamatory under these circumstances.  But we need not decide that point because the central focus of defendants' statements was not simply that Coomer had been on an Antifa call, but what he had said on that call.

¶ 127    The same is true of the Powell Defendants' argument that their statement that the call was recorded was not defamatory.  In a vacuum, the existence (or not) of a recording might not be defamatory, and we do not understand Coomer to argue otherwise.  But Powell used the claimed recording to fortify her claim that Coomer made the statement.  A jury could reasonably conclude that Powell's reference to a recording, while perhaps not defamatory on its own, increased the defamatory impact of her other statements.

c.    Opinion

¶ 128    The Hoft Defendants and Metaxas each contend that their statements were protected opinion and hyperbole.  They assert that, as a political opinion blog and talk radio host, respectively, no one would understand their statements as anything other than

intentionally provocative commentary.  With respect to statements expressing the factual assertions we identify above, we disagree.

¶ 129    A statement may be actionable as defamation if it is "sufficiently factual to be susceptible of being proved true or false." *Anderson*, ¶ 34 (citation omitted).  Statements of pure opinion that do not "contain a provably false factual connotation" or that "cannot 'reasonably [be] interpreted as stating actual facts' about an individual" are constitutionally protected and nonactionable. *Keohane*, 882 P.2d at 1299 (citation omitted); *see Lawson*, ¶ 30.

¶ 130    But there is no "wholesale defamation exemption for anything that might be labeled 'opinion.'"  *Milkovich*, 497 U.S. at 18.  To the contrary, expressions of opinion "often imply an assertion of objective fact."  *Id.*  And "[s]imply couching [a factual assertion] in terms of opinion" — for example, by prefacing the statement with a qualification like "I think" or "I believe" — does not itself insulate the speaker from liability.  *Id.* at 19; *see also Anderson*, ¶ 35.

¶ 131    To distinguish between an actionable assertion of fact and a nonactionable statement of pure opinion, we apply a two-part test. *Keohane*, 882 P.2d at 1299.  First, we ask whether the statement is "sufficiently factual to be susceptible of being proved true or false."

64

*Id.* (citation omitted).  This step is satisfied if "the statement contains *or implies* a verifiable fact."  *NBC Subsidiary (KCNC-TV), Inc. v. Living Will Ctr.*, 879 P.2d 6, 10 (Colo. 1994) (emphasis added).  Second, we ask "whether reasonable people would conclude that the assertion is one of fact."  *Keohane*, 882 P.2d at 1299.  In answering this second question, we may consider how the statement is phrased, the context, and the surrounding circumstances, including the medium through which the statement is disseminated and the audience to whom it is directed.  *Id.*

¶ 132   The assertions we identify above — that Coomer said he made sure that President Trump was not going to win the election, and that he took steps to undermine the election results — are "sufficiently factual to be susceptible of being proved true or false." *Id.* (citation omitted).  Either Coomer made the statement on the conference call or he did not.  Either he took steps to undermine the election results or he did not.  Those are factual assertions.

¶ 133   Moreover, we conclude that a reasonable person would understand these portions of the Hoft Defendants' and Metaxas's statements as assertions of fact.  We recognize that the statements were made on platforms commonly used to express opinions.  And

65

some of what these defendants said in their articles and radio show undoubtedly *would* qualify as protected opinion or hyperbole — for example, that Coomer was "unhinged," a "lunatic," or "evil."

¶ 134    But assertions of fact can be made on an opinion platform. And as to the statements in question, defendants did not hedge. They did not even couch the statements with qualifying language like "I think," "I believe," or "in my opinion."  Rather, they reported Oltmann's account in declarative terms and then connected it to claimed election irregularities — Metaxas directly, saying Coomer had "effectively succeed[ed]," and the Hoft Defendants only slightly less so.  *See Milkovich*, 497 U.S. at 18 (noting that factual assertion may be implied).  Further, those statements came in the context of broader claims of election improprieties nationwide, including by the Trump Campaign itself, making it more likely that defendants' audiences would take the statements as fact.  *See Keohane*, 882 P.2d at 1303-04 (holding that other claims of official misconduct indicated that a reasonable person would understand an accusation of similar misconduct as a statement of fact); *cf. Rosenblum*, ¶ 44 (rejecting argument that no reasonable internet user could have believed statements because internet is "inherently unreliable").

¶ 135    We also reject defendants' suggestion that their statements are

protected because they identified the bases for those statements,

including Oltmann's interview, internet videos of Coomer, and

Coomer's social media posts.  Such disclosure of the underlying

facts is not an automatic safe harbor.  *Milkovich*, 497 U.S. at 18-19.

The statement may still imply a false assertion of fact if those facts

are incorrect or incomplete, or if the speaker's assessment of them

is provably false.  *Id.*  That is the essence of Coomer's claim.

¶ 136    That is how this case differs from *Herring Networks, Inc. v.*

*Maddow*, 8 F.4th 1148 (9th Cir. 2021), and *McDougal v. Fox News*

*Network, LLC*, 489 F. Supp. 3d 174, 182 (S.D.N.Y. 2020).  In both

*Herring Networks* and *McDougal*, the plaintiffs did not dispute any

of the underlying verifiable facts but only the defendants' subjective

characterization of those facts.  *See Herring Networks*, 8 F.4th at

1159 (distinguishing between the defendant's "commentary and the

actual news she is reporting"); *McDougal*, 489 F. Supp. 3d at 178,

182 (noting that the plaintiff alleged in the complaint that she

received the payment but disputed "the accusation of 'extortion,'

coupled with the description of [her] alleged actions").  In contrast,

Coomer's claims concern the truth of the reported facts.

### 3.    Falsity

¶ 137    We next conclude that, accepting Coomer's evidence as true, he has shown a reasonable likelihood of proving by clear and convincing evidence that defendants' statements were false.

¶ 138    In his declaration, Coomer attested that (1) he never participated in any Antifa conference call or any other call related to protest activity; (2) he never stated he had the ability or desire to affect the outcome of an election; (3) he did not boast about his supposed ability to rig the 2020 presidential election; (4) he did not take any action to subvert the election; and (5) he did not have the ability to alter the results of the election in any way.  Coomer also generally accounted for his daily schedule on September 25, 2020, and each day during the week of September 27, 2020 — no part of which included anything like the call Oltmann described.

¶ 139    This declaration, if true, could provide clear and convincing evidence that defendants' statements about what Coomer had said and done were false.  *See Anderson*, ¶ 68 (relying on the plaintiff's affidavit attesting that he had never sexually assaulted anyone or "engaged in conduct that could reasonably be interpreted as sexual assault" to conclude that a reasonable juror could find by clear and

convincing evidence that the sexual assault allegation was false).

Despite defendants' exhortations, we cannot at this stage reject (or

discount) Coomer's declaration as incredible.  *See id.* at ¶ 70.

¶ 140    Coomer presented other evidence as well.  For example,

several defendants suggest that a September 25, 2020, conference

call described in Anderson's declaration might have been the

conference call in question.  But if that is the case, Anderson's

declaration corroborates Coomer's denial.  Anderson attested that,

on that call, "no one mentioned 'Eric from Dominion.'"  He also

stated that, although he was "generally familiar with all of the call

participants," he did not know, had never met, and had never heard

of Eric Coomer.  Another person Oltmann suggested might have

been on the call, Heidi Beedle, attested that she was not aware of

an Antifa call in late September 2020 and had never met Coomer.

