United States Bankruptcy Court
Southern District of Florida

In re:                                                                                          Case No. 24-13938-MAM
TGP Communications, LLC                                                          Chapter 11
    Debtor

# CERTIFICATE OF NOTICE

District/off: 113C-9                              User: admin                                    Page 1 of 3
Date Rcvd: Jul 25, 2024                     Form ID: pdf004                           Total Noticed: 89

The following symbols are used throughout this certificate:

| Symbol | Definition |
|---|---|
| + | Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP. |
| ## | Addresses marked '##' were identified by the USPS National Change of Address system as undeliverable. Notices will no longer be delivered by the USPS to these addresses; therefore, they have been bypassed. The debtor's attorney or pro se debtor was advised that the specified notice was undeliverable. |

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Jul 27, 2024:**

| Recip ID | | Recipient Name and Address |
|---|---|---|
| db | + | TGP Communications, LLC, 1820 NE Jensen Beach Blvd, Unit 1120, Jensen Beach, FL 34957-7212 |
| sp | + | Bradley A Kloewer, P.O. Box 1064, Salida, CO 81201-1064 |
| sp | + | Charlie J. Cain, 303 Colorado St., Suite 2850, Austin, TX 78701-0137 |
| cr | + | Dr. Eric Coomer, c/o Vincent F. Alexander, 201 East Las Olas Blvd., Suite 2200, Fort Lauderdale, FL 33301-4445 |
| intp | + | Jim Hoft, c/o Furr and Cohen, P.A., 2255 Glades Road., Ste 419A, Boca Raton, FL 33431-7379 |
| sp | + | Michael J Gottlieb, 1875 K Street NW, Washington, DC 20006-1238 |
| sp | + | Rachel C Strickland, 787 Seventh Avenue, New York, NY 10019-6018 |
| cr | + | Ruby Freeman, c/o David A. Blansky, Esq., Dunn Law, P.A., 66 W. Flagler St., Suite 400, Miami, FL 33130-1877 |
| sp | + | Ryan E. Chapple, 303 Colorado St, Suite 2850, Austin, TX 78701-0137 |
| cr | + | Wandrea' Arshaye Shaye Moss, c/o David A. Blansky, Esq., Dunn Law, P.A., 66 W. Flagler St., Suite 400, Miami, FL 33130-1877 |
| 97475639 | + | Bryan Coe, % Sanders Law Group, 333 Earle Ovington Blvd, Suite 402, Uniondale, NY 11553-3645 |
| 97344233 | + | Christopher Douglass, 199 Clarkson Road, Ballwin, MO 63011-2243 |
| 97459724 | + | Dr. Eric Commer, c/o Charles Cain, Cain & Skarnulis PLLC, 303 Colorado Street, Suite 2850, Austin, TX 78701-0137 |
| 97344234 | + | Eric Coomer, c/o CAIN & SKARNULIS PLLC, P. O. Box 1064, Salida, CO 81201-1064 |
| 97344235 | + | Eric Coomer, c/o RECHTKORNFELD PC, 1600 Stout Street, Suite 1400, Denver, CO 80202-3110 |
| 97475836 | + | Gregory Mango, Sanders Law Group, 333 Earl Ovington Boulevard, Suite 402, Uniondale, NY 11553-3645 |
| 97405906 | + | James Hoft, 8750 South Ocean Drive, Unit 534, Jensen Beach, FL 34957-2125 |
| 97344237 | + | James Kirk, 947 CENTURY OAKS DR, Manchester, MO 63021-6921 |
| 97344238 | + | Jane Doe - A, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344239 | + | Jane Doe - B, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344240 | + | Jane Doe - C, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344241 | + | Jane Doe - D, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344242 | + | Jane Doe - E, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344243 | + | Jane Doe - F, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344244 | + | Jane Doe - H, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344245 | + | Jane Doe - I, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344246 | + | Jane Doe - J, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344247 | + | Jane Doe - K, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344248 | + | Jez Morano, 8750 South Ocean Drive, Unit 534, Jensen Beach, FL 34957-2125 |
| 97344249 | + | John Doe - A, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344250 | + | John Doe - AA, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344251 | + | John Doe - B, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344252 | + | John Doe - BB, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344253 | + | John Doe - C, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344254 | + | John Doe - CC, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344255 | + | John Doe - D, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344256 | + | John Doe - E, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344257 | + | John Doe - F, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344258 | + | John Doe - FF, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344259 | + | John Doe - G, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344260 | + | John Doe - GG, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344261 | + | John Doe - H, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344262 | + | John Doe - I, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344263 | + | John Doe - J, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344264 | + | John Doe - M, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |

District/off: 113C-9                          User: admin                                    Page 2 of 3
Date Rcvd: Jul 25, 2024                       Form ID: pdf004                                 Total Noticed: 89