¶ 141    Coomer also points to apparent inconsistencies or weaknesses

in Oltmann's account of the call, including that (1) the screenshot

of Oltmann's alleged Google search is dated September 26, 2020,

while Oltmann's affidavit states that the call occurred on or about

the week of September 27, 2020; (2) Oltmann originally said it was

a phone call but later said it was a Zoom call; and (3) there was no

recording of the call despite a later claim by some defendants that there was. Though not alone sufficient, these factors would provide further grounds for a jury to find that Oltmann's account was false.

¶ 142    Defendants cite a litany of evidence that they contend could support a contrary finding. They do not point to any direct evidence that *Coomer* made the statement. Nor does any defendant even assert on appeal, much less cite evidence, that Coomer in fact took steps to undermine the election results. But defendants point to the following evidence that could support a jury finding that the call occurred as Oltmann described and that Coomer was the speaker:

- Oltmann attested to his account of the call in a sworn affidavit and in his deposition testimony.

- Oltmann presented contemporaneous notes of the call.

- Oltmann presented a screenshot of a Google search for "eric dominion denver Colorado," dated the day after the conference call described in Anderson's declaration.

- Oltmann allegedly described the call to two other people before discussing it on his podcast.

- Coomer made social media posts that were "anti-Trump" and supportive of Antifa.

- There was a Zoom call among Denver activists around the time of the alleged call Oltmann described.

¶ 143    Several defendants argue that a reasonable jury could find from this evidence that Coomer cannot prove by clear and convincing evidence that Oltmann's account of the call was false. And that may be true. But it answers the wrong question. The question is not whether a reasonable jury could find in defendants' favor. The question is whether, accepting Coomer's evidence as true, there is a reasonable likelihood that a jury could find in *Coomer's* favor. If there is a reasonable likelihood of *either* finding — a verdict in favor of defendants *or* a verdict in favor of Coomer — Coomer has necessarily overcome the anti-SLAPP threshold.

¶ 144    To be clear, we do not make any determination as to which evidence — Coomer's or defendants' — is more credible. When, as here, there is competing evidence, we may not weigh the evidence at all. *Rosenblum*, ¶ 24. We conclude only that Coomer has presented evidence establishing a reasonable likelihood that he will be able to prove the falsity of defendants' statements at trial. The question of which version of events to believe is one for the jury. *L.S.S.*, ¶ 44.

¶ 145    Some defendants highlight certain statements that they

contend are substantially true, including that Dominion had

"penetrated our election system" (Malkin), that *a* call occurred

involving the parties and topics Oltmann claimed (the Hoft

Defendants), that there were *reports* of Coomer having made the

statement (the Powell Defendants), and that Coomer was "anti-

Trump" (the Powell Defendants).  *See SG Ints. I, Ltd. v.*

*Kolbenschlag*, 2019 COA 115, ¶ 21 ("Substantial truth is a complete

defense to defamation.").  To the extent these arguments are

premised on the existence of a call in which Coomer participated,

we reject them for the reasons above: Coomer presented an affidavit

denying that he participated in any such call.  To the extent they

assert the substantial truth of statements other than those that

Coomer made the comment attributed to him and took steps to

undermine the 2020 presidential election, they are beside the point.

Coomer's claims are not based on defendants' statements that he

disapproved of President Trump, or even on defendants' assertions

about Dominion more generally.  They are based on defendants'

statements about what Coomer said and did with regard to the

election.  And as discussed above, each defendant went further than simply reporting that *others* had made those statements.

### 4.    Actual Malice

¶ 146    As noted above, because defendants' statements involve a matter of public concern, Coomer must "establish a reasonable probability that he will be able to produce clear and convincing evidence of actual malice at trial." *Rosenblum*, ¶ 40.  Defendants each contend that Coomer has not met this burden.  We disagree.

### a.    Legal Standard

¶ 147    Actual malice means that the speaker made the statement "with actual knowledge that it was false or with reckless disregard for whether it was true." *L.S.S.*, ¶ 40.  A speaker acts with reckless disregard if the speaker "entertain[s] serious doubts as to the truth of the statement or act[s] with a high degree of awareness of its probable falsity." *Creekside Endodontics*, ¶ 38 (citation omitted).

¶ 148    This is a subjective standard.  *See St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *see also In re Green*, 11 P.3d 1078, 1086 n.7 (Colo. 2000).  The question is not "whether a reasonably prudent [person] would have published, or would have investigated before publishing." *St. Amant*, 390 U.S. at 731.  Instead, the evidence

must "permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [the] publication," *id.*, or was highly aware of its probable falsity, *Creekside Endodontics*, ¶ 38.

¶ 149    But that does not mean that a defendant can defeat a defamation claim simply by "testifying that he published with a belief that the statements were true." *St. Amant*, 390 U.S. at 732. Nor does it mean that what a reasonable person would have known or believed is irrelevant. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) ("[I]t cannot be said that evidence concerning . . . care never bears any relation to the actual malice inquiry."). Actual malice can, and often must, be proved by circumstantial evidence. *Id.*; *see also Creekside Endodontics*, ¶ 37 ("[I]t is rare for there to be evidence that the speaker *knew* their statement was false yet published it anyway."). And one way of showing a defendant in fact entertained serious doubts as to the truth of a statement is to show that any reasonable person would have entertained such doubts. *See Harte-Hanks Commc'ns*, 491 U.S. at 667-68 (holding that departure from accepted standards of reporting supported finding of reckless disregard); *Reader's Digest Ass'n v. Superior Ct.*, 690 P.2d 610, 618 (Cal. 1984) ("[E]vidence of

negligence . . . may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or . . . knowledge of falsity.") (citation omitted).

¶ 150    Thus, while inadequate investigation by a layperson is generally not alone sufficient to show actual malice, grossly inadequate investigation might be. *Creekside Endodontics*, ¶ 38. Similarly, while the failure to corroborate information received from an otherwise reliable source does not establish actual malice, *id.*, "a reporter's failure to pursue the most obvious available sources of possible corroboration or refutation" may do so, *Kuhn v. Tribune-Republican Publ'g Co.*, 637 P.2d 315, 319 (Colo. 1981). Other circumstantial evidence of actual malice may include (1) the speaker's hostility toward the plaintiff; (2) inconsistencies in the source's account; (3) reasons to doubt the veracity or reliability of the source; (4) the inherent improbability of the claim; and (5) other credible information contradicting the information. *See St. Amant*, 390 U.S. at 732; *L.S.S.*, ¶ 40; *Gonzales,* ¶ 81; *Anderson*, ¶¶ 64-67.

¶ 151    Contrary to defendants' assertions, such considerations do not convert the actual malice standard into an objective one. The question remains the defendant's subjective state of mind — in

other words, what the defendant actually knew or believed.[14]  But

rarely will a plaintiff have direct evidence of a defendant's mental

state.  *See, e.g.*, *Nixon v. City & Cnty. of Denver*, 2014 COA 172,

¶ 29.  And in the absence of such evidence, a plaintiff can prove

that element by presenting evidence that would permit the *inference*

that the defendant acted with actual malice based on all the

circumstances.  *See Kuhn*, 637 P.2d at 318; *L.S.S.*, ¶ 46.