| 97344265 | + | John Doe - N, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344266 | + | John Doe - O, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344267 | + | John Doe - Q, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344268 | + | John Doe - R, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344269 | + | John Doe - S, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344270 | + | John Doe - T, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344271 | + | John Doe - U, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344272 | + | John Doe - V, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344273 | + | John Doe - W, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344274 | + | John Doe - Y, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344275 | + | John Doe - Z, c/o Jonathan Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97475831 | + | Jonathan M. Cader, Sanders Law Group, 333 Earl Ovington Boulevard, Suite 402, Uniondale, NY 11553-3645 |
| 97475638 | + | Jonathan M. Cader, % Sanders law Group, 333 Earl Ovington Boulevard, Suite 402, Uniondale, NY 11553-3645 |
| 97475570 | + | Jonathan M. Cader, Esq, % Sanders Law Group, 333 Earle Ovington Blvd., Suite 402, Uniondale, NY 11553-3645 |
| 97344276 | + | Jonathon Burns, POB 191250, Saint Louis, MO 63119-7250 |
| 97344277 | + | Kellie Poen, 344 Fallon Pkwy, Saint Peters, MO 63376-7704 |
| 97475571 | + | Level 12 Productions, LLC, % Sanders Law Group, 333 Earle Ovington Blvd, Suite 402, Uniondale, NY 11553-3645 |
| 97475834 | + | Michelle Ong, Sanders Law Group, 333 Earl Ovington Boulevard, Suite 402, Uniondale, NY 11553-3645 |
| 97475832 | + | Robert Miller Photographer, LLC, Sanders Law Group, 333 Earl Ovington Boulevard, Suite 402, Uniondale, NY 11553-3645 |
| 97344286 | + | Ruby Freeman, c/o Aanchal Chugh, Esq., 1440 New York Avenue, N.W., Washington, DC 20005-2111 |
| 97344280 | + | Ruby Freeman, c/o Von A. DuBose, Esq., 75 14th Street, NE, Suite 2110, Atlanta, GA 30309-3644 |
| 97344282 | + | Ruby Freeman, c/o UNITED TO PROTECT DEMOCRACY, 2020 Pennsylvania Ave. NW, Suite 163, Washington, DC 20006-1811 |
| 97344281 | + | Ruby Freeman, c/o UNITED TO PROTECT DEMOCRACY, 15 Main St., Suite 312, Watertown, MA 02472-4403 |
| 97344279 | + | Ruby Freeman, c/o YALE LAW SCHOOL, 127 Wall Street, P.O. Box 208215, New Haven, CT 06520-8215 |
| 97461793 | + | Ruby Freeman, c/o Rachel C. Strickland and James H. Bu, 787 Seventh Avenue, New York, NY 10019-6018 |
| 97344284 | + | Ruby Freeman, c/o Charles Smith, Esq. and Michael Morr, 155 N. Wacker Drive, Chicago, IL 60606-1787 |
| 97344283 | + | Ruby Freeman, c/o UNITED TO PROTECT DEMOCRACY, 82 Nassau Street, #601, New York, NY 10038-3703 |
| 97344287 | + | Ruby Freeman, c/o Eliza Simons, Esq., One Manhattan West, New York, NY 10001-0193 |
| 97344285 | + | Ruby Freeman, c/o Mary E. Grinman, Esq., 500 Boylston Street, Boston, MA 02116-3740 |
| 97475850 | + | Steven Hirsch, Inc., Sanders Law Group, 333 Earl Ovington Boulevard, Suite 402, Uniondale, NY 11553-3645 |
| 97344288 | + | Tammie Gassawsy, 19274 Babler Forest Rd, Chesterfield, MO 63005-6021 |
| 97344289 | + | Ted Slater, 2820 N PINAL AVE, STE 12 PMB 209, CASA GRANDE, AZ 85122-7927 |
| 97461812 | + | Wandrea ArShaye Moss, c/o Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019-6018 |
| 97344298 | + | Wandrea Moss, c/o Aanchal Chugh, Esq., 1440 New York Avenue, N.W., Washington, DC 20005-2111 |
| 97344294 | + | Wandrea Moss, c/o Von A. DuBose, Esq., 75 14th Street, NE, Suite 2110, Atlanta, GA 30309-3644 |
| 97344297 | + | Wandrea Moss, c/o UNITED TO PROTECT DEMOCRACY, 2020 Pennsylvania Ave. NW, Suite 163, Washington, DC 20006-1811 |
| 97344292 | + | Wandrea Moss, c/o UNITED TO PROTECT DEMOCRACY, 15 Main St., Suite 312, Watertown, MA 02472-4403 |
| 97344293 | + | Wandrea Moss, c/o YALE LAW SCHOOL, 127 Wall Street, P.O. Box 208215, New Haven, CT 06520-8215 |
| 97344296 | + | Wandrea Moss, c/o Charles Smith, Esq. and Michael Morr, 155 N. Wacker Drive, Chicago, IL 60606-1787 |
| 97344299 | + | Wandrea Moss, c/o UNITED TO PROTECT DEMOCRACY, 82 Nassau Street, #601, New York, NY 10038-3703 |
| 97344300 | + | Wandrea Moss, c/o Eliza Simons, Esq., One Manhattan West, New York, NY 10001-0193 |
| 97344295 | + | Wandrea Moss, c/o Mary E. Grinman, Esq., 500 Boylston Street, Boston, MA 02116-3740 |

TOTAL: 87

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI). Electronic transmission is in Eastern Standard Time.

| Recip ID | Notice Type: Email Address | Date/Time | Recipient Name and Address |
|---|---|---|---|
| 97384523 | Email/Text: OGCBankruptcy@floridarevenue.com | | |
| | | Jul 25 2024 22:33:00 | Florida Department of Revenue, Bankruptcy Unit, Post Office Box 6668, Tallahassee, Florida 32314-6668 |
| 97344236 | Email/Text: sbse.cio.bnc.mail@irs.gov | | |
| | | Jul 25 2024 22:34:00 | Internal Revenue Service, POB 7346, Philadelphia, PA 19101-7346 |

TOTAL: 2

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

| Recip ID | Bypass Reason | Name and Address |
|---|---|---|
| sp | | Aaron E. Nathan |

District/off: 113C-9        User: admin        Page 3 of 3

Date Rcvd: Jul 25, 2024        Form ID: pdf004        Total Noticed: 89

| | | |
|---|---|---|
| sp | | Brittany Williams |
| sp | | James H. Burbage |
| sp | | Meryl Governski |
| sp | | Rachel Goodman |
| sp | *+ | Ruby Freeman, c/o David A. Blansky, Esq., Dunn Law, P.A., 66 W. Flagler St., Suite 400, Miami, FL 33130-1877 |
| 97344290 | *+ | TGP COMMUNICATIONS LLC, 1820 NE Jensen Beach Blvd, Unit 1120, Jensen Beach, FL 34957-7212 |
| 97344278 | ##+ | Ruby Freeman, c/o Dowd Bennett LLP, 7733 Forsyth Blvd, Suite 1900, Saint Louis, MO 63105-1803 |
| 97344291 | ##+ | Wandrea Moss, c/o Dowd Bennett LLP, 7733 Forsyth Blvd, Suite 1900, Saint Louis, MO 63105-1803 |

TOTAL: 5 Undeliverable, 2 Duplicate, 2 Out of date forwarding address

# NOTICE CERTIFICATION

**I, Gustava Winters, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Jul 27, 2024        Signature:     /s/Gustava Winters

---

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on July 25, 2024 at the address(es) listed below:**

| Name | Email Address |
|---|---|
| Bart A Houston | on behalf of Debtor TGP Communications  LLC bhouston@houstonroderman.com, dschena@houstonroderman.com |
| David Blansky | on behalf of Creditor Ruby Freeman dblansky@dunnlawpa.com  rbasnueva@dunnlawpa.com |
| David Blansky | on behalf of Creditor Wandrea' Arshaye "Shaye" Moss dblansky@dunnlawpa.com  rbasnueva@dunnlawpa.com |
| Linda Marie Leali | on behalf of Trustee Linda Marie Leali trustee@lealilaw.com F005@ecfcbis.com;lkennedy@lealilaw.com;LindaLealiPA@jubileebk.net |
| Linda Marie Leali | trustee@lealilaw.com  F005@ecfcbis.com;lkennedy@lealilaw.com;LindaLealiPA@jubileebk.net |
| Martin P Ochs | on behalf of U.S. Trustee Office of the US Trustee martin.p.ochs@usdoj.gov |
| Office of the US Trustee | USTPRegion21.MM.ECF@usdoj.gov |
| Robert C Furr, Esq | on behalf of Interested Party Jim Hoft ltitus@furrcohen.com atty_furrcohen@bluestylus.com;staff1@furrcohen.com;yfernandez@furrcohen.com |
| Vincent F Alexander | on behalf of Creditor Dr. Eric Coomer valexander@shutts.com  SLall@shutts.com,JGoodwin@shutts.com |

TOTAL: 9



**ORDERED in the Southern District of Florida on July 24, 2024.**

_____
**Mindy A. Mora, Judge**
**United States Bankruptcy Court**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:                                          Chapter 11

TGP Communications, LLC,                        Case No. 24-13938-MAM

        Debtor.
_____/

## MEMORANDUM OPINION AND ORDER
## GRANTING MOTION TO DISMISS CHAPTER 11 CASE
## UNER SECTIONS 1112(b) AND 305(a) OF THE BANKRUPTCY CODE AND
## CANCELLING HEARING

Whether a bankruptcy case succeeds or fails depends on many factors, but two things must exist for the process to function as Congress intended: transparency and good faith.