### b.   Oltmann Defendants

¶ 152   Accepting Coomer's evidence as true allows for one of two

conclusions: either (1) Oltmann fabricated his account of the

September 2020 conference call; or (2) there *was* a conference call

---

[14] The Oltmann Defendants assert that the district court erred by referring to a negligence standard in one paragraph of its order. But the court did not apply a negligence standard.  Rather, it first concluded that Coomer had shown *at least* negligence (i.e., the third element of an ordinary defamation claim), *see Rosenblum*, ¶ 38, before applying the heightened standard of actual malice in the very next paragraph.  Thus, while the court's conclusion as to negligence was unnecessary, the court ultimately applied the correct standard. *Cf. Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667-68 (1989) ("[W]hen the [lower court's] opinion is read as a whole, it is clear that the conclusion concerning the newspaper's departure from accepted standards . . . [is] merely supportive of the court's ultimate conclusion" that the record demonstrated actual malice.).

and *someone* on that call said they "made sure" President Trump was "not going to win," but that person was not Coomer.

¶ 153    The first alternative, by definition, would show actual malice on the part of the Oltmann Defendants because it would mean Oltmann knew his account was false.  *See St. Amant*, 390 U.S. at 732 ("Professions of good faith will be unlikely to prove persuasive . . . where a story is fabricated by the defendant [or] is the product of his imagination . . . .").  We cannot say whether or not that is the case because it turns on credibility assessments we cannot make.  But based on the parties' conflicting evidence and Coomer's denial, a jury could reasonably so find.  *See L.S.S.*, ¶ 52 (noting that when faced with "competing narratives," courts "have routinely held that a plaintiff's allegations that the defendant made false accusations are sufficient to create a factual issue as to actual malice").

¶ 154    Even if a jury were to accept the second alternative, however, Oltmann's account itself creates a reasonable likelihood that a jury could find by clear and convincing evidence that he entertained serious doubts as to whether the speaker was Coomer.  As told by Oltmann, his sole bases for concluding that the speaker was Coomer were that (1) an anonymous person said — and in the

77

original telling, *asked if* — "Eric is the Dominion guy"; (2) Coomer's

first name is Eric and he worked at Dominion Voting Systems;

(3) Coomer had responsibilities related to voting technology; and

(4) Coomer was highly critical of President Trump on social media.[15]

No one on the call identified the speaker as Coomer.  Nor did the

speaker identify himself as someone associated with Dominion.

¶ 155    From that information, Oltmann jumped first to the explosive

claim that Coomer — not an anonymous "Eric," but Coomer — had

made the statement, and then to the even more explosive claim that

Coomer had interfered with the election.  All without attempting to

contact the "most obvious source of corroboration or refutation":

Coomer himself.  *Rosenblum*, ¶ 46.  Given the gravity of the

allegations and the size of the inferential leap they required, there is

a reasonable likelihood that a jury could find that Oltmann acted

with reckless disregard for the truth in making those accusations.

*See Creekside Endodontics*, ¶ 38 (noting that grossly inadequate

---

[15] Oltmann testified in his deposition that the voice of the speaker
on the call was the same as Coomer's voice on videos that Oltmann
found on the internet.  But in Oltmann's initial account on his
podcast, he said that he "can't be sure" if the voice was a "match" to
those videos.  And Oltmann did not mention the voice similarities in
his interviews with the other defendants or in his affidavit.

investigation may show actual malice); *Samsel v. Desoto Cnty. Sch. Dist.*, 242 F. Supp. 3d 496, 533-34 (N.D. Miss. 2017) ("[G]iven the magnitude of the step [the defendant] was taking in [making the statement], it was incumbent on him to exercise great care . . . .").

¶ 156    Indeed, Oltmann himself acknowledged that, at least initially, he *did* doubt the speaker was Coomer.  The only new pieces of information he says persuaded him otherwise were the claims of election irregularities, Coomer's involvement in election technology, and Coomer's social media posts.  Whether this information in fact sufficed to satisfy Oltmann of a connection he had previously rejected — or whether the claims of election irregularities by others emboldened him to trumpet a theory he still questioned — is a factual question we cannot answer.  *See Rosenblum*, ¶ 24.  But there is a reasonable likelihood that a jury could find that Oltmann continued to harbor the doubts he admittedly did at first.

¶ 157    The Oltmann Defendants dispute the district court's conclusion that Oltmann relied on an anonymous source, asserting that *he* was the source of his own report.  This argument conflates what Oltmann says he heard on the call with who said it.  Oltmann may have had firsthand knowledge that *someone* said, "Trump is

not going to win.  I made effing sure of that," and that someone else *said* that person was "Eric, the Dominion guy."  But the source of the claim that the speaker *was* "Eric from Dominion" — the sole basis for attributing that statement to Coomer — was the anonymous person on the call.  *See St. Amant*, 390 U.S. at 732 (noting that a finding of good faith is unlikely where a story is "based wholly on an unverified anonymous telephone call").

¶ 158    Moreover, as to Oltmann's statements that Coomer interfered with the election, those claims were substantially undermined by the November 12, 2020, CISA statement, which concluded that "[t]here is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised."  Although this report did not specifically refer to Coomer, its conclusion that the 2020 presidential election "was the most secure in American history" and that "there is no evidence" to the contrary was fundamentally inconsistent with Oltmann's claim that Coomer "put his finger on the scale" of the election.  And although Oltmann's initial statements came before the CISA statement was issued, he continued making his accusations for several weeks thereafter.

¶ 159    It is possible that a jury could find that Oltmann was undeterred by the CISA statement because he genuinely disbelieved it, or perhaps because he was unaware of it.  But it is also reasonably likely that a jury could find that, as to Oltmann's post-November 12 statements, the CISA statement made Oltmann aware of the probable falsity of his claims, yet he persisted in making those claims nonetheless.  *Cf. Gonzales*, ¶ 87 (concluding that a judicial finding that there was no independent corroboration for defendants' claims could support a finding of actual malice).

### c.    Other Defendants

¶ 160    The other defendants' arguments as to actual malice overlap substantially, as does the evidence.  Thus, while we consider the evidence of actual malice as to each defendant individually, we discuss these defendants collectively, addressing specific arguments made by particular defendants as appropriate.  With respect to each defendant, we conclude that Coomer has met his burden of establishing a reasonable likelihood that he will be able to prove actual malice by clear and convincing evidence.  *See L.S.S.*, ¶ 41.

i.    Reliability of Source and Account

¶ 161    In ruling that Coomer had established a reasonable likelihood of proving actual malice, the district court relied in part on its conclusion that Oltmann was not a credible or reliable source. Several defendants take issue with this conclusion, characterizing it as an improper credibility finding, and an unsupported one at that.

¶ 162    As we discuss above, a court may properly consider evidence relevant to a source's credibility at the time the allegedly defamatory statements are made.  *See Curtis Publ'g Co.*, 388 U.S. at 157-58. Such evidence may bear on whether the defendant acted with reckless disregard in publishing the statements.  *Id.*  But for the reasons above, we need not reach any conclusions concerning Oltmann's reliability as a general matter.  Even if defendants genuinely believed Oltmann's account of the call, that account itself could reasonably support a finding that defendants entertained serious doubts about the two points in question: (1) that Coomer was the one on the call who made the comment, and (2) that Coomer then took steps to undermine the election results.

¶ 163    First, Oltmann admittedly had no direct personal knowledge that Coomer made the statement, or even that an "Eric from

Dominion" made the statement. Instead, that claim was indisputably based entirely on an anonymous person identifying another anonymous person as "Eric, the Dominion guy." That is the sole factual basis for the claim: Oltmann's report about what he heard an anonymous person say. In other words, Oltmann was the source for what was said, but the source of the underlying information was unknown. *See St. Amant*, 390 U.S. at 732.