Article I, Section 8, Clause 4 of the United States Constitution grants Congress power to enact uniform laws governing bankruptcies. Those laws, which have become the bedrock upon which bankruptcy courts grant relief, require unflinching disclosure

of identity, obligations, ownership, and other relevant facts in exchange for freedom from debt. Most debtors find that to be a fair trade.

In this unusual bankruptcy case, truth is at the center of all disputes. Lack of truthful disclosure, theories based upon half-truths, claims for which truth could provide a defense—all possibilities are on display. Litigation about truth pushed the debtor to file bankruptcy, but that unusual twist does not alter the Court's duty to remain focused on bankruptcy issues.

This Court's only task in this case is to determine whether the debtor, a business entity wholly owned and run by one person, has demonstrated a valid reorganizational purpose for chapter 11 bankruptcy motivated by good faith intent. The answer, in short, is no, it has not.

## BACKGROUND[1]

The debtor, TGP Communications, LLC ("TGP"), is a limited liability corporation owned by James Hoft ("Hoft"). Hoft formed TGP to run a website featuring politically charged articles. That website is named The Gateway Pundit.

### A. The Gateway Pundit and TGP

Hoft started The Gateway Pundit years ago, before the creation of TGP as a business entity. Originally, The Gateway Pundit was, as Hoft described it, a hobby. Over time, Hoft cultivated an audience of dedicated readers for The Gateway Pundit.

---

[1] In addition to their attendance at an evidentiary hearing on June 27, 2024, the parties submitted a Joint Stipulation of Facts (DE 80) that greatly aided the Court's understanding of material facts. The parties also supplied copies of the transcript for TGP's meeting of creditors pursuant to 11 U.S.C. § 341 (the "341 Meeting"). ECF Nos. 76-19 and 76-20. The United States Trustee conducted the 341 Meeting under oath, as is typical.

In 2012, Hoft decided to formalize his ownership of The Gateway Pundit through formation of TGP as a limited liability business entity.[2]

Hoft remains TGP's sole owner and only employee.[3] He originally formed TGP and registered it to do business in the state of Missouri, where he owns a home. Hoft still spends a fair amount of time in St. Louis but decided in 2021 that he preferred to spend at least part of the year in Florida. That decision led Hoft to buy, using TGP's funds, an oceanfront condo in Jensen Beach, Florida.[4] The condo is titled in the name of 2021 Main Street LLC, a Missouri limited liability company, which is solely owned by Hoft.

At some point after that, Hoft began conducting TGP's operations in Florida. According to TGP's Statement of Financial Affairs, TGP started doing business in Florida sometime in October 2021.[5] For reasons Hoft was unable to articulate, TGP did not register to do business in the state of Florida until one week before the filing of this bankruptcy case. Taking Hoft's sworn testimony at face value, TGP has been

---

[2] Hoft owns 100% of the equity of TGP. TGP's primary asset is the website known as The Gateway Pundit, along with title to a Porsche that Hoft drives and garages at his residence in St. Louis.

[3] Hoft's twin brother, Joe Hoft, has served as a contract employee and Hoft's husband, Jezreel Morano, provides digital marketing services in exchange for regular monthly income. Hoft testified that neither his brother nor his husband were regular employees.

[4] TGP disclosed, via Hoft's testimony, that Hoft used TGP's funds to purchase the condo pursuant to an undocumented, interest-free loan. There are no business terms to disclose because no loan documents exist. The majority of TGP's revenue seems to derive from ad revenue and reader donations, which are openly solicited on The Gateway Pundit website. See https://www.thegatewaypundit.com/ (lateral menu tab titled "How to Help", with dropdown tab labeled "Support TGP with a donation").

[5] ECF No. 34, pdf p. 19 (Official Form 207, Part 7, Previous Addresses). TGP's Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida identifies the date as November 1, 2021. ECF No. 50, at pdf p. 127 (Exhibit B).

doing business in the state of Florida for approximately 3 years without a local business license.[6]

### B. The Articles and Media Insurance Policy

About a year before Hoft's purchase of the Jensen Beach condo, The Gateway Pundit published a series of articles (the "Articles") about the 2020 presidential election. Those Articles included titles like "BREAKING: CROOKED GEORGIA ELECTIONS SUPERVISOR Filmed Pulling Out Suitcases of Ballots from Beneath Table IS IDENTIFIED — IT'S RUBY'S DAUGHTER! (Video)" and "HUGE! Video Footage From Georgia Shows Suitcases Filled with Ballots Pulled From Under Table AFTER Supervisor Told GOP Poll Workers to Leave Tabulation Center".[7] The Articles include a series of stories published by TGP focusing on the former director of product strategy and security for Dominion Voting Systems. *See, e.g.,* "Denver Business Owner: Dominion's Eric Coomer Is an Unhinged Sociopath – His Internet Profile is Being Deleted and Erased."[8]

Publication of the Articles ultimately led to state court complaints being filed in Missouri and Colorado against Hoft and TGP for defamation and other intentional torts.[9] Hoft admits that the defense of those lawsuits pushed TGP to seek bankruptcy

---

[6] It is possible that TGP owes back taxes due to its failure to timely disclose its status as a foreign entity conducting business within the state of. Florida.

[7] *See* https://www.thegatewaypundit.com/2020/12/breaking-crooked-elections-superviser-filmed-pulling-suitcases-ballots/ and https://www.thegatewaypundit.com/2020/12/video-footage-georgia-shows-suitcases-filled-ballots-pulled-table-supervisor-told-gop-poll-workers-leave-tabulation-center/.

[8] *See* https://www.thegatewaypundit.com/2020/11/denver-business-owner-dominions-eric-coomer-unhinged-sociopath-internet-profile-deleted-erased-audio/.

[9] The Dismissal Motion (ECF No. 39, defined later in this Opinion) refers to litigation in Georgia on pages 2 and 11-12. The defined term "Georgia Litigation" is described in footnote 5 of the Dismissal

relief and argues that rapid depletion of benefits payable under media insurance coverage to pay TGP's legal fees could eventually harm TGP and its creditors. That prospect is the stated motivation for bankruptcy relief, as TGP is currently able to pay its operating debts in the ordinary course of its business.

Creditors Ruby Freeman ("Freeman"), Wandrea' Arshaye Moss ("Moss"), and Dr. Eric Coomer ("Coomer") dismiss the availability of insurance funds as ancillary to their fight for justice. They contend that policy limits should not be the only issue considered, and urge the Court to look at the whole picture, assessing good faith from a broader perspective. Freeman, Moss, and Coomer believe that TGP's schedules, statements of financial affairs, and actions to date, including TGP's request to evade typical bankruptcy disclosure, reflect the use of bankruptcy as a pure litigation tactic.