¶ 164    Then, assuming the person who made the statement *was* "Eric, the Dominion guy," defendants needed to make another leap to conclude that person was Coomer. That leap was based entirely on (1) the fact that Coomer was a person named "Eric" who worked at Dominion Voting Systems, and (2) Coomer's social media posts in opposition to President Trump. This might be enough to raise suspicion that it was Coomer who made the statement, and perhaps even enough for a jury to find defendants sincerely believed it was him. But given the limited substantiation, there is a reasonable likelihood that a jury could find that defendants were touting the theory as fact — whether for entertainment purposes or to bolster their claims of election irregularities more generally — without being convinced beyond serious doubt of its truth.

¶ 165    Second, neither Oltmann nor any other defendant claimed to have firsthand knowledge that Coomer actually interfered with the election.  That assertion appears to have been based solely on defendants' skepticism about the election results and Coomer's role in election technology.  As noted above, it was contradicted by the official statement of CISA, the government agency responsible for election security, which rejected any claim that the election had been compromised *by anyone*.  Other than Coomer's role with Dominion, defendants offered no information as to *how* they believed Coomer had personally manipulated the election results.  Nor do they even attempt to defend such a belief on appeal.  There is a reasonable likelihood that a jury could find that defendants recklessly disregarded the truth by asserting such an explosive and improbable claim without any evidence to support it.

¶ 166    Thus, defendants' efforts to distinguish *Curtis Publishing* based on the reliability of their source (Oltmann) and his account are beside the point.  In *Curtis Publishing*, the defendant's source had indisputably overheard a conversation involving the plaintiff, and the only issue was what the plaintiff had said on that call.  388 U.S. at 137.  Because the source necessarily had personal

knowledge of what he did or did not hear, the entire story turned on the source's reliability. If he was telling the truth, the story was true; if he was not, it was not. *Id.* at 157-58. In contrast, even if the alleged conference call happened exactly as Oltmann described, that account could not itself establish the truth of the inferences defendants drew from it — namely, that the speaker on the call was Coomer and that Coomer took steps to subvert the election results.

ii.    Adequacy of Investigation by Media Defendants

¶ 167    The media defendants — Malkin, the Hoft Defendants, and Metaxas — argue that the district court held them to too high of a standard in concluding that they did not adequately investigate Oltmann's claims. They assert that they are not journalists but opinion commentators and, thus, should not be held to the same standard as reporters. They further contend that no investigation was necessary because Oltmann was offering a firsthand account.

¶ 168    Whether or not these defendants should be held to the same standards as news reporters, we conclude that a jury could reasonably find that their investigation was grossly inadequate. *See Creekside Endodontics*, ¶ 38. Notwithstanding the gravity of Oltmann's accusations, none of the defendants even attempted to

contact Coomer — the "most obvious source of corroboration or refutation" — before publishing those accusations. *Rosenblum,* ¶ 46. Indeed, it does not appear they attempted to contact *anyone* other than Oltmann. Nor do they identify anything else they did to attempt to verify Oltmann's claims. While it may be true that a talk radio host or podcaster need not investigate every topic discussed on the show, the wholesale failure to look into an account reported as fact — particularly one as explosive as the one in this case — could bear on whether the host actually believes the account (or is simply using it to spur discussion without regard to its truth).

¶ 169    Metaxas asserts that the nature of his show prevents him from "do[ing] anything other than cursorily vet[ting] the guest before the show." And he correctly points out that talk show hosts cannot be expected to know everything their guests will say on their show. But Metaxas *did* know what Oltmann was going to say, at least in material part, as indicated by Metaxas's introduction to the show, which made clear that Oltmann was there to discuss his allegations about Coomer. Then, after the show, Metaxas posted a link to the interview on social media, obviously knowing at that point (and highlighting in the post) the substance of Oltmann's claim.

¶ 170    None of this is to suggest that media members may only make statements "whose validity [is] beyond question." *N.Y. Times Co. v. Connor*, 365 F.2d 567, 576 (5th Cir. 1966).  And reliance on a single source does not, by itself, prove actual malice.  *Id.*  But as noted above, the single source in this case had no personal knowledge of material portions of the claim that was being reported.  Under these circumstances, a jury could reasonably find that the media defendants acted with actual malice in publishing those claims.

iii.    Affidavit and Vetting of Oltmann's Claims by Powell Defendants and Trump Campaign

¶ 171    The Powell Defendants and the Trump Campaign also challenge the district court's conclusion that their investigation was inadequate.  Beyond the arguments made by the other defendants, they highlight that they had an affidavit from Oltmann attesting to his account.  That affidavit, they contend, gave them a sufficient basis for repeating Oltmann's claims without further investigation.

¶ 172    We agree that the affidavit is one factor that could weigh against a finding of actual malice — at least as to Oltmann's account about what was said on the call.  But again, that account leaves all the same gaps we describe above.  The affidavit does

nothing to bridge the gap between the anonymous caller's reference to "Eric from Dominion" and Coomer.  Nor does it provide any basis for Powell's assertion that Coomer "rigged" the election.

¶ 173    The Powell Defendants contend that the district court "flipped the burden of proof" by requiring them to produce evidence to support Powell's assertions.  We do not read the district court order as having done so.  Instead, the court concluded that Coomer had met *his burden* of presenting prima facie evidence of falsity because he "unequivocally declared" Powell's statements were false.  The court noted that Coomer's declaration was *also* uncontroverted because the Powell Defendants had "not put forward any evidence" to support their allegations.  But that statement, which was consistent with the court's consideration of supporting *and* opposing affidavits, did not supplant Coomer's prima facie burden.

### iv.    Subjective Knowledge

¶ 174    Several defendants argue that, regardless of whether a reasonable person in their position would have entertained serious doubts about the statements they made, they sincerely believed them.  The Hoft Defendants, in particular, assert that they still do.  Among other things, defendants point to the nature of Coomer's

social media posts, his patents in voting technology, and defendants' personal assessments of Oltmann as a credible source.

¶ 175    All of this is evidence defendants may present at trial.  And if a jury ultimately believes them, they may prevail.  *See St. Amant*, 390 U.S. at 731; *L.S.S.*, ¶ 40.  But a defendant cannot defeat a defamation claim at this early stage simply by saying they believed their statements were true.  *See L.S.S.*, ¶ 49 (holding that plaintiff made a prima facie showing of actual malice despite defendant's argument that she had no reason to doubt the statements).  If a plaintiff presents evidence that is reasonably likely to support the contrary finding, the question is one for the jury.  *Id.* at ¶ 44.

### v.    Other Credible Sources

¶ 176    Defendants also take issue with the district court's conclusion that their statements were contradicted by other credible sources, including the CISA statement and a December 1, 2020, statement by then-United States Attorney General William Barr to the Associated Press that "to date, we have not seen fraud on a scale that could have effected a different outcome in the election."

¶ 177    As to Attorney General Barr's statement, defendants argue that the district court erred by relying on that statement because it

came after most of defendants' statements.  We agree.  What Attorney General Barr said on December 1, 2020, could have no bearing on what defendants knew or believed before that date. Thus, we do not consider Attorney General Barr's statement with respect to any statements made before December 1, 2020.

¶ 178    As to the CISA statement, defendants argue that it cannot support a finding of actual malice because (1) it sheds no light on Oltmann's account about what Coomer *said* on the conference call, and (2) it does not conclusively foreclose any claims of election fraud.  Defendants are correct that the CISA statement does not directly contradict Oltmann's account of what occurred on the conference call.  But as discussed above, it does contradict defendants' claims that Coomer subverted the election.  And although we recognize that certain defendants question the veracity of the CISA statement, it is one piece of evidence that could support a finding of actual malice.  *See Anderson*, ¶¶ 65-67.  The actual impact of that statement on defendants' subjective state of mind is a factual question that we cannot resolve.  *See Rosenblum*, ¶ 24.