No other creditor has voiced an opinion regarding the relative importance of the media insurance policy (the "Policy"), which is perhaps to be expected given the composition of the creditor body. Besides the IRS and a modest amount of trade claimants, other scheduled creditors with sizeable claims include Hoft's husband, Jezreel ("Jez") Morano, law firms hired to represent TGP's (and presumably Hoft's) interests, and various contract writers who produced articles about the 2020 election (all of whom wish to remain anonymous in this bankruptcy case).[10] Recently, five

---

Motion as an action brought by the defendants in the Missouri litigation seeking the issuance of third-party subpoenas from the Superior Court of Fulton County based on letters rogatory issued by the Missouri state court.

[10] ECF No. 26 (motion to approve concealing writers' names and identifying personal information from public view). TGP made this request despite having published personal identifiable information, including home addresses, of the State Court Plaintiffs.

other creditors filed proofs of claim alleging (without any supporting documentation) damages owed for copyright infringement.[11]

### C. TGP's Assets

TGP's assets are eye-catching. TGP purchased and holds title to a 2021 Porsche Cayenne that Hoft drives and garages at his home in St. Louis. Although TGP's schedules describe investment accounts holding over a million dollars in funds, Hoft testified that he considers those funds to be his personal retirement savings. Indeed, in TGP's recently filed Chapter 11 Subchapter V Plan of Reorganization (ECF No. 93) (the "Plan"), the Liquidation Analysis attached as Exhibit B indicates that TGP proposes to realize only $270,000 from the Schwab investment accounts to pay creditors.[12]

TGP has consolidated its existing revenue into one postpetition bank account with a sizeable balance. For a period of time, at least some (and potentially all) donations flowing from links posted on The Gateway Pundit website were directed to an account held by another entity that Hoft owns and controls, the Justice League of America ("Justice League").[13]

---

[11] Proofs of Claim Nos. 6-11. Sanders Law Group filed these claims. None of the claims contains information for the claimant beyond a name, nor do they include a final judgment or complaint.

[12] Although personal retirement accounts are generally exempt in a personal bankruptcy, this is a business entity case and the accounts are described on schedules and statements as assets of TGP's bankruptcy estate. ECF No. 34.

[13] When the Court began preparing this Opinion in early July 2024, The Gateway Pundit website directed reader donation funds to Justice League. Since that time, The Gateway Pundit website has been edited to indicate that donations may be sent to TGP at a post office box in Jensen Beach. That street address, 1820 NE Jensen Beach Blvd. "Unit" 1120, is for a "Mail Box Plus" location. See https://www.jensenbeachshipping.com/; see also ECF No. 79-19, pdf p. 8 (transcript p. 25 at lines 1-14).

TGP holds a small amount of cryptocurrency. TGP also has the ability to call almost $1,000,000 in loans to Hoft, his brother, and Justice League.[14] Intellectual property, including article rights, websites, and internet domain names, comprise the bulk of TGP's other assets.[15] And, of course, TGP may draw on the Policy as needed for legal fees, up to the coverage limits.

TGP's known, easily reachable assets are over 22 times greater than its liabilities. The total amount of TGP's scheduled liabilities are only 4% of the value of its assets.[16] These figures exclude the potential value of intellectual property rights, which TGP disputes have any value on the open market.[17]

TGP may have other bankruptcy assets as well in the form of preference payments. Within the 90 days prior to the petition date of its bankruptcy filing, TGP transferred $95,000 to Justice League (an entity wholly owned by Hoft), $27,000 to Orchid Grove Media, $17,714.64 to Conradson Rentals, $30,125.09 to O'Malley

---

Justice League continues to maintain a donation page at GiveSendGo to pay for unspecified legal fees. See https://www.givesendgo.com/G2HD4. That website contains the following copy: "The Justice League was created to defend The Gateway Pundit against First Amendment assaults on our business and free speech. Please consider donating to help with expenses incurred from the numerous legal battles we are constantly facing."

[14] ECF No. 34, at pdf p. 11. In the Liquidation Analysis attached to the Plan, TGP has projected that it could recover $799,860 from Hoft, but indicated that the obligations due from Joe Hoft and the Justice League are likely uncollectible. ECF No. 93, at p. 30. That statement directly contradicts the Amended Schedules, which were filed under penalty of perjury. See ECF No. 34, pdf p. 11, at question 71 (Continuation Sheet) (describing doubtful or uncollectible amount as "$0.00").

[15] The Liquidation Analysis attached to the Plan reflects that TGP's intellectual property has no liquidation value. ECF No. 93, at p. 30.

[16] ECF No. 34, at pdf p. 1. Scheduled assets are valued at $2,323,996.76, while scheduled claims are reflected as being in the amount of $102,596.61.

[17] TGP listed extensive intellectual property rights on its schedules with an "unknown" value. ECF No. 34.

McCulloch LLC, and $13,477.73 to Slightly Offensive Inc. These amounts do not include transfers to Hoft, his husband (Jezreel Morano), or various contract writers (all identified by "Doe" pseudonyms).[18]

It is unclear whether and to what extent TGP has any insider preference claims. TGP did not disclose any transfers to Hoft or Justice League in the one year prior to bankruptcy in the appropriate line for doing so on TGP's Statement of Financial Affairs (Part 2, Question 4).[19]

## DISMISSAL ARGUMENTS

Freeman and Moss sought dismissal of TGP's bankruptcy case pursuant to Bankruptcy Code §§ 1112(b) and 305(a) or, alternatively, relief from the automatic stay to continue litigation in Missouri and Georgia. ECF No. 39 (the "Dismissal Motion"). Coomer joined in the request for dismissal and likewise alternatively sought stay relief to continue litigation in Colorado. ECF No. 57 (the "Joinder").[20]

Freeman, Moss, and Coomer (all collectively, the "State Court Plaintiffs") have strong personal reasons for seeking dismissal to continue litigation (all state court cases combined, the "State Court Litigation"). The Dismissal Motion and Joinder describe terrifying attacks directed at the State Court Plaintiffs following The

---

[18] ECF No. 34, pdf. p. 28 (Continuation Sheet for Official Form 207).

[19] This statement conflicts with disclosure in the question immediately prior (Part 2, Question 3), as well as Hoft's sworn testimony. ECF No. 76-20, pdf p. 46 at lines 6-15) (Hoft is TGP's only employee).

[20] Because the Joinder adopts all arguments made in the Dismissal Motion, the Court will address all requests for relief in the same discussion.

Gateway Pundit's publication of the Articles, which accuse them of tampering with the 2020 presidential election results.

Several reputable sources debunk The Gateway Pundit's version of election events, but Hoft stands by their accuracy. In an evidentiary hearing before this Court on June 27, 2024 (the "Hearing"), TGP continued to assert that The Gateway Pundit "broke" the stories told in the Articles and it has been beleaguered ever since.

Even though the parties' positions regarding the Articles dominate the narrative about dismissal, the Court's task is not to evaluate the truthfulness of the Articles or the viability of the State Court Litigation. Instead, the Court considers the purpose of chapter 11 as part of the Bankruptcy Code and TGP's demonstration of good faith (or lack thereof) in seeking to use it.