¶ 179    Relatedly, we acknowledge the Trump Campaign's argument that the focus of the inquiry must be on defendants' state of mind

at the time the statements were made and not what has happened

since.  We also acknowledge that, in November 2020, claims of

election irregularities were ubiquitous among certain media outlets

and political circles.  But what defendants (or others) thought at the

time about the election results more generally is not the question in

this case.  The question is whether defendants acted with reckless

disregard in asserting that *Coomer* took steps to undermine the

election.  And at this stage, the even more limited question is

whether there is a reasonable likelihood that a jury could so find.

vi.    Other Factors Cited by the District Court

¶ 180    Defendants dispute several other factors the district court

cited in support of its conclusion that Coomer had met his prima

facie burden of proving actual malice.  Most significantly, several

defendants assert that the record does not support the district

court's conclusion that they had political and financial incentives to

defame Coomer or that they did so to advance a "preconceived

storyline."  Others challenge the district court's reliance on the

Trump Campaign memorandum finding no connection between

Coomer and Antifa and the inherent improbability of defendants'

claims.  Because we do not rely on these factors (or any other we do

not address above) in concluding that Coomer has met his prima

facie burden, we need not decide whether the record supports them.

### 5.    Damages

¶ 181    The Hoft Defendants contend that the district court erred by

concluding that Coomer had made a sufficient showing of actual

damages to sustain his claim.  *See L.S.S.*, ¶ 36.  We disagree.

¶ 182    Actual damages may be established by "proving harm to

reputation, personal humiliation, mental anguish, or physical

suffering."  *Keohane*, 882 P.2d at 1304.  A plaintiff's own testimony

regarding the emotional distress the statements caused them is

alone sufficient to support a finding of actual damages.  *Id.* at 1305;

*Anderson*, ¶ 88.  Thus, a plaintiff's affidavit attesting to mental

anguish and reputational harm resulting from the statements is

sufficient to defeat an anti-SLAPP motion.  *Anderson*, ¶ 88.

¶ 183    In his declaration, Coomer attested that he had suffered

"severe emotional distress, pecuniary loss, and other damages" as a

result of the defamatory statements.  He explained that those

damages included (1) anxiety and depression, for which he has

sought medical treatment; (2) the tarnishing of his reputation;

(3) the end of his employment and the "effective" end of his career in

election services; and (4) his receipt of "almost daily threats." Although the Hoft Defendants characterize these statements as conclusory and unsupported, they are sufficient to satisfy Coomer's burden at this stage of the case. *See Anderson*, ¶ 88.

¶ 184    Citing the incremental harm doctrine, the Hoft Defendants further assert that Coomer failed to show that his injuries were caused by the defamatory statements and not by his own acts, including his social media posts and public statements. *See Tonnessen v. Denver Publ'g Co.*, 5 P.3d 959, 965 (Colo. App. 2000) ("[W]hen unchallenged or nonactionable parts of a particular publication are damaging, another statement, though maliciously false, may not be actionable because it causes no harm beyond the harm caused by the remainder of the publication."). Resolution of this question requires weighing the evidence, which we cannot do. *Rosenblum*, ¶ 24. At this stage, we conclude only that a jury could reasonably find that accusing Coomer of having said he "made sure" President Trump was not going to win, and then implying he had participated in a scheme to "rig" the election, caused Coomer emotional, reputational, and career harm beyond that which would have resulted from his social media posts being made public.

### 6.    Litigation Privilege

¶ 185    The Trump Campaign next asserts that the statements made by Giuliani and Powell at the November 19 press conference were protected by the litigation privilege.  We disagree.

¶ 186    The litigation privilege is an absolute privilege that permits an attorney to "publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which [the attorney] participates as counsel, if it has some relation to the proceeding."  *Killmer, Lane & Newman, LLP v. BKP, Inc.*, 2023 CO 47, ¶ 21 (quoting Restatement (Second) of Torts § 586).  As an absolute privilege, it provides "absolute immunity" to the speaker, even if the statements are false, defamatory, and made with actual malice.[16]  *Gonzales*, ¶ 24.

¶ 187    Two, and sometimes three, conditions must be satisfied for the privilege to apply: (1) the statement must have some relation to the subject matter of the litigation; (2) the statement must be made in

---

[16] We agree with the Trump Campaign that the district court was incorrect in suggesting that the litigation privilege "can be lost by a finding of actual malice."  But because we conclude the litigation privilege does not apply, that error is harmless.  *See* C.A.R. 35(c).

furtherance of the objective of the litigation; and (3) in the case of
prelitigation statements, the proceedings must actually be
contemplated in good faith. *Killmer, Lane & Newman*, ¶ 24.

¶ 188    The applicability of the litigation privilege is a question of law
that we review de novo. *Id.* at ¶ 18. In doing so, we resolve all
doubts about whether a statement is privileged "in favor of [the
statement's] relevancy or pertinency." *Id.* at ¶ 25 (citation omitted).

¶ 189    The Trump Campaign's assertion of the litigation privilege is
premised on (1) a Michigan lawsuit the Campaign filed eight days
before the November 19 press conference and (2) Giuliani's
reference to anticipated litigation in other states. The Michigan
complaint did not reference Coomer and mentioned Dominion in
only three paragraphs. Those paragraphs alleged that Dominion's
voting machines caused a "massive miscount" in one Michigan
county and were not sufficiently tested in another. Giuliani was not
shown as an attorney of record on the complaint, and neither he
nor the Campaign filed any subsequent lawsuits. But beginning six
days after the press conference, and three days after the Campaign
publicly stated that Powell was "not a member of the Trump legal
team," Powell filed four additional lawsuits challenging the election

results on behalf of individual plaintiffs.  The complaints in those

lawsuits did refer to Coomer and his alleged conference call remark.

¶ 190    Resolving all doubts in favor of relevancy, we conclude that the

statements about Coomer at the November 19 press conference had

"some relation to the subject matter" of the Michigan lawsuit —

even though those statements went well beyond the allegations of

the complaint.  *Id.* at ¶ 40; *see also id.* at ¶ 47 (expressing no

opinion as to "whether defamatory press statements that go beyond

the allegations of the complaint are actionable").  We further

assume that Giuliani and Powell contemplated additional related

litigation in good faith — even though neither Giuliani nor the

Trump Campaign ever filed any, and Powell did so only after the

Campaign declared her not to be a member of its legal team.

¶ 191    But we cannot conclude that the statements were made in

furtherance of the objective of the litigation.  *Id.* at ¶ 24.  Unlike a

class action, in which publication may serve to notify potential class

members, *see id.* at ¶ 41, no such notice was needed here; the

litigants had already been identified, certainly for the Michigan

lawsuit and presumably for any other litigation anticipated to be

filed shortly.  Nor does the context of the statements support the

Trump Campaign's suggestion that their purpose was to solicit additional plaintiffs or witnesses. The Campaign has offered no persuasive explanation as to how arguing its claims to the public could have advanced its existing or contemplated litigation. Cases are decided in courts of law, not in the court of public opinion.