## LEGAL STANDARDS

### A.    Section 305(a)(1)

Section 305(a)(1) of the Bankruptcy Code is not a typical basis for dismissal of a chapter 11 case. It permits dismissal or suspension of all proceedings at any time if the best interests of the debtor and creditors would be better served by doing so. 11 U.S.C. § 305(a)(1). The authority granted under the statute is extraordinary, prompting courts to approach it with caution. *In re First Fin. Enters., Inc.,* 99 B.R. 751, 754 (Bankr. W.D. Tex. 1989) ("Since the decision to abstain under section 305(a) is not reviewable by appeal or otherwise, it is certainly an extraordinary power which should be exercised sparingly and only in unusual circumstances.") (internal

citations and quotation marks omitted).

Abstention or dismissal makes sense where a debtor attempts to circumvent the Bankruptcy Code "by doing indirectly what cannot be done directly," including filing bankruptcy purely as a litigation strategy. *Id.* It also makes sense when an entity that is otherwise ineligible for bankruptcy relief seeks to backdoor its way into bankruptcy protection. *Id.* at 755-56. Courts may likewise permit abstention or dismissal under § 305(a) when litigation is already well underway in another forum and that forum is available to determine the parties' interests. *Passavant Mem'l Homes v. Laurel Highlands Foundation, Inc. (In re Laurel Highlands Foundation, Inc.)*, 473 B.R. 641, 654 (Bankr. W.D. Pa. 2012).

## B. <u>Section 1112(b)</u>

Bankruptcy Code § 1112 provides that a court may dismiss a bankruptcy case for cause on request of a party in interest, and after notice and a hearing. 11 U.S.C. § 1112. Subsection 1112(b)(4) provides a list of sixteen factors that may constitute "cause":

> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
> (B) gross mismanagement of the estate;
> (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;
> (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;
> (E) failure to comply with an order of the court;
> (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;
> (G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

10

(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K) failure to pay any fees or charges required under chapter 123 of title 28;

(L) revocation of an order of confirmation under section 1144;

(M) inability to effectuate substantial consummation of a confirmed plan;

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

The list is not exclusive and most courts agree that a case may also be dismissed if it was not filed in good faith. *In re Aearo Techs. LLC*, Case No. 22-02890-JJG-11, 2023 WL 3938436, at *9 (Bankr. S.D. Ind. June 9, 2023). As with all good faith or bad faith determinations, the protocol for analysis is difficult to pin down because, to put it simply, facts matter.

The leading case on dismissal of a chapter 11 case in this Circuit, *In re Phoenix Piccadilly, Ltd.*, describes the existence of the following factors as indicative of a bad faith chapter 11 filing:

(i) The debtor has only one asset, the property, in which it does not hold legal title;

(ii) The debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors;

(iii) The debtor has few employees;

(iv) The property is the subject of a foreclosure action as a result of arrearages on the debt;

(v) The debtor's financial problems involve essentially a dispute between the debtor and its secured creditors which can be resolved in a pending state court action; and

11

> (vi) The timing of the bankruptcy filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

849 F.2d 1393, 1394-95 (11th Cir. 1988).[21] *Phoenix Piccadilly* did not restrict the parameters of good faith to the above metrics and encouraged bankruptcy courts to consider any factors that evidence "an intent to abuse the judicial process and the purposes of the reorganization provisions." *Id.* (internal citation omitted).

That type of thought process has led some courts to adopt a multi-factor test to analyze whether a petition was filed in good faith. *Aearo Techs.*, 2023 WL 3938426, at *12-14. Other courts have elected to focus on whether a chapter 11 case serves a "valid reorganizational purpose". *Id.* at *14. The "purpose" line of inquiry requires an appreciation of what, precisely, constitutes a valid reorganizational purpose, which is yet another difficult-to-pin-down topic. *Id.* at 15.

The United States Supreme Court has offered some guidance on that point through description of valid bankruptcy goals. Two well-accepted objectives of the bankruptcy process are (i) preserving going concerns, and (ii) maximizing property available to satisfy creditors. *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 No. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999). Those goals are important touchstones, but the inquiry for good faith runs deeper.

Implicit in any good faith analysis is the question of whether the bankruptcy filing masks other, less savory, aims. In addition to advancing a valid bankruptcy purpose, courts consider whether the debtor filed a bankruptcy case merely to obtain

---

[21] The full case name is *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.).*

a tactical advantage. *LTL Mgmt. v. Official Comm. of Talc Claimants (In re LTL Mgmt., LLC)*, 64 F.4th 84, 100-01 (3d Cir. 2023) (internal citations omitted). Another key inflection point is whether the debtor exhibits financial distress that is curable through the bankruptcy process. *Id.* at 101-04.

The synthesis of these divergent but complementary standards makes a complex question even more difficult. The Court issues this Opinion to pull together the threads of binding precedent in this Circuit while thoughtfully weighing all persuasive case law regardless of origin. At its core, the question of good faith is an equitable one, and facts will always make a difference.

## ANALYSIS

The Court begins its analysis with § 1112(b) and the factors listed in *Phoenix Piccadilly* because that case is binding precedent within our Circuit.

### A.    Application of Phoenix Piccadilly

*Phoenix Piccadilly* lists six factors for dismissal analysis under § 1112(b):

(i) The debtor has only one asset, the property, in which it does not hold legal title;

(ii) The debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors;

(iii) The debtor has few employees;

(iv) The property is the subject of a foreclosure action as a result of arrearages on the debt;

(v) The debtor's financial problems involve essentially a dispute between the debtor and its secured creditors which can be resolved in a pending state court action; and

(vi) The timing of the bankruptcy filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

*Phoenix Piccadilly,* at 1394-95.

Factual distinctions prevent meaningful application of the *Phoenix Piccadilly* factors to this bankruptcy case. Only two of the *Phoenix Piccadilly* factors are present, namely: few employees and potential use of bankruptcy as a litigation strategy.[22] The paucity of other factors does not mean, however, that good faith is present. None of the other *Phoenix Piccadilly* factors exist because the factual predicate for each one does not exist.

*Phoenix Piccadilly* involved a dispute between a debtor and its secured creditors over title to real property.[23] The circumstances are wildly different in this bankruptcy case. Plaintiffs' disputes arise from a series of politically charged articles that spawned multiple defamation claims.[24] We are not dealing with secured claims and real property, but rather tort claims and insurance policy benefits. The situation is markedly different from the factual scenario underlying *Phoenix Piccadilly*.

### B.  Beyond *Phoenix Piccadilly*

The chasm between the *Phoenix Piccadilly* factors and the situation at hand requires analysis from a different vantage point. When does use of chapter 11 serve

---

[22] Even arriving at this conclusion requires the Court to extrapolate a bit as to factor (vi). The Court describes the mismatch between factors and facts in more detail below.

[23] The Eleventh Circuit Court of Appeals decided *Phoenix Piccadilly* in 1988. Congress later amended § 362 of the Bankruptcy Coded to include present-day § 362(d)(3) to address issues unique to single asset real estate cases. *See* Bankruptcy Reform Act of 1994, PL 103–394, October 22, 1994, 108 Stat 4106, § 218(b) (adding paragraph (3)).