¶ 192    Moreover, even if there were a litigation-related purpose for publicizing the allegations of the Michigan complaint, Giuliani and Powell did not "merely repeat[], summarize[], or paraphrase[]" those allegations. *Id.* at ¶ 42. Indeed, the statement in question — that Coomer "specifically says that they're going to fix this election" — does not appear in the Michigan complaint at all. Even the limited allegations about Dominion that do appear in the complaint do not allege that Dominion "fixed" the election but only that there were "mechanical malfunction[s]." The litigation privilege does not give an attorney cover to make defamatory statements to the public that, for whatever reason, they were unwilling to advance in court, simply because they bear some relation to the subject of ongoing litigation. *Cf. id.* at ¶ 24 (noting that an attorney cannot cloak a defamatory statement in privilege by filing a bad faith and meritless claim).

¶ 193    Finally, with respect to Giuliani's statements, the Trump
Campaign's litigation privilege claim runs into another roadblock.
The privilege extends only to statements made in connection with a
proceeding in which the attorney making the statement participates
as counsel.  *Id.* at ¶ 21.  It does not appear from the record that
Giuliani participated as counsel in the Michigan lawsuit or in any of
the other lawsuits that were filed after the press conference.

¶ 194    We acknowledge that the district court, relying on a federal
case, stated that the litigation privilege does not apply to statements
made to the media.  *See Seidl v. Greentree Mortg. Co.*, 30 F. Supp.
2d 1292, 1314-15 (D. Colo. 1998).  Our supreme court has since
rejected this categorical rule.  *Killmer, Lane & Newman*, ¶ 48.  But
that does not mean anything an attorney says at a press conference
goes.  Instead, such statements, like any others, are protected only
when they are made in furtherance of the objective of the litigation.

¶ 195    Because we conclude the statements at issue were not made
to further the litigation, the litigation privilege does not apply.

7.    Communications Decency Act

¶ 196    The Trump Campaign asserts that Eric Trump's tweet of the
Gateway Pundit article and President Trump's tweet of the One

America News Network segment are immune from liability under the CDA.  Because Coomer has established a reasonable likelihood of prevailing against the Campaign without these two tweets, this issue does not affect whether Coomer's claim can proceed.  But because the Campaign specifically challenges these two alleged publications, we will address the issue.  *See Balla v. Hall*, 273 Cal. Rptr. 3d 695, 672 (Ct. App. 2021).  We agree with the Campaign that these two tweets may not form the basis for liability.[17]

¶ 197    The CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1); *see also* 47 U.S.C. § 230(e)(3) (precluding any state law cause of action or liability that is "inconsistent with this section").  This law protects users of interactive websites from

---

[17] The Trump Campaign asserted in its special motion to dismiss that the CDA provided immunity for the tweet by Eric Trump, but it did not extend that argument to the tweet by President Trump until its reply.  Nevertheless, because the same analysis applies to both tweets and the district court ruled on the merits of the argument with respect to both tweets, we will consider both tweets as well. *See Rinker v. Colina-Lee*, 2019 COA 45, ¶ 26 (noting that we may consider an unpreserved issue when the district court rules on it); *Farmer v. Colo. Parks & Wildlife Comm'n*, 2016 COA 120, ¶ 19.

"defamation claims based on information provided by another information content provider." *Rosenblum*, ¶ 48.  The district court concluded that the tweets were not protected by the CDA because (1) Eric Trump's tweet did not merely republish the Gateway Pundit article but included his own defamatory statement, and (2) the CDA does not apply when the user knows or has reason to know the information is defamatory.  We disagree on both counts.

¶ 198    First, neither Eric Trump's nor President Trump's tweet included any statement beyond the information in the article and video they shared.  *See id.* (indicating that "[h]ad [the defendant] just posted the link," the post might be protected under the CDA).  Eric Trump's tweet stated simply, "Eric Coomer — Dominions Vice President of U.S. Engineering — 'Don't worry about the election, Trump's not gonna win.  I made f*cking sure of that!'"  That quote (as well as Coomer's name and title) was pulled verbatim from the article, which unmistakably attributed the quote to Coomer.  The tweet therefore conveyed only "information provided by another information content provider."  47 U.S.C. § 230(c)(1).  President Trump's tweet said even less, merely quoting the segment's title, "Dominion-izing the Vote," and making no mention of Coomer at all.

¶ 199    Second, the district court's conclusion that the CDA does not

apply to information that a user "knew or had reason to know was

defamatory" finds no support in the text of the CDA or case law

applying it.[18]   Indeed, case law from other jurisdictions is uniformly

to the contrary.   *See In re Facebook, Inc.*, 625 S.W.3d 80, 89-93

(Tex. 2021) (noting "national consensus" and "overwhelming weight

of authority" rejecting distinction between liability as a speaker or

publisher and liability as a distributor) (citations omitted); *Barrett v.

Rosenthal*, 146 P.3d 510, 517-20, 518 n.9 (Cal. 2006) (citing cases);

*Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331-33 (4th Cir. 1997).

¶ 200    The district court relied exclusively on Justice Thomas's

statement respecting the denial of certiorari in *Malwarebytes, Inc. v.

Enigma Software Group*, 592 U.S. ___, ___, 141 S. Ct. 13, 15-16

(2020) (published order).   That statement — the statement of a

---

[18] The Trump Campaign at first appears to adopt this exception,
including it in its recitation of the applicable law and confusingly
citing *Barrett v. Rosenthal*, 146 P.3d 510, 513, 525 (Cal. 2006),
which stands for the opposite proposition.   But it goes on to cite
*Barrett*'s pronouncement that "Congress has comprehensively
immunized republication by individual [i]nternet users."   *Id.* at 529.
And it argues that retweets of information previously published by
others are categorically protected by the CDA.   Thus, despite the
Campaign's contradictory statements of the law, we construe its
argument as contesting both grounds for the district court's ruling.

single Justice, not a decision of the Court — is contrary to the position taken by "every existing judicial decision" of which we are aware. *In re Facebook*, 625 S.W.3d at 91. But even that statement would only support a "know or reason to know" exception for *distributors* — a term that traditionally encompassed actors like newspaper vendors and booksellers who distribute the publications of others. *See Malwarebytes*, 592 U.S. at ___, 141 S. Ct. at 15-16; *Barrett*, 146 P.3d at 513. Whether or not that term might include "[i]nternet platforms" that do no more than host content published by third parties, not even Justice Thomas's statement extends so-called "distributor liability" to the individual users who post that content. *See Malwarebytes*, 592 U.S. at ___, 141 S. Ct. at 14-15 (questioning "sweeping protection to [i]nternet platforms").

¶ 201    Thus, because the two tweets by Eric Trump and President Trump consisted solely of "information provided by another information content provider," 47 U.S.C. § 230(c)(1), Coomer's claim against the Trump Campaign may not be based on those tweets.

B.    Intentional Infliction of Emotional Distress

¶ 202    Malkin, the Hoft Defendants, Metaxas, and the Trump Campaign assert that the district court erred by not dismissing

102

Coomer's claim for intentional infliction of emotional distress.  But apart from the Hoft Defendants, their sole argument is that Coomer did not establish a reasonable likelihood of proving actual malice. *See Hustler Mag., Inc v. Falwell*, 485 U.S. 46, 56 (1988) (holding that "actual malice" requirement applies to claims for intentional infliction of emotional distress premised on publications that are subject to heightened constitutional protections); *Lewis v. McGraw-Hill Broad. Co.*, 832 P.2d 1118, 1124-25 (Colo. App. 1992).  Because we have concluded that Coomer has satisfied his burden with respect to actual malice, we reject this argument.  *See L.S.S.*, ¶ 53.