[24] The evolution of technology provides another reason why the *Phoenix Piccadilly* factors do not provide a resilient platform for analysis in this bankruptcy case. Adoption of internet technology was not widespread in 1988, so bankruptcy cases from that era naturally do not address circumstances that could arise only in today's internet-soaked world.

14

a litigation tactic, rather than a valid reorganizational purpose? Does it matter if the debtor acknowledges that it plans to cap potential litigation claims by structuring a repayment plan that will limit the amount collectible, should the non-debtor party prevail in the litigation? How should a court assess good faith intent to reorganize when the claims at issue involve personal injury torts and remain unliquidated?

Whether a court applies a multi-factor test, a totality of the circumstances test, or evaluates the presence of "cause" under § 1112(b), the ultimate question is the same: does this particular use of chapter 11 comport with Congressional intent behind the Bankruptcy Code? Thoughtfully addressing this question requires the court to delve deeper and consider the full picture.

### C. Valid Reorganizational Purpose

As noted before, the concept of a valid reorganizational purpose is fuzzy at best. Every chapter 11 bankruptcy case brings different facts, history, and perspectives. Policy goals supporting chapter 11 bankruptcy relief include preservation of the economy and prevention of harm to innocent third parties, like employees and third party creditors. Congress envisioned bankruptcy as a public policy tool, not a corporate weapon. *See, e.g.* 11 U.S.C. § 1129(a) (listing factors supporting confirmation of a chapter 11 plan).

Several courts evaluating whether a chapter 11 bankruptcy case furthers a valid reorganizational purpose have focused on whether the debtor is in financial distress. *See, e.g., LTL Mgmt.*, 64 F.4th at 101 ("Our precedents show a debtor who does not suffer from financial distress cannot demonstrate its Chapter 11 petition

15

serves a valid bankruptcy purpose supporting good faith."). That is an important part of the analysis, but not the only step. Other factors also matter.

Consideration of additional factors is entirely consistent with *Phoenix Piccadilly* because "there is no particular test for determining whether a debtor has filed a petition in bad faith". 849 F.2d at 1394. Whenever the Court discerns an intent to abuse the judicial process, undermine the purpose of the reorganization provisions, or circumvent legitimate state court litigation, evaluation of other concerns is wholly appropriate. *Id.*

### D. <u>Other Factors</u>

It would be impossible for this Court (or any bankruptcy court) to draft a complete list of universal factors demonstrating good faith intent to reorganize, or the flip side, bad faith intent to abuse the chapter 11 process. It's fair to say that a certain sense of "you know it when you see it" perspective pervades any sort of good/bad faith analysis, as each is necessarily fact intensive. *See, e.g., Piazza v. Nueterra Healthcare Physical Therapy, LLC (In re Piazza)*, 719 F.3d 1253, 1271 (11th Cir. 2013) ("Bad faith does not lend itself to a strict formula.") and *In re Letterese*, 397 B.R. 507, 512 (Bankr. S.D. Fla. 2008) (evaluating debtor's good faith in chapter 13 case under totality of the circumstances). The expansiveness of the inquiry requires bankruptcy courts to be thorough yet detail-oriented in their analysis.

In the context of chapter 11 and, more specifically, subchapter V of the Bankruptcy Code, some considerations jump out as uniquely important. Those factors include the debtor's level of financial distress, ability to formulate and execute a

16

viable reorganization plan, and evidence of filing purely (or primarily) as a litigation tactic.

### 1. *Financial Distress*

From a balance sheet perspective, TGP is a healthy business with a modest number of liquidated obligations. TGP's schedules and statements of financial affairs (ECF No. 34) list assets of $2,323,996.76 and liabilities of $102,596.61. All of TGP's liquidated obligations are general unsecured debts.

Over half of TGP's liquid assets ($1,105,286,.25) rests in four investment accounts. Hoft views those investment accounts as his personal retirement savings, but inclusion of the funds as part of TGP's bankruptcy estate indicates that they are (or should be) available for distribution to creditors.

| General Description | Current Value |
|---|---|
| Robinhood acct #1307 | $ 8,588.24 |
| Charles Schwab (401k) acct #4627 | $ 497,511.37 |
| Charles Schwab acct #8256 | $ 107,617.10 |
| Charles Schwab acct #2360 | $ 491,569.54 |
| **Total** | $1,105,286,.25 |

TGP (through Hoft, as its sole principal) offloaded a sizeable chunk of its other liquid assets through unusual exports of cash. TGP made two undocumented interest-free loans, first, to an entity solely owned by Hoft, and second, to his twin brother, Joe.[25] Together, these loans total $820,860. TGP also purchased a Porsche for Hoft to

---

[25] Hoft used his loan to purchase the Jensen Beach condo in the name of 2021 Main Street LLC, another limited liability company owned solely by Hoft. *See* ECF No. 76-20, at p. 63.

drive while in St. Louis. That vehicle has a listed value of $53,339.[26]

Justice League, another entity wholly owned by Hoft, owes TGP $150,000.[27] The circumstances of this debt are unclear, as there is no documentation in the record (or anywhere, apparently) of the reason for the transfer, deal terms, or other standard formalities for a business loan from one entity to another.

Although TGP's balance sheet is healthy (excluding potential obligations owed to the State Court Plaintiffs), the future of TGP's cash flow is less clear. For a period of time, The Gateway Pundit directed reader donations to other entities owned by Hoft, including Justice League.[28] Justice League may provide a benefit to TGP in the form of litigation funding for the State Court Litigation. Then again, Justice League may choose to use reader donations for other purposes.[29] Hoft controls both entities, but they are legally separate entities, and the Court is unaware of a formal litigation support agreement between Justice League and TGP. To the extent that reader

---

[26] The Liquidation Analysis attached as an exhibit to the Plan projects the liquidation value of the Porsche as $36,000. *See* ECF No. 93, at p. 30.

[27] The Court observes that this sum matches the amount described on Justice League's GiveSendGo webpage as the target goal for reader-supported donations offered to help The Gateway Pundit. *See* https://www.givesendgo.com/G2HD4 (last visited July 19, 2024). As of July 19, 2024, Justice League had raised $105,346 of its $150,000 goal.

The Liquidation Analysis attached as an exhibit to the Plan projects this debt as uncollectible because "Justice League is largely funded by TGP and advances other TGP causes and projects. Liquidation of TGP would eliminate funding and donations would cease if there are no additional projects to pursue." *See* ECF No. 93, at p. 30. That statement directly contradicts the Amended Schedules, which were filed under penalty of perjury. *See* ECF No. 34, pdf p. 11, at question 71 (Continuation Sheet) (describing doubtful or uncollectible amount as "$0.00").

[28] *See* Background § C, above.

[29] See https://www.givesendgo.com/G2HD4 ("Any amount raised will be applied to legal fees and other expenses incurred by the Justice League of America and for our current and future investigations.").

donations might once again be directed to Justice League rather than TGP, that would presumably create a drop in future revenue for TGP.