¶ 203    The Hoft Defendants also argue that Coomer failed to show "extreme and outrageous conduct," as required to sustain his claim. *See Mackall v. JPMorgan Chase Bank, N.A.*, 2014 COA 120, ¶ 49 (listing elements).  To satisfy this standard, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999) (citation omitted).  Whether a defendant's conduct rises to this level is generally a question of fact for the jury.  *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877,

883 (Colo. 1994).  Our role is limited to determining "whether reasonable persons could differ on the question" — or, in the anti-SLAPP context, whether there is a reasonable likelihood that a jury could find the defendant's conduct sufficiently outrageous.  *Id.*

¶ 204    We agree with the Hoft Defendants that there is no evidence that they incited violence against Coomer.  But we do not agree that their conduct can be deemed not extreme and outrageous as a matter of law.  As we explain above, Coomer presented evidence that would support a finding that the Hoft Defendants falsely accused him — someone who made his career in election technology — of saying he "made sure" President Trump would not win reelection and implied, with no evidence, that he had rigged the presidential election.  *Cf. Tonnessen*, 5 P.3d at 967 (holding that article could not constitute outrageous conduct because it was not defamatory).  The Hoft Defendants then repeated those claims several times to a nationwide audience, going so far as to publish an article about a $1 million "bounty" for Coomer's "comeuppance."

¶ 205    These statements went beyond mere insults, annoyances, or trivialities.  See *Pearson v. Kancilia*, 70 P.3d 594, 597 (Colo. App. 2003).  They struck at the core of American democracy and made

Coomer a personification of claims that the presidential election had been stolen.  Given the magnitude of those accusations, and the minimal evidence to support them, there is a reasonable likelihood that a jury could find the dissemination of those claims "atrocious," "utterly intolerable," and "beyond all possible bounds of decency."  *Coors Brewing Co.*, 978 P.2d at 666 (citation omitted).

¶ 206    The Hoft Defendants also assert that Coomer has not met his burden of showing the required element of severe emotional distress.  *See Mackall*, ¶ 49.  But as discussed above, Coomer's declaration attesting that he has "suffered severe emotional distress," including anxiety and depression, as a result of the statements made by the Hoft Defendants and others suffices to meet his burden at this stage of the case.  *See Anderson*, ¶ 88.

C.    Conspiracy

¶ 207    All defendants except the Oltmann Defendants[19] and DTR[20]

assert that the district court erred by denying their special motions

to dismiss the conspiracy claim.  They argue that Coomer did not

establish a reasonable likelihood of success on this claim because

he failed to present any evidence of an agreement.[21]  We agree.

¶ 208    A claim for civil conspiracy has five elements: (1) two or more

persons; (2) an object to be accomplished; (3) a meeting of the

minds on the object or course of action; (4) an unlawful overt act;

---

[19] Because the Oltmann Defendants do not challenge the district court's ruling on the conspiracy claim, apart from their more general challenges above, we do not consider this claim with respect to them.  *See, e.g.*, *People v. Perez-Hernandez*, 2013 COA 160, ¶ 9 (explaining that arguments not raised on appeal are abandoned).

[20] As noted above, DTR's sole argument in its opening brief was that it was formed after the statements at issue.  In its reply brief, DTR specifically challenges the conspiracy claim, but it does so only on the ground that DTR did not exist at the time of the alleged conspiracy.  Because we have rejected this argument, we do not further consider Coomer's conspiracy claim against DTR.

[21] Several defendants also argue that, as a derivative cause of action, the conspiracy claim must be dismissed if the other claims are dismissed.  *See Colo. Cmty. Bank v. Hoffman*, 2013 COA 146, ¶ 43 ("[I]f the acts alleged to constitute the underlying wrong provide no cause of action, then no cause of action arises for the conspiracy alone.") (citation omitted).  Because we have concluded that the other claims may proceed, this argument necessarily fails.

and (5) resulting damages.  *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995).  Because Coomer alleges a conspiracy to defame him and inflict emotional distress upon him, he must show an agreement as to that objective or the course of action to achieve it.  *Rosenblum*, ¶ 54.  He need not show a single collective agreement among *all* defendants, but he must show a meeting of the minds between each defendant and at least one other person.  *Id.* at ¶ 55.

¶ 209    A civil conspiracy may be "implied by a course of conduct and other circumstantial evidence."  *Id.* at ¶ 52 (citation omitted).  But we will not "infer the agreement."  *Nelson*, 908 P.2d at 106.  Rather, a plaintiff must present "evidence of such an agreement," whether direct or circumstantial.  *Id.*  Such evidence may not consist solely of a "shared political ideology" or "close political ties."  *Rosenblum*, ¶¶ 53, 55.  Nor is it enough to show "concerted efforts" to advance a political message.  *Id.* at ¶ 55.  The plaintiff must present some indicia that the defendant actually *agreed* with at least one other person to make the defamatory statements.  *Id.* at ¶¶ 52, 56.

¶ 210    Despite the district court order permitting Coomer to conduct discovery on this point, he has failed to present any such evidence.  Instead, his argument is premised almost entirely on Oltmann

having served as the other defendants' source of information and coordinating with them to present his account on their shows. We cannot conclude that such ordinary sharing of information and coordination between the media and their sources gives rise to a conspiracy. *See Dowd v. Calabrese*, 589 F. Supp. 1206, 1213-14 (D.D.C. 1984) (noting that allowing "the traditionally-recognized relationships between sources and reporters [to] become actionable as conspiracies on a substantial scale" would result in "the 'chilling' of such relationships and collaborations"). "[W]hat is required in this sensitive First Amendment area is . . . proof not merely of a joint purpose to publish, but specific evidence of a joint purpose to defame." *Id.* at 1214 (footnote omitted); *see also Rosenblum*, ¶ 56.

¶ 211    For similar reasons, the Powell Defendants and the Trump Campaign's coordination with a reporter from One America News Network concerning a story about claimed election fraud cannot alone prove a conspiracy. *See Dowd*, 589 F. Supp. at 1213-14 ("[P]roof of cooperation between two individuals who have a common purpose to produce a news story does not represent a sufficient basis for an actionable conspiracy," even when the story gives rise to separate defamation claims against each individual.). Nor do

their efforts to verify Oltmann's story by requesting an affidavit. *See Rosenblum*, ¶ 56 (concluding that defendant's attempt to verify the accuracy of the source's account undermined conspiracy claim).

¶ 212    The district court concluded that defendants "cooperated and fed off one another to spread dangerous and inflammatory political disinformation designed to undermine the legitimacy of the 2020 presidential election."  Coomer similarly cites an alleged public "agreement to delegitimize the results of the [e]lection."  But even if there were an agreement among defendants — as opposed to parallel efforts stemming from a shared political ideology — to undermine the legitimacy of the election, Coomer cannot prevail by showing an agreement to undermine the legitimacy of the election generally.  He must show an agreement to defame or inflict emotional distress *upon him*.  And we see no evidence that defendants agreed to advance their ostensible overarching shared purpose by defaming Coomer.  Different media outlets reporting on the same story — even a false one — does not prove a conspiracy.

¶ 213    We also reject any implication that coordination among the Trump Campaign, Giuliani, and the Powell Defendants could support a claim for conspiracy at a time when Coomer contends

Powell was acting as an agent of the Campaign.  A corporation and its agents acting on its behalf "do not constitute the 'two or more persons' required for a civil conspiracy."  *Pittman v. Larson Distrib. Co.*, 724 P.2d 1379, 1390 (Colo. App. 1986); *see also Semler v. Hellerstein*, 2016 COA 143, ¶¶ 30-33 (holding that attorney acting within the scope of representation cannot conspire with a client, absent a claim of fraud or an allegation that the attorney acted for personal gain), *rev'd on other grounds sub nom. Bewley v. Semler*, 2018 CO 79.  This principle likewise precludes any conspiracy between the individual defendants and their related entities.