For the moment, TGP remains able to pay its operating debts as they come due.[30] TGP's primary cash flow concern is the rapid depletion of the benefits payable under the Policy. Once the Policy limits are reached, TGP will have to look to other sources of revenue to pay its legal bills, and, potentially, judgments in the State Court Plaintiffs' favor. That possibility is the driving force behind TGP's bankruptcy filing, but it remains to be seen whether TGP will ever suffer cash flow insolvency.

TGP's present financial status weighs in favor of dismissal, as it does not exhibit financial distress or the need to reorganize. For the sake of full analysis, the Court will continue with the next consideration, which is TGP's reorganization plan. In that analysis, the Court will consider the assets available to fund a plan, along with TGP's anticipated use of those assets.

### 2. *Reorganization Plan*

Publication of sensational stories has generated healthy revenues for TGP. TGP reported gross revenue in 2022 of $2,860,691 and in 2023 of $3,097,988.38.[31] Gross revenue reported for 2024 appears on track to match those years.[32] Website

---

[30] TGP projections for the three years of distributions to creditors under its Plan indicate that it will realize disposable income each month of $54,323, or annually $651,876, after covering normal operating expenses. *See* ECF No. 93, at p. 28.

[31] ECF No. 30, at 27.

[32] *Id.*

visits generate ad revenue, and reader donations provide another income stream.

The viability of that strategy as a long-term business plan, however, is now in question. The State Court Litigation challenges The Gateway Pundit's brash (and allegedly not fact-checked) reporting style, which may in turn compromise its profitability. If a court determines that statements in the Articles are defamatory, then The Gateway Pundit might choose to adopt a more restrained editorial style. That choice could lead to fewer website views, which would likely soften revenue.

The Plan indicates that TGP's future business model would be substantially consistent with its current business strategy, as its projected annual income would be $2,940,000, which is in line with the gross income reported during the prior two years. TGP's existing business model has provided sufficient revenue for Hoft to (i) purchase a Florida oceanfront condo titled in the name of 2021 Main Street LLC for cash along with a Porsche that he drives while in Missouri, (ii) fund over $1,000,000 in investment accounts, and (iii) pay his husband a regular income in addition to Hoft's own distributions. Hoft, as TGP's principal and only employee, has several strong incentives to maintain TGP's status quo.

What is not contemplated by the Plan is the distribution to general unsecured creditors of anything more than TGP's disposable net income over three years. The Plan does not contemplate any recovery from Hoft for the loan it made to enable him to purchase the Jensen Beach condo, nor does it contemplate any benefits being funded from the Policy, nor does it provide for the distribution to general unsecured creditors of any of the funds held by TGP in its investment accounts.

While most chapter 11 debtors prominently describe alterations to existing business models to combat past weaknesses or market threats, this one is different. There is no stated plan to change anything except to fund disposable income over three years to buy peace with the State Court Plaintiffs. More simply stated, there is no discussion on the record about TGP's *need* to reorganize, only the desire to do so in a way that blunts the impact of pending litigation against Hoft and TGP.

TGP's desire to fend off and manage liability arising from litigation claims in bankruptcy is not, in and of itself, problematic. The underlying issues run deeper, beyond litigation management. TGP failed to show that it is insolvent or has a present business need to revamp its business model.

And, with the Plan TGP just filed, it has similarly failed to show that any proposed reorganization plan would have a reasonable prospect of being confirmed. TGP's strategy seems to be that it doesn't matter what claims are asserted by the State Court Plaintiffs or what judgments are entered in the State Court Litigation, because the payout to all general unsecured creditors will be capped at three years of disposable net income under TGP's Plan.

That viewpoint conflates TGP's liability with Hoft's and begs the question of how reorganization is supposed to benefit TGP, rather than Hoft. Although it is difficult to tell where TGP ends and Hoft begins, Hoft is a separate co-defendant in the State Court Litigation who possesses or controls significant assets accrued with TGP's funds. Those assets include the Jensen Beach condo (purchased for just under

21

$800,000)[33] and the investment accounts (with a balance of over $1,000,000). It is difficult to envision a consensual plan (much less post-confirmation tranquility) if those assets were effectively squirreled away without creditor consent, nor would the plan pass muster.[34]

TGP's explanations regarding the "good faith" nature of its filing color the facts an improbable hue. Because legal fees incurred in the State Court Litigation have already depleted $700,000 of the Policy's $2 million in gross benefits, TGP insists that it filed bankruptcy to benefit the State Court Plaintiffs and that a subchapter V reorganization plan preserving the remaining $1.3 million in policy benefits would facilitate a robust payout of all claims. That simply isn't true.

The Plan, as envisioned by TGP, which limits the amount required for distributions to TGP's projected net income over three years, would do three things: (i) restrict the total amount payable to the State Court Claimants to whatever TGP earns over the next few years, effectively capping whatever litigation damage exposure that TGP now faces to an amount that TGP finds palatable, (ii) require the State Court Plaintiffs to share the future revenue allocated to the Plan with all other general unsecured claimants, thereby further limiting the State Court Plaintiffs' potential recovery, and (iii) dilute the possible recovery for non-litigation general unsecured claimants by likewise requiring them to share the plan-allocated portion of TGP's future revenue with the State Court Plaintiffs.

---

[33] *See* ECF No. 76-20, at pp. 38 (lines 38:1-38:13), 62-63 (lines 62:16-63:25), pp. 98-99 (lines 98:8-99:7).

[34] *C.f. Harrington v. Purdue Pharma L.P.,* Case No. 23-124 (Slip Op. June 27, 2024) (denying validity of third party releases in chapter 11 absent consent).

TGP's proposed Plan that mostly seeks to limit litigation exposure to its sole principal—and only that—looks a lot like bad faith.[35] Chapter 11 may be used to manage litigation claims (particularly for some categories of claimants, like asbestos claims), but there are limits, as the Court will discuss below.

### 3. *Existing Litigation*

Even though TGP has many tools at the ready to defray litigation costs—i.e., assistance from the Justice League, repayment of the Hoft brothers' loans (which may necessitate sale of the Jensen Beach condo), selling intellectual rights to the Articles or website domains, and liquidation of the investment accounts—it has expressed little to no interest in pursuing those options.[36] Instead, TGP's preferred path is one of limitation: it proposes to restrict litigation costs, including damages payable to the State Court Plaintiffs, to a capped amount payable from TGP's disposable income over the next 3 years.

There are several problems with this scenario. The viability of TGP's current business model in the face of defamation lawsuits is questionable, as already discussed. That is the first obstacle. TGP's apparent unwillingness to call existing loans (like the one Hoft used to purchase the Jensen Beach condo) or seek regular payment from Hoft for use of corporate assets (like the 2021 Porsche Cayenne) creates the second hurdle, and is indicative of bad faith. Favoring equity holders over creditors is typically not allowed in bankruptcy. *Cryzewski v. Jevic Holding Corp.*,

---

[35] *See* ECF No. 93, at ¶11.7(b).