¶ 214    Thus, we conclude that Coomer has failed to meet his burden of establishing a reasonable likelihood of prevailing on his conspiracy claim with respect to all defendants other than the Oltmann Defendants and DTR (which claims we do not address). The conspiracy claim against these defendants must be dismissed.

### D.    Injunction

¶ 215    In their special motions to dismiss, the Oltmann Defendants and Metaxas moved to dismiss Coomer's "claim" for injunctive relief.  In addressing that argument, the district court analyzed each element of a permanent injunction as to all defendants and

concluded that, "[s]ubject to the adjudication of his claims, Coomer has established a prima facie basis for injunctive relief."

¶ 216    On appeal, the Hoft Defendants and the Trump Campaign contend that the district court erred by addressing Coomer's request for injunctive relief because an injunction is not a substantive claim that is subject to an anti-SLAPP motion.  Coomer agrees that review of this request was premature, and so do we.

¶ 217    Section 13-20-1101(3)(a) provides that "[a] *cause of action . . .* is subject to a special motion to dismiss unless . . . there is a reasonable likelihood that the plaintiff will prevail on the *claim.*" (Emphasis added.)  But an injunction, even if pleaded as a claim for relief, is a remedy, not an independent cause of action.  *Wibby v. Boulder Cnty. Bd. of Cnty. Comm'rs*, 2016 COA 104, ¶ 4 n.2.

¶ 218    That remedy is not itself subject to an anti-SLAPP motion to dismiss.  Its fate flows from the substantive claim to which it is attached.  If the substantive claim is dismissed, the ancillary request for injunctive relief goes with it.  Otherwise, resolution of that request must await resolution of the claim on the merits.  *Cf. Winston v. Polis*, 2021 COA 90, ¶ 21 ("Speculation about a possible remedy is premature because no . . . violation has been found.").

¶ 219    We therefore agree with the Hoft Defendants and the Trump Campaign that the district court erred by addressing the merits of Coomer's request for injunctive relief.  We nevertheless affirm the denial of the special motions to dismiss this request because that request could not be dismissed under the anti-SLAPP statute.[22]

## V.    Attorney Fees

¶ 220    Malkin, the Hoft Defendants, DTR, and the Trump Campaign request their attorney fees and costs under section 13-20-1101(4)(a).  That subsection provides that "in any action subject to [the anti-SLAPP statute], a prevailing defendant on a special motion to dismiss is entitled to recover the defendant's attorney fees and costs."  *Id.*  The statute entitles a defendant who prevails on appeal to recover their appellate attorney fees and costs.  *Rosenblum*, ¶ 61.

¶ 221    A partially prevailing defendant "must generally be considered a prevailing party unless the results of the motion were so insignificant that the party did not achieve any practical benefit

---

[22] Because we conclude that a request for injunctive relief is not subject to an anti-SLAPP motion to dismiss, we do not address the Trump Campaign and Hoft Defendants' argument that injunctive relief is not feasible or Metaxas's argument that injunctive relief would constitute an unconstitutional prior restraint on speech.

from bringing the motion." *Id.* at ¶ 63 (citation omitted). But the fees awarded to such a defendant must be "commensurate with the extent to which the motion changed the nature and character of the lawsuit in a practical way." *Mann v. Quality Old Time Serv., Inc.*, 42 Cal. Rptr. 3d 607, 619 (Ct. App. 2006). "Whether a party prevailed on an anti-SLAPP motion — and to what extent the partial success warrants an apportionment of fees — is a determination that lies within the broad discretion of a district court." *Rosenblum*, ¶ 63.

¶ 222    Because we have rejected DTR's sole argument on appeal and affirmed the district court's denial of its special motion to dismiss, we deny its request for attorney fees and costs. *See Salazar*, ¶ 66.

¶ 223    Resolution of the other defendants' fee requests is less clear cut. For the most part, we have affirmed the district court order as to these defendants, concluding that Coomer's claims for defamation and intentional infliction of emotional distress may proceed. The survival of the defamation claim in particular — which was the primary focus of defendants' briefing — substantially limits the degree of defendants' success. *See Mann*, 42 Cal. Rptr. 3d at 618-19 (considering, among other things, "whether the same factual allegations remain to be litigated"); *Gonzales*, ¶ 104 (denying

attorney fees because court "denied virtually all of [defendants'] requested relief, and the effect of [the] disposition is that . . . the only communications whose merits were at issue on appeal . . . survive defendants' anti-SLAPP motion").  And although we have slightly narrowed Coomer's claim against the Trump Campaign by concluding that two tweets are protected by the CDA, that does not make the Campaign a partially prevailing defendant because the defamation claim as a whole survives.  *See Salazar*, ¶ 66.

¶ 224    Nevertheless, given our reversal of the district court's ruling on the conspiracy claim, we cannot say that these defendants received *no* practical benefit from this appeal.  *Rosenblum*, ¶ 63.  We thus exercise our discretion under C.A.R. 39.1 to remand to the district court to determine whether Malkin, the Hoft Defendants, and the Trump Campaign are partially prevailing defendants; the extent to which their partial appellate success, if any, warrants an award of appellate fees; and the reasonableness of those fees.  *Id.* at ¶ 64.

## VI.   Disposition

¶ 225    We reverse the district court's denial of the special motions to dismiss the conspiracy claim as to Malkin, the Hoft Defendants, Metaxas, the Powell Defendants, and the Trump Campaign.  We

114

reverse the ruling that the tweets by Eric Trump and President Trump are not protected by the CDA, and we hold that the Trump Campaign may not be liable for those tweets.  We affirm the district court order in all other respects (except as to Giuliani).  We remand to the district court for determination of the requests for attorney fees and costs by Malkin, the Hoft Defendants, and the Trump Campaign, and for further proceedings consistent with this opinion.

JUDGE NAVARRO and JUDGE KUHN concur.

# 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

**STATE OF COLORADO**
**2 East 14th Avenue**
**Denver, CO 80203**
**(720) 625-5150**

**PAULINE BROCK**
**CLERK OF THE COURT**

## NOTICE CONCERNING ISSUANCE OF THE MANDATE

Pursuant to C.A.R. 41(b), the mandate of the Court of Appeals may issue forty-three days after entry of the judgment. In worker's compensation and unemployment insurance cases, the mandate of the Court of Appeals may issue thirty-one days after entry of the judgment. Pursuant to C.A.R. 3.4(m), the mandate of the Court of Appeals may issue twenty-nine days after the entry of the judgment in appeals from proceedings in dependency or neglect.

Filing of a Petition for Rehearing, within the time permitted by C.A.R. 40, will stay the mandate until the court has ruled on the petition. Filing a Petition for Writ of Certiorari with the Supreme Court, within the time permitted by C.A.R. 52(b), will also stay the mandate until the Supreme Court has ruled on the Petition.

BY THE COURT:    Gilbert M. Román,
                 Chief Judge

DATED: January 6, 2022

***Notice to self-represented parties****: You may be able to obtain help for your civil appeal from a volunteer lawyer through the Colorado Bar Association's (CBA) pro bono programs. If you are interested in learning more about the CBA's pro bono programs, please visit the CBA's website at* https://www.cobar.org/Appellate