[36] *See* ECF No. 34, at pdf p. 8 (Part 11, Question 71) (describing the doubtful or uncollectible amount of $970,760 in loans as $0).

580 U.S. 451, 457 (2017). Public policy as expressed through the Bankruptcy Code provides the third, very large impediment.

Congress drafted the Bankruptcy Code and is responsible for revising it as needed. The plain statutory language and years of legislative history show that bankruptcy relief is intended to foster equitable goals, not provide a Monopoly-style "Get out of jail free" card for potential personal injury torts. That policy is reflected in the statutory limitation prohibiting bankruptcy courts from adjudicating personal injury tort claims, the elevation of certain personal injury claims in payment priority relative to other unsecured claims, and the ability of creditors to file actions under § 523 to obtain a judgment rendering some claims nondischargeable. 28 U.S.C. § 157(b)(5); 11 U.S.C. §§ 507(a)(10) and 523(a)(6).

Nothing in the text of subchapter V of chapter 11 indicates that Congress intended to (and did) create a new form of bankruptcy that encourages limiting a debtor's principal's personal exposure for corporate acts, absent consent. *C.f. Harrington v. Purdue Pharma L.P,* Case No. 23-124 (Slip Op. June 27, 2024) (denying validity of third party releases in chapter 11 absent consent). Perceived attempts to use subchapter V to "game the system" in a similar fashion have been met with disfavor in this Court. *In re Bensalz Prods., LLC*, 2022 WL 1617690, at *5-6 (Bankr. S.D. Fla. May 19, 2022) (describing potential factors indicating use of subchapter V bankruptcy as a litigation tactic).

### E. The Policy Proceeds

The most telling aspect of TGP's failure to demonstrate that its bankruptcy

filing is intended to preserve going concern value or maximize property available to satisfy creditors is its reliance upon depletion of the Policy as a justification for relief. *LaSalle St. P'ship*, 526 U.S. at 453. The Policy, like all insurance policies, is a contract allocating risk. Its use is restricted to its terms, which means that the proceeds of the Policy may only be used in accordance with the Policy terms. All of this logic is very basic, but it still merits discussion because TGP has acted as if maximizing use of the Policy benefits serves all creditors. It does not.

It is true that if Policy limits are met, and no further funds are made available by Hoft, Justice League, or another revenue source, TGP will be forced to tap as-yet unused assets to pay litigation costs or a potential judgment. It is also true that, at that time, all unsecured creditors' interests could be at stake.

But we are not there yet.

TGP remains both balance sheet and cash flow solvent. There is no present financial distress, no looming foreclosure sale, no prospect of a market crash. There is only the State Court Litigation in which TGP must defend itself. That's not a basis for bankruptcy relief; it's the justice system in operation. And the State Court Plaintiffs have made their positions clear: they want their day in court to present their state law claims, rather than the ability to file a proof of claim in a bankruptcy case and receive a payout capped at what TGP predicts its disposable income might

be over the next 3 years.[37]

### F. Section 305 and 1112

The only question left to determine is whether dismissal is appropriate under § 305(a), § 1112(b), or both.

The Court concludes that both options make sense. Although the bulk of this Opinion focuses upon factors relevant to § 1112(b), the unique facts of this bankruptcy case make it suitable for dismissal under § 305(a) as well. By filing for subchapter V relief, TGP attempts to accomplish indirectly what it cannot do directly. *First Fin.*, 99 B.R. at 754. Hoft's testimony at the section 341 Meeting and further statements by counsel demonstrate that TGP filed bankruptcy purely as a litigation strategy. *Id.* Litigation is already well underway in two other fora, both of which are far better available to determine the parties' interests. *Laurel Highlands*, 473 B.R. at 654. In lieu of a repetitious recitation of facts justifying relief under § 305(a), the Court will summarize its analysis this way: in this particular bankruptcy case, all the facts that support § 1112 dismissal also support § 305(a) dismissal.

The Court is mindful of the extreme nature of dismissal pursuant to § 305(a) and does not impose this remedy lightly. It is appropriate and correct in this limited instance. The record of this bankruptcy case, including the Schedules and Statements of Financial Affairs (ECF No. 34), transcripts of the 341 Meeting (ECF Nos. 76-20

---

[37] It is worthy to note that despite claims made by TGP at hearings before this Court that the reason for filing this case was to preserve Policy benefits for the benefit of the State Court Plaintiffs, the Plan funds distributions to general unsecured creditors solely from three years of disposable income. No mention is made in the Plan of using Policy benefits to fund a distribution to the State Court Plaintiffs.

and 76-21), Joint Stipulation (ECF No. 80), transcript of the June 27, 2024 Hearing, and the Plan (ECF No. 93), all strongly support this conclusion. The facts are what they are, and the Court accepts the sworn statements submitted by TGP as true and accurate. Despite facing a substantial burden of proof, the State Court Plaintiffs have shown that dismissal is in the best interests of TGP and all creditors. *In re C & C Dev't Group, LLC*, 2012 WL 1865422, at *3 (Bankr. S.D. Fla. May 22, 2012); *FMB Bancshares, Inc. v. Trapeza CDO XII, Ltd. (In re FMB Bancshares, Inc.)*, 517 B.R. 361, 371 (Bankr. M.D. Ga. 2014) (describing movant's evidentiary burden); *see also In re Jefferson Cnty., Ala.*, 474 B.R. 228, 277 (Bankr. N.D. Ala. 2012) ("Section 305 creates an exception to the rule that a federal court is required to exercise its bankruptcy jurisdiction.").

## CONCLUSION

This case features charged emotions and polarizing facts. None of that impacts this Court's sole duty, which is determining whether TGP demonstrated good faith intent in filing and pursuing this chapter 11 bankruptcy case. The answer is no. The Court will dismiss this bankruptcy case as a bad faith filing.

## ORDER

The Court **ORDERS** that:

1. The Dismissal Motion is **GRANTED**.

2. The Bankruptcy Case is **DISMISSED**.

3. The hearing previously scheduled for August 2, 2024 at 9:30 a.m. (pursuant to ECF No. 85) is **CANCELLED**.

4. The Court retains jurisdiction over the implementation and interpretation of this Order.

**###**

Copy to:

David A. Blansky, Esq.
*(Attorney Blansky must serve this Order upon the service list below and all other interested parties in compliance with applicable rules).*

Martin Ochs, Office of the United States Trustee

Mark Hamilton, General Counsel
Florida Department of Revenue
P. O. Box 6668
Tallahassee, FL 32314-6668

Re: Case No. 2024SC317 (Malkin, et al. v. Coomer)
Colorado Supreme Court
2 East 14th Avenue
Denver, CO 80203

Re: Case No. 4:21CV1424 HEA (Freeman, et al. v. Hoft, et al.)
United States District Court
Eastern District of Missouri, Eastern Division
111 South 10th Street
St. Louis, MO 63102

Re: Case No. 2122-CC09815 (Freeman, et al. v. Hoft, et al.)
Missouri Circuit Court
Twenty-Second Judicial Circuit Court (City of St. Louis)
10 North Tucker Blvd.
St. Louis, MO 63101