1        UNITED STATES BANKRUPTCY COURT
          SOUTHERN DISTRICT OF FLORIDA
2           WEST PALM BEACH DIVISION

3                    Case No.:  24-13938-MAM

4

5  IN RE:

6  TGP COMMUNICATIONS, LLC,

7       Debtor.
_____/

8

9

10

11

12                    ECF # 26, 39

13                    June 27, 2024

14

15

16          The above-entitled cause came on for a

17  Zoom hearing before the HONORABLE MINDY A. MORA, one

18  of the Judges of the UNITED STATES BANKRUPTCY COURT,

19  in and for the SOUTHERN DISTRICT OF FLORIDA, at 1515

20  North Flagler Drive, West Palm Beach, Florida, on

21  Thursday, June 27, 2024, commencing at or about 1:28

22  p.m., and the following proceedings were had:

23

          Transcribed from a digital recording by:
24              Helayne Wills, Court Reporter

25

Page 2

```
 1   APPEARANCES:
 2        LINDA LEALI, Subchapter V Trustee
 3
          HOUSTON RODERMAN, PLLC, by
 4        BART A. HOUSTON, ESQ.,
          on behalf of the Debtor
 5
 6        WILKIE FARR & GALLAGHER, LLP, by
          RACHEL C. STRICKLAND, ESQ.,
 7        BRITTANY WILLIAMS, ESQ.,
          JAMES BURBAGE, ESQ.,
 8        and
          DUNN LAW, P.A., by
 9        DAVID A. BLANSKY, ESQ.,
          on behalf of Creditors Ruby Freeman and
10        Wandrea Arshay "Shaye" Moss
11
          SHUTTS & BOWEN, LLP, by
12        VINCENT F. ALEXANDER, ESQ.,
          and
13        CHARLES CAIN, ESQ.,
          on behalf of Creditor Eric Coomer
14
15        OFFICE OF THE UNITED STATES TRUSTEE, by
          MARTIN OCHS, ESQ., (via Zoom)
16        on behalf of the U.S. Trustee
17
          FURR AND COHEN, P.A., by
18        ROBERT C. FURR, ESQ.,
          on behalf of Jim Hoft
19
20        ALSO PRESENT:
          ECRO:  Electronic Court Reporting Operator
21        RUBY FREEMAN (Listen Only)
          SHAYE MOSS (Listen Only)
22        ERIC COOMER (Listen Only)
          JIM HOFT(Listen Only)
23        JONATHAN BURNS (Listen Only)
24   EXHIBITS                              PAGE
25     No. 26                               28
```

1           THE COURT:  Okay, great.  Then, having

2    gotten those matters out of the way, let's turn to

3    TGP Communications, LLC, and let's go through taking

4    appearances, please.

5           MR. HOUSTON:  Good afternoon, Judge.  I'm

6    Bart Houston.  I represent the debtor-in-possession.

7    At counsel's table with me is Jonathan Burns,

8    executive vice-president and general counsel of the

9    debtor, Mr. Hoft, who is the 100 percent shareholder

10   is also present in the courtroom, and has his own

11   counsel, Mr. Furr.  I'm sure he'll make his own

12   appearance.

13          I would just tell the Court one thing.  I,

14   about a month ago, had COVID, and have a congestion

15   in my ears, and my hearing is a little bit strained.

16   So I may request that Your Honor repeat things if I

17   don't hear them, so I'm sure I got it accurately,

18   but that would be why.

19          THE COURT:  Mr. Houston, I had the same

20   thing happen to me in April.  So I feel your pain on

21   that.  Feel free to ask me to repeat myself.

22          MR. HOUSTON:  Thank you.

23          MR. FURR:  Judge, Robert Furr for the

24   owner, Jim Hoft.

25          THE COURT:  Thank you.

```
 1              MS. STRICKLAND:  Good morning, Your Honor.
 2   Rachel Strickland, Wilkie Farr & Gallagher.  I'm
 3   joined by my co-counsel, Brittany Williams, David
 4   Blansky and James Burbage, and we are here on behalf
 5   of Ruby Freeman and Shaye Moss.
 6              THE COURT:  All right.  Thank you.
 7              Our audio system at counsel table isn't
 8   great, so in the future, if you would just come to
 9   the podium to address the Court.
10              MS. STRICKLAND:  Will do, Your Honor.
11              THE COURT:  Thank you.
12              MR. ALEXANDER:  Good afternoon, Your
13   Honor.  Vincent Alexander of Shutts & Bowen on
14   behalf of Dr. Eric Coomer.  I'm joined on the Zoom
15   with co-counsel, Charlie Cain.
16              THE COURT:  Great.  Thank you,
17   Mr. Alexander.
18              MR. ALEXANDER:  Mr. Cain is admitted pro
19   hac vice, although he won't be making argument
20   today.
21              THE COURT:  Okay.  Thank you.
22              Okay.  And on Zoom, Mr. Ochs.
23              MR. OCHS:  Thank you, Your Honor.  Martin
24   Ochs for the United States Trustee.
25              Your Honor, if I could just echo on
```

1    something that Your Honor said.  If parties are

2    going to speak, if they would just stand at the

3    podium so that I can see them, as well, that would

4    be very helpful.  Thank you.

5              THE COURT:  Okay.  So, here's what I would

6    like to do.  We have set for hearing today two

7    matters.  We have a hearing on -- continued hearing

8    on the motion to approve omission, countered by

9    Mr. Ochs' motion to continue that hearing.  We also

10   have set for hearing the motion to dismiss filed by

11   litigation plaintiffs, or in the alternative, to

12   modify the automatic stay.

13             I'd like to first talk about and give you

14   the Court's preliminary ruling on the motion to

15   approve omission, and then we'll turn to the motion

16   to dismiss the case.

17             Okay.  As a reminder, at the last hearing

18   we talked about a structure that might work for the

19   concern expressed by Mr. Houston on behalf of the

20   creditors who were listed as Jane Doe, John Doe,

21   with a service address care of Mr. Burns.

22             I expressed concern about that, and noted

23   that in a decision by Judge Mark in the Aerotech

24   case, that I believe was cited in somebody's papers,

25   that we would consider a structure in which a claims

1    agent was retained, and that the unredacted version

2    of the schedules listing the creditors by name and

3    address still needed to be filed under seal with the

4    Clerk of the Court, and provided to the claims agent

5    and the U.S. Trustee, as well.

6           In order to get from here to there,

7    however, there was a discussion about the need for

8    evidence to demonstrate that this was really a

9    viable concern, and what the -- what was filed with

10   the Court was a little problematic.  So, the

11   debtor's motion to approve, which was filed at ECF

12   26, resulted in a document filed, a notice of

13   filing, and I'd like to just talk about why I found

14   that document problematic.

15          Now, the U.S. Trustee has filed an agreed

16   ex parte motion to continue this afternoon's hearing

17   on the motion to approve, but I really do think it's

18   important to point out what our local rules require

19   governing the filing of redacted or confidential

20   information or exhibits, in connection with the

21   motion to approve.

22          The order I entered deferring ruling on

23   the motion to approve, which was entered as ECF 77,

24   on June 24, 2024, directed the debtor to submit

25   sworn declarations as evidentiary support of the

1  relief requested in the motion to approve, in

2  advance of today's hearing.

3          On June 20th the debtor filed a notice of

4  filing redacted declarations, which were docketed at

5  ECF 72, which included a footnote indicating that

6  unredacted declarations would be provided to the

7  Court and Mr. Ochs, on behalf of the U.S. Trustee,

8  and a claims agent, presumably, pending the Court's

9  ruling on the motion.  But that notice failed to

10  comply with the procedures set forth in our local

11  rules.

12          Specifically, I'm talking about Local Rule

13  9070-1(a)(4), and 5005-1(a)(4), for the use of

14  confidential information in an evidentiary setting.

15  Local Rule 9070-1(a)(4), which governs electronic

16  submission of exhibits to the Court, mandates that

17  if a party determines that any confidential

18  information should be considered by the Court at

19  trial or evidentiary hearing, that party must

20  nevertheless submit redacted copies of its exhibits

21  in accordance with subsections (a)(2) of this local

22  rule, and seek authority to file the unredacted

23  documents under seal, as provided for in Local Rule

24  5005-1(a)(4).

25          That local rule, 5005-1(a)(4)(C) provides

1    for the manner of submitting motions to seal and

2    sealed documents to the Court.  In fact, CM/ECF has

3    a specific mechanism for a sealed document to be

4    uploaded after entry of an order by the Court, so

5    that it doesn't appear on the docket.

6              Mr. Houston, you didn't file an

7    appropriate motion to seal, and the notice and

8    redacted exhibits filed doesn't adequately comply

9    with the procedures set forth in Local Rule

10   5005-1(a)(4)(C).  So therefore, I'm going to direct

11   you to promptly comply with our local rules,

12   9070-1(a)(4), and 5005-1(a)(4)(C).

13             You have to file a motion seeking

14   authority to file under seal unredacted copies of

15   the exhibits, attached to your notice of filing, in

16   accordance with Local Rule 5005-1, by July 3, 2024.

17             I'm going to grant the U.S. Trustee's

18   motion to continue the hearing on the motion to

19   approve, and we'll talk about what makes sense as a

20   continued date, but please understand that failure

21   to comply with the Court's directive in a timely

22   manner will result in the notice filed at ECF 72

23   being stricken from the record.

24             Okay.  So, Ms. Romaguera, my thought was

25   that we would set a hearing on the motion to approve

1  the omission of the creditor data somewhere three to

2  four weeks out.  Because I think it's likely to take

3  that long to resolve the issues surrounding the

4  motion to dismiss or for stay relief.

5           ECRO:  How long will it take, all day?

6           THE COURT:  I think it will be all day,

7  because my hope is that that same day we -- let's

8  just say this.  I'm not optimistic that we're going

9  to finish the evidentiary presentation today.  Maybe

10  we will, maybe we won't.  I don't know.  And if we

11  don't, we may need to finish that up.

12           My hope would be that at the conclusion of

13  that hearing, maybe after a brief recess, that the

14  Court might be able to issue an order on the motion

15  to dismiss or for stay relief, and it would be good

16  to have these two hearings scheduled on the same

17  date and time.

18           ECRO:  Judge, I'm thinking maybe July 31.

19           THE COURT:  I need everyone to look at

20  their calendars to see if that date will work.

21           That's a Wednesday, folks.

22           MR. HOUSTON:  Judge, I have a trial in

23  front of Judge Robson in Orlando on that day

24  starting at 10:00 a.m., so that is a day that I

25  definitely wouldn't be able to attend.

1          THE COURT:  What about Friday, the 26th of

2    July?

3          MR. OCHS:  Your Honor, if I may be heard.

4    Martin Ochs for the United States Trustee.

5          I will otherwise be engaged in another

6    matter for that day, and so I will not be able to do

7    this.  I think it makes the most sense if I

8    participate in the hearing.  So I'd ask that the

9    Court not use that date.

10         Thank you.

11         THE COURT:  August 2?

12         MR. HOUSTON:  Good for me, Judge.

13         MR. OCHS:  If I could just have one

14   moment, Your Honor.  Bear with me for one second.

15   I'm sorry.  I'm on a wrong date.  I apologize.

16         August 2nd would work well for the United

17   States Trustee.  Thank you.

18         THE COURT:  All right.  Other counsel,

19   yes?

20         MS. STRICKLAND:  Yes, Your Honor.

21         THE COURT:  All right.  Thank you.

22         MR. ALEXANDER:  August 2nd works for us,

23   as well, Your Honor.  Thank you.

24         THE COURT:  Okay.  Debtor's counsel, yes.

25   Mr. Furr.  Okay, great.  So our continued date then

1    would be August 2, 2024.

2              MR. HOUSTON:  If it helps the Court at

3    all, Mr. Burbage and I and other counsel have worked

4    pretty diligently to stipulate to as many facts as

5    were reasonably able to be stipulated to, and have

6    not submitted any declarations or witness lists.

7    I'm not sure that the Court thought that this will

8    extend beyond a day is entirely accurate.  I think

9    that we put enough together for the Court to review,

10   that perhaps it will be a little less onerous.

11             THE COURT:  Okay.  Well then, August 2

12   would then likely be a date by which either a

13   written opinion or an oral ruling would be presented

14   to the parties.  Okay.

15             Then, Mr. Ochs, what I need from you is an

16   order granting your motion to continue.

17             MR. OCHS:  I will draft that, Your Honor,

18   and submit it.  I believe I had submitted something,

19   so I just need to clean that up and resubmit it, and

20   I will do that quickly.

21             If I could, Your Honor, just for clarity

22   of the record and for the clarity of that order, if

23   I could ask the Court, the August 2nd date, what

24   time should we start?

25             THE COURT:  It's a Friday, so let's start

1  at 9:30, with the hopes that we finish earlier.

2         MR. OCHS:  Very well.  Thank you, Your

3  Honor.

4         THE COURT:  Ms. Romaguera is asking the

5  question whether that's going to be an in-person

6  hearing or via -- or a hybrid hearing.  I'm going to

7  say for the moment hybrid, I think would be

8  appropriate, particularly if the parties don't think

9  that there's going to be a rollover of any

10  evidentiary presentation to the Court.

11         Okay.  All right.  So with that then, I

12  think what makes sense is for the motion to dismiss

13  or for stay relief to be presented to the Court,

14  response by the debtor, and any reply.

15         All right, Ms. Strickland, whenever you're

16  ready.

17         MS. STRICKLAND:  Thank you, Your Honor.

18  Good afternoon.  Rachel Strickland of Wilkie Farr &

19  Gallagher, on behalf of Ruby Freeman and Shaye Moss.

20         I wanted to start with some housekeeping

21  things to make sure that your record stays clean,

22  the joint stipulation that Mr. Houston referred to

23  is the joint stipulation of facts.  That's at Docket

24  80, and the pre-agreed upon exhibits are at Docket

25  76.  All of those exhibits are ours, as the debtor

1    has submitted zero evidence.

2           Your Honor, I have two exempt bars of the

3    debtor's publications.  I've already provided a copy

4    to Mr. Houston.

5           Can I approach?

6           MR. HOUSTON:  These are not matters that

7    were in the exhibit register, and not provided to me

8    until about 20 minutes ago, Judge.  I don't believe

9    they have much probative value.

10          They're articles that were cited in their

11   reply, so certainly if Your Honor feels it's

12   appropriate, you can review them, but I never agreed

13   to them going into evidence.

14          MS. STRICKLAND:  Your Honor, I'm not

15   submitting them into evidence.  They're simply

16   demonstratives.  I printed them off of the Internet

17   this morning.  They're statements of the debtor.

18          THE COURT:  I think it would be better,

19   Ms. Strickland, if you just discuss them in your

20   argument.

21          MS. STRICKLAND:  No problem.  Very well,

22   Your Honor.

23          So the fundamental question before Your

24   Honor is whether the debtor filed this case with a

25   legitimate bankruptcy purpose, or whether the debtor

1   and its owner, Jim Hoft, are improperly using the
2   bankruptcy system and abusing the judicial process.
3   Considering the totality of the records before you,
4   dismissal of this bad case filing is warranted.
5           Let me give Your Honor a roadmap for my
6   argument today.  I'll start by providing some
7   background about my clients and their claims.  That
8   context is critical to understanding the debtor, and
9   why my clients feel so strongly about the motion to
10  dismiss.  The motion can be found at Docket Number
11  39.  Thereafter, I'll address the facts in the
12  record, and the legal argument raised in our motion.
13          So to begin, let's discuss my clients,
14  their claims, and how Jim Hoft and the Gateway
15  Pundit helped destroy their lives.  The facts I'm
16  about to discuss can be found in the second amended
17  petition in the Missouri litigation, which is Docket
18  76, Exhibit 1.
19          On election day 2020, Ms. Freeman and
20  Ms. Moss served as election workers in the State
21  Farm Arena in Fulton County, Georgia.  Their job was
22  to help process absentee ballots, and because of the
23  pandemic, there were quite a lot of them.
24          It was a busy day, but pretty uneventful,
25  and for the next few weeks life carried on for them

1   as it always had.  That changed on December 3, 2020.

2   On that day a team of lawyers from the Trump

3   campaign baselessly asserted that grainy security

4   footage showed an unidentified person counting

5   illegal ballots.  The Gateway Pundit, and its owner,

6   Jim Hoft, took these unsupported factual assertions

7   and immediately published them to tens of millions

8   of readers, attributing names and additional

9   accusations of criminal fraud against Ms. Freeman

10  and Ms. Moss.

11          Within 24 hours those claims went through

12  a detailed explanation of what misinterpreted videos

13  actually showed.  On December 4, the Gateway Pundit

14  published an article identifying the clients by

15  name, despite the fact that 24 hours before, all of

16  the allegations had been publicly and definitively

17  refuted by Georgia election workers.

18          So they knew on the day of the statements

19  that the statements were false.  Nonetheless, it

20  didn't stop them.  They published it.  It's

21  interesting, because in the reply, Docket 71,

22  Paragraph 4, the debtors say, "Oh, no, no, no, this

23  isn't really our doing.  These all derived with

24  somebody else."

25          But on the debtor's website, which is

1    still available in several different locations, but

2    including an April 22, 2022 post, the debtor wrote

3    that the Gateway Pundit was the very first to

4    identify the women, and on several different

5    postings, attribute their own journalism to scooping

6    the story.

7            They continued to publish defamatory

8    statements about my clients, and we've given an

9    example of that in Footnote 9 of our reply, which is

10   on the docket.

11           Mr. Hoft has testified that the cases were

12   commenced solely because of this litigation.  That's

13   the reason we're here, according to the debtor.  Yet

14   inexplicably, these claims were not listed in the

15   list of creditors attached to the petition at Docket

16   2, at all.  In Paragraph 6 of the reply, Docket 71,

17   the debtor says, "All these statements are just

18   opinions."  So let's hear what some of the opinions

19   are.

20           They say that my clients kicked out

21   election observers for the purpose of counting

22   illegal ballots, hid illegal ballots in suitcases

23   under tables, so that they could count them, and

24   counted ballots multiple times.  Needless to say,

25   these are not opinions.  They are factual statements

1    that are entirely false.

2           As is the debtor's pattern, after

3    identifying my clients by name, they linked articles

4    to their personal information.  First came hundreds

5    of phone calls and e-mails and texts that

6    Ms. Freeman, Ms. Moss, Ms. Moss's 14 year old son,

7    all began receiving that day, December 4.  In the

8    days and weeks that followed, the campaign that the

9    Gateway Pundit had against Ms. Freeman and Ms. Moss,

10   they began facing unimaginable and devastating

11   effects on their lives.

12          The FBI asked Ms. Freeman to leave her

13   house for a number of months.  The FBI's suggestion

14   probably saved her life, because on January 5th,

15   after she fled her home, the day before the events

16   at the capitol, an angry mob gathered outside of

17   Mrs. Freeman's house.  People also showed up at

18   Ms. Freeman's 74 year old mother's house, and

19   demanded to make a citizens' arrest.  She had to

20   leave her job with Fulton County after eight years,

21   and she is still facing the effects of the damage

22   today.

23          On December 2, 2021, Ms. Freeman and

24   Ms. Moss filed a lawsuit in Missouri state court

25   against the debtor, Jim Hoft, his brother, Joe Hoft,

1   and they asserted claims of defamation, intentional

2   infliction of emotional distress.  The litigation,

3   which we refer to as the Missouri litigation, is

4   defined by the debtor's delay tactics, of which this

5   Chapter 11 is just the latest example.

6            In December of 2021, the defendants sought

7   to have the case removed to Federal Court.  That

8   failed, and it was remanded back.  In January of

9   '23, the defendants filed counterclaims for

10  defamation.  Those were dismissed.  In April of '23,

11  the defendants moved to dismiss the claims under

12  Georgia's anti-SLAPP statute.  That motion was

13  denied.  In August of '23, the defendants appealed.

14  Those appeals were denied.

15           So they ran out of procedural strategies

16  to delay the Missouri litigation, and then they just

17  started ignoring discovery deadlines.  After well

18  over a year of not engaging, the defendants finally

19  launched their own discovery request.  A Special

20  Master was appointed, and the Special Master made a

21  recommendation, and subsequently a Court entered an

22  order that all discovery had to be completed by

23  May 31st of 2024.

24           On April 24, the day the Freeman

25  plaintiffs noticed depositions of the Hoft brothers,

1    the debtors filed for bankruptcy, that exact day

2    that they were served with notices to appear for a

3    deposition.  That history is important for one

4    reason.  Your Honor has seen tons of debtors, I'm

5    sure, who file because they have perfectly healthy

6    businesses, but for bet-the-farm litigation.

7            I'm not here to suggest that those are not

8    appropriate filings, but this one is different.

9    This one is an exception, because of pre-petition

10   and post-petition conduct that all point to one

11   thing, and that's bad faith.

12           So in assessing whether dismissal is

13   warranted as a bad faith filing under Section 1112,

14   the central question is whether the debtor has filed

15   with a valid purpose, or whether the filing is an

16   effort to abuse the judicial process and the

17   purposes of the real litigation statute.  The

18   totality of the circumstances inquiry is what's

19   appropriate here, and it's a flexible approach,

20   which we and the debtors agree on.

21           So let's go through some of the facts in

22   this case that demonstrate how the debtor and Jim

23   Hoft, who I submit are one and the same, are abusing

24   the judicial process.  Let's start with the

25   petition.

1          The cases are filed solely to deal with

2    the litigation.  That's what the debtor testified

3    to.  And both our litigation, the Missouri

4    litigation, as well as Dr. Coomer, originate from

5    the debtor's coverage of the election.  Despite

6    this, you look at the petition, you look at the list

7    of creditors, Docket 2, nowhere to be found.

8          Next up we go to the 341 Meetings in the

9    case.  First meeting scheduled for May 30.  Has to

10   be continued.  Why?  Debtor no shows.  Jim Hoft, who

11   is the only legal representative of the debtor,

12   skipped it.

13         Then there's the second 341 Meeting on

14   June 6.  Jim Hoft testified that he didn't sign the

15   debtor's schedules and statements.  We've attached a

16   copy of the transcript at Docket 76.  Literally five

17   minutes before that 341 Meeting, the debtor filed a

18   pleading signed by Jonathan Burns, who is at

19   counsel's table today, which is located at Docket

20   52.

21         Mr. Burns is not an employee of the

22   debtor.  He has referred to himself as the general

23   counsel and executive vice-president, but his legal

24   tie to the debtor is murky at best.  But he files a

25   certification, it's at Docket 52, and says that Jim

1    Hoft was not involved in the preparation of the
2    debtor's statements and schedules.
3            In fact, if you look at Pages 32 and 33 of
4    Exhibit 20, the most recent 341 Meeting, debtor's
5    counsel informs the parties on the record that
6    Mr. Hoft doesn't know anything about the disclosures
7    being made in these cases.  The sole principal of
8    the debtors isn't involved.
9            They use this cover as a reason the debtor
10   doesn't know a bunch of important facts that are
11   then asked of him.  Why is Mr. Hoft's 401(k) linked
12   to a debtor account?  Why is the company store
13   linked to Mr. Hoft's bank account?  Why is this
14   Florida business paying Missouri taxes?  Why does
15   the balance sheets filed by the debtor show $691,000
16   in equity draws?  Is it a dividend?  The debtor
17   doesn't know.
18           Why are bank accounts of the debtors in
19   the name of Hoft, with a doing business as the
20   Gateway Pundit.  Big disclosure problem.
21           But Mr. Hoft is also improperly using the
22   debtor as his piggy bank.  He confirmed at his 341
23   Meeting that the debtor transferred large sums to
24   insiders.  He calls them loans.  This is generally
25   found at the 341 transcript, Pages 35 through 43,

1    Your Honor.

2                So the first of these so-called loans,

3    Mr. Hoft acquires the condo for himself and his

4    husband.  That's how their connection to Florida

5    comes.  It's money from the Gateway Pundit.

6                The second so-called loan is to the

7    Justice League.  That's a separate entity owned

8    entirely by Mr. Hoft, which files right wing

9    political actions and fund raises for Mr. Hoft.

10               And third, he has a loan to his twin

11   brother, Joe Hoft.  He has no idea what it was used

12   for, according to his 341 testimony.

13               All three of these transfers collectively

14   are about a million dollars.  All of these loans are

15   not documented in any way.  They're not written on a

16   piece of paper.  There's no interest.  They have no

17   repayment schedule, no stated maturity date.

18               When asked about it Mr. Hoft said at his

19   341 Meeting, "He's my twin brother.  I wouldn't put

20   an interest rate on a loan to my brother."

21               Well, Your Honor, Mr. Hoft isn't making

22   the loan.  This so-called business, the Gateway

23   Pundit, is making the loan.  So these are giveaways

24   to friends and family for no consideration.

25               Mr. Hoft confirmed that the debtor bought

1    a Porsche that he uses in Missouri.  That's a joint

2    stipulation, 29 and 30.  According to the 341

3    Meeting of Mr. Hoft, there's a personal assistant

4    that runs his household errands.  Also received

5    transfers post-petition from the debtor from a US

6    Bank account that is Mr. Hoft's account with a d/b/a

7    in the name of the debtor.

8          Now, the debtor has positioned himself or

9    itself, whichever you think, to say -- they sort of

10   put themselves forward like they're just

11   incompetent, not malicious, not bad faith, just

12   don't realize the rules, but that's not true.  So

13   let's go back to the debtor's tried and true method.

14          Two days after the 341 Meeting concluded

15   on June 18th, Jim Hoft publishes an article on the

16   Gateway Pundit questioning the integrity of the

17   United States Trustee's Office, identifies Mr. Ochs

18   by name, and states that he has been influenced by

19   the Biden DOJ to prevent the Gateway Pundit from

20   proceeding with its Chapter 11 case.

21          Now, when the debtor did this to our

22   clients they received death threats and needed

23   protection from the FBI.  So the debtor is using the

24   same playbook against the U.S. Trustee in this case.

25   This is beyond the pale.  It is undermining the

Page 24

1   integrity of this process, and by extension, the

2   professionals who dedicate their careers to it.  The

3   debtor is quite clearly abusing the judicial system.

4           Your Honor, this is one that I printed off

5   this morning.  I have it here.  I won't pass it up.

6   It's dated June 20, 2024.  It's on the Internet.

7   It's a statement of the debtor.

8           The title of the article is, "The

9   Department of Justice is targeting the Gateway

10  Pundit in their hopes to ruin us - Secretly injected

11  itself in Chapter 11 case.  Why?"

12          In this article they cite a source that

13  says, "The Department of Justice influenced the

14  Trustee assigned to our case and is pressuring this

15  man to make sure our Chapter 11 efforts fail."

16          They write that, "In most cases the 341

17  hearing ends after ten minutes or less," and that,

18  "Trial attorney Martin Ochs with the U.S. Department

19  of Justice presided over the hearing.  Mr. Ochs

20  harassed and abused the Gateway Pundit owner,

21  belittled, attacked and questioned Hoft nearly the

22  entire time," and reiterates that this process, the

23  341 Meeting, took hours, when it should have not,

24  normally listed for ten minutes.

25          According to this article, they learned

1    through an anonymous source that Mr. Ochs was

2    influenced by the Biden DOJ to prevent TGP

3    Communications from proceeding with the Chapter 11

4    bankruptcy, and he did his best to follow the orders

5    from above.

6           In this they do two other things.  They

7    continue to defame my clients, where close to the

8    end of the article it says, "Why did they not want

9    the truth of Ruby and Shaye's late night ballot drop

10   incident to make its way into the courtroom?"

11          And then at the very conclusion of the

12   article it asks followers to, "Please pray for Jim

13   Hoft, Joe Hoft, and the Gateway Pundit.  And please

14   help us in the historic battle for truth by donating

15   to support them at GiveSendGo," and they attach a

16   link so that followers can donate.

17          The link is not to the debtors.  The link

18   is to the Justice League, a non-debtor owned by Jim

19   Hoft.  That same non-debtor owned by Jim Hoft that

20   the debtor transferred -- they call it a loan, but

21   again, they didn't even bother to put an IOU on a

22   napkin -- $150,000, Mr. Hoft, the debtor, his

23   brother, Mr. Hoft's spouse, and his wholly owned

24   entities, all getting money.  It's like a

25   (unintelligible).

1                    More bad faith on the amended schedules

2         and statements at Docket 34.  Jim Hoft answers no to

3         the question about whether within one year before

4         filing the case, did the debtor provide an insider

5         with value in any form, including salary,

6         compensation, draws, bonus, et cetera?"  He said no.

7                    Same document, Mr. Hoft discloses payments

8         to himself, the Justice League, his husband.  So he

9         falsely answered this question under penalty of

10        perjury twice, another abuse of the judicial system.

11                   I know Your Honor has spent a little bit

12        of time looking at the issue of the redactions, and

13        I won't go into it, because I know the matter has

14        been continued, but it's a huge red flag.  The April

15        MOR, which is at Docket 51, shows an unusual level

16        of evasiveness in contrast to the bankruptcy

17        system's belief in transparency, and demonstrates an

18        abuse of the judicial system.

19                   Any one of these facts in isolation might

20        be tolerable, other than, I would submit, the

21        article about the U.S. Trustee, but they build a

22        mosaic of textbook bad faith.  So let's apply the

23        law to these facts.

24                   Phoenix Piccadilly, in that case, just

25        like this one, there's multiple creditors.  The

1    timing of the debtor's filing evidenced intent to

2    delay and frustrate creditors.  Here, again, it's

3    the exact same day they get served with that

4    deposition notice, where the brothers are going to

5    have to sit for a depo.

6              Also in Piccadilly the Court notes that

7    the Chapter 11 filing was in the Middle District of

8    Florida in that case, when the business was in

9    Kentucky.  The 11th Circuit noted that even if the

10   filing was "technically proper," the choice to file

11   the petition so far away may be evidence of bad

12   faith.

13             Same is true here.  The business, and its

14   sole employee, seem by all accounts to be in

15   Missouri.  Remember, that's where that Porsche is

16   that Mr. Hoft drives, bought courtesy of the Gateway

17   Pundit.

18             The connections in Florida are a new

19   condo, again, paid for by the debtor, and a new

20   filing with Florida a week before the petition date,

21   and, of course, the paid mailbox that we've talked

22   about at prior hearings.  So those are the factual

23   similarities to the seminal case.

24             Let's go through the applicable factors

25   which cut in favor of dismissal.  Number one, number

```
 1   of assets.  It's a pretty simple business.  The
 2   debtor's assets are disclosed at Docket 34.  They've
 3   got bank accounts, most of them, by the way, in the
 4   name of Jim Hoft, d/b/a The Gateway Pundit,
 5   securities accounts, the Porsche in Missouri driven
 6   by Hoft, the non-documented IOUs from insider loans
 7   to the Hofts.  They've got some website domain
 8   names, and they've got the catalog of articles.
 9              That's all they have.  This is not a
10   complicated business.  And the assets don't require
11   the assistance of the bankruptcy.
12              Number of unsecured creditors.  So, the
13   number two creditor listed on that schedule that
14   doesn't list either my clients or Dr. Coomer, is the
15   debtor's husband.  So the total claims, unsecured
16   claims, listed, are about $102,000.  A lot of them
17   are writers, they're insiders, many of them.  Then
18   you contrast this $102,000 of general unsecured
19   claims with the $292,000 in cash the debtors have on
20   hand at the end of April, plus whatever they've made
21   in the last two months.
22              It doesn't say anything about the million
23   dollars in assets that holds in security accounts
24   that can easily be liquidated.  So the number of
25   unsecured creditors is few.  They appear
```

1    artificially inflated, since Mr. Hoft's husband is
2    one of them, as an example, his brother is one of
3    them.  They have pretty de minimis claims.
4           Then we go to factor three, the number of
5    employees.  It's Mr. Hoft.  He's the only one.
6           Factor six, intent to frustrate legitimate
7    efforts of creditors.  The petition was filed after
8    Hoft's rope-a-dope of creditors came to an end.  It
9    was the same day he was served with the deposition
10   notice.
11          Now, the debtors have said a bunch of
12   cases involving dismissal are with a secured
13   creditor.  That's true, but that's not dispositive
14   of anything.  You're not allowed to be a bad faith
15   filer no matter what the priority of your creditors
16   is.  Bad faith filings are not allowed, and 1112
17   doesn't say anything about being a secured creditor.
18   I think that's a red herring.
19          There's a lot of facts that demonstrate
20   abuse of the bankruptcy system in bad faith.  Both
21   my clients and Dr. Coomer, who joined in the motion
22   to dismiss, agree.  At the 341 Meeting, even the
23   U.S. Trustee put the debtor on notice that it might
24   file its own motion to dismiss.
25          So we've put in a lot of evidence.  There

Page 30

1    is a lot in the docket before you.  As I said at the

2    outset, the debtor has not filed a single

3    declaration in support of its objection, so none of

4    the evidence that we have put in has been

5    contradicted.

6              So what's the debtor going to say in the

7    face of that?  They're facing two lawsuits, that

8    reorganization in the face of litigation is often

9    found to be a bankruptcy purpose.  The cost of those

10   lawsuits is being paid for by insurance.  The debtor

11   testified at the 341 Meeting that originally they

12   weren't sure whether the litigation was going to

13   cover them both, partially because they didn't

14   notice their insurer properly.

15             But they have now, and the insurance is

16   paying for all the costs associated with the

17   litigation of both sets of litigation plaintiffs,

18   Missouri and Colorado.  Contrary to the debtor's

19   bald assertion, this case is not serving the

20   interest of any creditors.  There's only two

21   universe of creditors, litigation creditors, both

22   cases derive out of the exact same allegations of

23   voter fraud, and all the other creditors who have de

24   minimis claims that can easily be paid in the

25   ordinary course.

1           And that's not in dispute.  The debtors

2     stipulated that it has the ability to pay its

3     non-litigation creditors in the ordinary course.

4     That's in the joint stipulation, Paragraph 46,

5     Docket 80.

6           The second bucket of creditors, my clients

7     and Dr. Coomer, unanimously believe that this case

8     should be dismissed.  So while the debtor is going

9     to portray itself as a responsible party looking to

10    preserve something, they've got $1.3 million of

11    insurance coverage left.  They used a third of it on

12    their litigation delay-based tactics.

13          So the only parties that really have an

14    economic interest in those insurance proceeds both

15    want the case dismissed.  There's no creditor

16    interests being served here.

17          In addition to an argument about

18    maximizing property available to creditors, that's

19    also nonsense.  This is going to be fairly binary.

20    Number one, the more they defame our clients while

21    they're in Chapter 11, the more our clients have

22    administrative claims that go ahead of all other

23    general unsecured creditors.  That's not serving

24    anybody.

25          Moreover, the debtor says, "Oh, no, no,

1    no.  Stuffing ballots in a suitcase, that's an

2    opinion.  I'm going to win.  There's going to be a

3    zero liability here."

4            Well, if they're right, and I submit they

5    can't possibly be, then they have nothing to worry

6    about.  The bankruptcy doesn't help them one way or

7    the other.  If they're wrong, the claims could be

8    astronomical that they would have no business going

9    forward in a Chapter V.  They would be completely

10   unable to do anything.  So we believe the dismissal

11   is warranted under 1112 as a bad faith filing.

12           As Your Honor knows, our paper also moved

13   for dismissal under Section 305(a), similar totality

14   of the circumstances analysis.  So I won't repackage

15   the factors that I just went through, unless Your

16   Honor wants me to.

17           But the one thing I would highlight about

18   305(a) is that the Court does not need to reach the

19   finding that the debtor filed in bad faith for that

20   one, although I think there is abundant evidence of

21   bad faith.  Under Section 305(a), all Your Honor

22   would have to conclude is that, if Your Honor thinks

23   the dismissal is in the best interest of creditors

24   and the debtor, that would be a basis.

25           So it's definitely in the best interest of

1    the creditors.  With respect to the debtor, it's

2    certainly in the best interest of the debtor, as

3    well, if they're going to continue to defame clients

4    and create new liabilities, to not have them be

5    instantaneously administrative claims with priority.

6              Again, it doesn't benefit the debtor, if

7    you believe their version of events, which is,

8    they've defamed no one, and they have no liability,

9    then the bankruptcy doesn't do anything for them

10   either.

11             Your Honor, do you want me to pause after

12   dismissal and address lift stay separately, do you

13   want me to keep going?  How would you like to handle

14   that?

15             THE COURT:  I'd like to hear your entire

16   argument.  Then we'll give Mr. Houston an

17   opportunity to respond.

18             MS. STRICKLAND:  Perfect.  Thank you, Your

19   Honor.

20             I think dismissal is clearly the right

21   action here, but if Your Honor disagrees, we would

22   submit you should lift the automatic stay and allow

23   the Missouri litigation to proceed.  Whether or not

24   the stay is lifted is basically a harm balancing

25   exercise, so lifting the stay doesn't harm the

1   debtor.  The fact discovery in the Missouri

2   litigation is five weeks from completion.

3   Completing the discovery will take minimal time, and

4   won't create significant additional erosion to the

5   insurance policy.

6           But again, it's not coming out of the

7   business moneys that are coming in that can be used

8   to pay other creditors in the ordinary course.  And

9   again, if the debtor stops messing around, and

10  actually complies with things, rather than

11  rope-a-doping, it's certainly less expensive and

12  more efficient.

13          The cost of defending the Missouri

14  litigation, completely covered by insurance, no

15  depletion of estate assets.  Lifting the stay, we

16  think would benefit the debtor and its estate.

17          THE COURT:  Let me ask you a question

18  about what you just stated.

19          MS. STRICKLAND:  Sure.

20          THE COURT:  Does the insurance also

21  provide, if there was a judgment obtained, for your

22  clients to be able to recover against those

23  insurance proceeds?

24          MS. STRICKLAND:  I believe so, Your Honor.

25  It's media coverage.

1          THE COURT:  So there is a depletion of

2    those estate assets.  I mean, it is a estate asset,

3    if those funds are available to make distributions

4    to your clients and Mr. Alexander's clients?

5          MS. STRICKLAND:  Correct.  Although it's

6    media coverage insurance.  So it is for this exact

7    purpose.  It's not otherwise available to any other

8    general unsecured creditor.

9          So the person that delivers -- they don't

10   have an office, I was going to say delivers coffee

11   to the office, but there is none -- the server

12   system or whatever they use, can't avail themselves

13   of that asset.

14          THE COURT:  To the extent a claim your

15   client holds is liquidated and can be satisfied from

16   the proceeds of this insurance, it leaves other

17   assets of the debtor available to satisfy other

18   claims?

19          MS. STRICKLAND:  Absolutely.

20          THE COURT:  Okay.  I'm sorry.  Continue.

21          MS. STRICKLAND:  No, not at all.

22          So, you know, we think that lifting the

23   stay, per Your Honor's point, that positions the

24   debtors to liquidate the claim.  We also don't

25   think -- and this is in all of the case law -- that

Page 36

1    this is the place for these defamation actions.  We

2    think they should go forward in Missouri and

3    Colorado state court respectively.

4              There's already been a fair amount of

5    wrangling with respect to where they should be.

6    It's been heavily litigated pre-petition, and

7    because of the remand, they are in their proper

8    home, we would submit.

9              The harm faced by our clients is huge.

10   There's a huge link between the debtor and Jim Hoft,

11   and as a result of that, the whole thing is

12   effectively stayed.  A full or partial modification

13   of the stay would allow for the completion of

14   factual discovery, another factor the Courts look at

15   when looking to grant stay relief.

16              So we think this case should be dismissed

17   for bad faith; the debtor attacking the U.S.

18   Trustee's Office, undermining the integrity of the

19   bankruptcy process, fund raising off of these

20   attacks.  The debtor perjured itself in filings like

21   the schedules and statements.  They've shown a

22   complete lack of candor and competence, as

23   demonstrated in the 341 Meeting testimony, redacted

24   monthly operating reports to a ridiculous degree.

25              There are no shortage of reasons to

1   believe that the debtor and Jim Hoft do not have the

2   debtor's best interest in mind, from loans to

3   families and friends, the Porsche, the decision to

4   file for bankruptcy the day he was notified of a

5   deposition.  It's really implausible to conclude

6   that Mr. Hoft suddenly started caring about

7   maximizing value to creditors.

8              So we have more than met our burdens, I

9   would submit, for cause under the Piccadilly

10  factors, and the debtors have submitted no evidence

11  at all, let alone any that refutes our case.  So we

12  would ask that Your Honor not reward Mr. Hoft and

13  the debtor by allowing them to reap the benefits of

14  the bankruptcy process, given their conduct, and we

15  think the case should be dismissed.

16             THE COURT:  Thank you, Ms. Strickland.

17             MS. STRICKLAND:  Thank you.

18             THE COURT:  Mr. Alexander, if you'd like

19  to express your client's views, before I hear from

20  Mr. Houston.

21             MR. ALEXANDER:  Thank you, Your Honor.

22  Vincent Alexander.

23             I'll be brief, Your Honor.  I don't want

24  to rehash the arguments that were so eloquently made

25  by Ms. Strickland, but I do want to address a couple

1    of points that kind of relate directly to

2    Dr. Coomer.

3              Before I do that I just -- there was a

4    brief discussion earlier regarding the admission

5    into evidence of Exhibits 1 through 25.  Earlier

6    this morning we did file a supplement to the exhibit

7    list.  That can be found at ECF Number 83.  I did

8    speak with Mr. Houston.  There's one exhibit,

9    Exhibit 26, and he has no objection to the admission

10   of that exhibit as part of the evidentiary record.

11             So we would move that in as part of the

12   other exhibits, 1 through 25.

13             THE COURT:  All right.  No objection,

14   Mr. Houston; is that correct?

15             MR. HOUSTON:  That's correct, Judge.  We

16   discussed it before the hearing.

17             THE COURT:  Thank you.

18             (Thereupon, Exhibit No. 26 was

19        admitted into evidence.)

20             MR. ALEXANDER:  Your Honor, I just thought

21   it would help to give a little background on who

22   Dr. Coomer is, and how he kind of relates to this

23   bankruptcy, and also to the request for dismissal

24   and also stay relief, which we've joined in.  We

25   certainly support all of the arguments that have

1    been made, but specifically, what's been referred to
2    as the Colorado litigation was commenced by
3    Dr. Coomer, who is the former director of product
4    strategy and security for the Dominion Voting
5    System.
6              He served in that role during the 2020
7    election -- presidential election.  And in the wake
8    of that election, there were various articles that
9    were published by the debtor about Dr. Coomer, which
10   contained what has been asserted by Dr. Coomer as
11   falsehoods.
12             Some exemplars of those -- and these are
13   some of the headlines.  This one is from
14   November 14, 2020.  "Report, Anti-Trump Dominion
15   Voting System security chief was participating in
16   Antifa calls, posted Antifa manifesto letters to
17   Trump online."
18             Then on November 16th, headline, "Denver
19   business owner, Dominion's Eric Coomer, is an
20   unhinged sociopath.  His Internet profile is being
21   deleted and erased."
22             From December 28, 2020, "Wake up, America.
23   Bold billionaire offers $1 million bounty for
24   Dominion, Eric Coomer's comeuppance."
25             These falsehoods had a serious impact on

1    Dr. Coomer, and resulted in him fleeing his home,

2    because of what he viewed as credible threats that

3    were received.  He had to sever ties with his

4    friends and family members to stay in seclusion

5    during these threats that were being made upon him.

6    He suffered damage to his reputation, privacy,

7    safety, his ability to earn, among other losses.

8                 As a result of those articles, on

9    December 22, 2020, Dr. Coomer filed what we've

10   referred to as the Colorado litigation, which that

11   exhibit is Exhibit Number 22 in the record.  That

12   includes claims, not only against the debtor, but

13   also the debtor's owner, Jim Hoft, among other

14   people.  There are many defendants who are in that

15   litigation.  It all relates to the claims that were

16   made as to Dr. Coomer allegedly rigging the 2020

17   election for his role at Dominion.

18                 In terms of a little bit of a procedural

19   history with respect to that case, on April 30th,

20   there was a special motion to dismiss that was filed

21   by the debtor and Mr. Hoft, trying to dismiss the

22   claims under Colorado's anti-SLAPP statute.  And

23   subsequently the District Court denied that.  There

24   was an appeal of that.  That appeal affirmed the

25   decision, and currently that is with the Colorado

1   Supreme Court.

2           What's interesting is, on April 25th, the

3   debtor filed a suggestion of bankruptcy in

4   underlying Colorado litigation, which there's

5   certainly no issue with that.  But then on May 10th,

6   in the Appellate Court, the debtor filed a joint

7   motion seeking an extension of time to file

8   petitions for writs of certiorari for the Supreme

9   Court, while this bankruptcy was pending.

10          Earlier this week, Exhibit 26, which I

11  previously referenced to Your Honor, was a

12  suggestion of bankruptcy, which was filed in the

13  Colorado Supreme Court.  And of relevance in that

14  particular filing -- and that was filed by --

15  Mr. Houston signed it -- is the reference that the

16  entire above captioned case is stayed as a result of

17  the debtor's bankruptcy filing.

18          THE COURT:  What date was that?

19          MR. ALEXANDER:  The date of that, June 24,

20  2024.

21          THE COURT:  Thank you.

22          MR. ALEXANDER:  Now, as I mentioned, the

23  debtor is not the only party to that appeal.  There

24  are multiple other parties to that appeal, including

25  Mr. Hoft.

1           And so in our view, what this

2   demonstrates, you have this timing issue, which

3   Ms. Strickland brought up, in terms of attempting to

4   use the bankruptcy and the benefits of the

5   bankruptcy, not for a restructuring purpose, but as

6   an improper litigation tactic.

7           An example of that is the suggestion of

8   bankruptcy.  At best it's just a mischaracterization

9   of the law under 362.  At worst, it's an attempt to

10  confuse the Court in the Colorado litigation that

11  this bankruptcy here in Florida has resulted in a

12  complete stay of that bankruptcy case.  We'll see

13  how all of that turns out with the Bankruptcy Court

14  there, but it's these types of filings where the

15  litigation is trying to be used to help non-debtors,

16  which demonstrates an improper purpose of the

17  bankruptcy itself.

18          As has been noted with respect to the

19  litigation, there are insurance policies that are

20  covering the defense costs.  So the fact that that

21  being a basis as to why the debtors filed to protect

22  and present those, it's not coming out of the

23  current revenue of the company.  It's being paid

24  under insurance policies.  That's not a negative

25  impact on the debtor's ability to operate this

Page 43

1    business, in terms of going forward.

2              And so the use -- an improper use of the

3    bankruptcy, the litigation tactics, we believe is a

4    strong ground for dismissal of the bankruptcy case,

5    And using the automatic stay to help non-debtor

6    parties.  If they want the benefit of the automatic

7    stay, then they can file their own bankruptcy cases,

8    but they haven't, and without any orders from this

9    Court, the automatic stay doesn't extend to any of

10   those non-debtor parties, and it's inappropriate for

11   the suggestion that it should.

12             We think very pertinent is the lack of

13   financial stress on the debtor at the time he filed.

14   We don't believe that there is necessarily a

15   requirement, but certainly that's a factor that's

16   looked at, in terms of whether the bankruptcy is

17   filed for a proper person.

18             The other point too, with respect to the

19   litigation, and this kind of leads more into stay

20   relief, Dr. Coomer is going to need to litigate --

21   or litigate and liquidate his claim.  There are

22   multiple defendants who are part of the Colorado

23   litigation, in terms of judicial economy, obviously,

24   getting consistent rulings, and having all the

25   relevant parties before one Court, is certainly

1    beneficial to happening.  Instead, everything is in

2    Colorado, and that's where it should remain.  There

3    was also a jury demand that was made with respect to

4    that litigation.

5              So we believe there are grounds for

6    dismissal of the case.  Alternatively, we believe

7    that it would be appropriate that the Court does not

8    dismiss the case, for stay relief to be granted and

9    provided to Dr. Coomer.  And again, we adopt and

10   incorporate all the arguments raised by (inaudible).

11             Thank you, Your Honor.

12             THE COURT:  All right.  Thank you,

13   Mr. Alexander.

14             Mr. Houston, I'm tempted to see whether

15   the U.S. Trustee has any comments first, and then

16   you can respond to every one at the same time.

17             MR. HOUSTON:  Understood, Judge.

18             THE COURT:  Mr. Ochs.

19             MR. OCHS:  Thank you, Your Honor.  Martin

20   Ochs for the United States Trustee.

21             The United States Trustee has not taken a

22   position yet on the motion to dismiss, and would ask

23   that you allow the others to continue, and then the

24   United States Trustee will take an appropriate step

25   when and if necessary.

1          Thank you.

2          THE COURT:  Thank you.

3          All right.  Mr. Houston.

4          MR. HOUSTON:  Maybe I misspoke when I said

5    our arguments would be truncated, Judge, but --

6    first I'd like to point out, I think Ms. Strickland

7    has taken very, very liberal license with many of

8    the facts that she says are facts.  I'll get to my

9    argument, but I just need to point out a couple of

10   those things.

11         And that is, number one, Ms. Strickland

12   argues that Mr. Hoft skipped the first 341 Meeting,

13   and that's not exactly accurate.  I don't recall if

14   I adequately addressed this in the debtor's

15   response, but throughout the infancy of this

16   bankruptcy, and certainly well before in preparing

17   for it, my communications have been almost entirely,

18   96 percent, with Mr. Burns, who is general counsel,

19   executive vice-president, and has demonstrated to me

20   that he has a better command of the day-to-day

21   operations, the financial information, access to

22   accounting information and other things that we

23   normally concern ourselves with in bankruptcy

24   schedules and in bankruptcy cases as they move

25   forward.

1          So at the first 341 Meeting, having the

2     person from the debtor most knowledgeable, I

3     presented Mr. Burns.  Mr. Ochs demurred on me

4     presenting Mr. Burns, and said that he felt it was

5     necessary that it be Mr. Hoft that would appear,

6     although Mr. Hoft, as I described in the papers, is

7     the philosophical leader and, you know, for lack of

8     a better term, the Apex of this debtor, and has less

9     information on the day-to-day financial matters and

10    business matters, as opposed to the content and the

11    direction that the debtor takes in its conservative

12    viewpoint expressed on the website.

13          And, in fact, that bore truth when we had

14    the next two continued 341s, and I presented

15    Mr. Hoft, as requested by the U.S. Trustee, and many

16    of the questions he said, "I just don't know," and

17    that get seized on by the creditors as incompetence.

18    That is exactly what I tried to avoid initially, as

19    I knew from my many communications with Mr. Burns,

20    and probably less so with Mr. Hoft, that Mr. Burns

21    had a better handle on and more information and

22    better working knowledge with the information that

23    would be important for creditors and for the U.S.

24    Trustee.

25          So Mr. Hoft was not a no show.  Mr. Hoft

1    was not presented.  Instead, Mr. Burns was

2    presented, and I've explained how that progressed

3    from there on, Judge.

4              The 341 Meeting continued for a second

5    session for approximately two hours, and Mr. Ochs

6    concluded that at 5:00 p.m. on that particular date.

7    Then it went for another two hours on a third

8    session, and creditors were able to ask their

9    questions to their satisfaction, and ultimately we

10   concluded the 341.

11             The other point I want to make before I

12   start my argument is that Ms. Strickland points out

13   that we have not presented any evidence of our good

14   faith.  I know the Court expects professionals in

15   this district, and I take it to heart, to work

16   together to try to work through stipulations of

17   fact, that is not necessary to call records

18   custodians and call someone to say that a particular

19   document was filed on a particular day in a

20   particular court.

21             And so I worked with counsel, opposing

22   counsel's firm, on at least three different sessions

23   through the stipulation of facts.  And, of course,

24   the Court is not considering, is not going to

25   consider, that being their evidence or my evidence.

1    And as is usual in a lot of these cases, the facts

2    are what they are, and it depends how the Court

3    views those facts in the context of the case law and

4    normal practice.  So to say that we presented no

5    evidence is really a misnomer.

6              Equally so, Judge, I reviewed very

7    studiously the documents that opposing counsel

8    proposed to go into an exhibit register, and the

9    majority of them being court papers that, of course,

10   this Court can take judicial notice of.  And so

11   there was a very collaborative effort there, and

12   ultimately resulting in both sides saying, "Hey, we

13   don't really need to present written declarations

14   and then put people on the stand and elongate the

15   hearing."

16             So when it's stated that we didn't present

17   any evidence, we participated quite aggressively in

18   developing the evidence for the Court to use as its

19   backdrop for making this decision.

20             So, Judge, this motion reminds me of the

21   proverbial dog that chases cars, and the question

22   being asked, what does the dog do when it catches

23   the car?  In this instance, if the litigation

24   creditors are successful and this case is dismissed,

25   there will be two litigations heading for a trial,

1    with substantial discovery remaining to be done,

2    approximately 40 depositions in the State of Georgia

3    in the Freeman case, and less so, because that

4    discovery really hasn't commenced in the Coomer

5    case, and that's in our stipulation of fact.

6              But there is a substantial amount of work

7    to be done by insurance counsel.  The two lawsuits

8    will continue, the case is dismissed or stay relief

9    is granted.  The insurance policy is a wasting

10   policy, diminishing in its value on the liability

11   side as attorney's fees are incurred and paid.

12             And it's a fair guess, Judge, that that

13   $1.3 million will be eaten up between these two

14   litigations long before they reach trial.  At that

15   point the debtor has a decision, do we just fold up

16   and go away, or do we use our own resources to

17   continue defending these cases, because we think

18   that there's a laudatory purpose in defending our

19   opinions and what we've expressed in a conservative

20   viewpoint website.

21             And so what happens then is the debtor's

22   assets become depleted.  Which are not that large to

23   begin with.  And then you get down to the proverbial

24   race to the courthouse.  Who gets to trial first?

25   If there is anything left, it's going to go to the

1    winner of that race.

2            THE COURT:  Let me just stop you there and

3    ask you a question, Mr. Houston.

4            MR. HOUSTON:  Sure.

5            THE COURT:  The question I have is this:

6    The claims that the litigation plaintiffs -- and I'm

7    talking about both the Missouri and Georgia

8    action -- the Colorado and Missouri action -- those

9    are tort claims.

10           MR. HOUSTON:  Yes.

11           THE COURT:  And those couldn't be

12   liquidated in this Court in any event.  So, they

13   have to be liquidated somewhere.

14           How would you envision that process

15   proceeding, by plaintiffs that I perceive -- the

16   Court perceives want their day in court, and not

17   necessarily just to reach a settlement, right?  They

18   want their day in court.  They want a jury and a

19   Judge to enter a judgment in their favor, not

20   because of anything that I've heard Ms. Strickland

21   or Mr. Alexander argue, my perception.

22           We can't liquidate those claims in this

23   Court, and that would be an essential part of a

24   restructuring effort by this debtor in a Chapter 11

25   case.  So how would you envision those claims

1    getting liquidated?

2              MR. HOUSTON:  I have three answers to that

3    question, Judge.  I thought about it myself, and

4    some other questions I assume the Court may ask me.

5              Number one, we have a very streamline

6    procedure in this Court for liquidating claims.  You

7    file a proof of claim.  And let's just assume that

8    proof of claim is an astronomical claim.  The

9    fortunate thing under Subchapter V is that those

10   claims, no matter what the amounts are, can be

11   treated in a plan, based upon the disposable

12   earnings of the debtor going forward for the three

13   or five-year period.

14             And so to the extent Mr. Coomer files a

15   big claim and Ms. Freeman files a smaller claim,

16   that just determines how the allocation of the pool

17   goes, and it may be that one creditor wants to

18   object to the claim of another creditor.  So the

19   proof of claim, I think, is the way it initially

20   gets liquidated traditionally.

21             The second way it happens is that there is

22   a proof of claim.  There potentially is an objection

23   to that proof of claim.  And to the extent there's

24   an objection, the debtor withdraws the reference and

25   it goes to the District Court for a jury trial.

1             And the third manner of dealing with

2    that -- and it's not really a manner of dealing with

3    it, but it's just sort of an unanswered question, is

4    defamation in Florida -- or Georgia law, because

5    Georgia law is governing their lawsuit, even though

6    they filed in Missouri -- is that a personal tort or

7    is it a general tort?

8             I would say to you in Florida there's a

9    lot of different cases going back and forth on

10   whether it's a general tort versus a personal tort.

11   And the definition being personal tort being an

12   injury to the body, a general tort being an injury

13   to some other intangible.  And then, of course,

14   there's the commercial torts, but that's not

15   involved here.

16             So I'm not sure that this Court can't

17   liquidate that, although I suspect this Court

18   wouldn't want to liquidate that.  And so therefore,

19   the reference is withdrawn and the District Court

20   that handles these matters all the time can deal

21   with it and give a jury trial.  But I think the true

22   answer is, to avoid wasting an asset, the insurance

23   policy, we would think that we would try to

24   negotiate with these creditors.

25             And I get that they may not want to

1    negotiate, but this is a Court that balances harm

2    and balances benefit.  And when you file a lawsuit

3    in our Courts, you're filing a lawsuit to obtain

4    compensation.  You're not necessarily filing a

5    lawsuit, although some do, to kill a company and put

6    it out of business.  And certainly that could be the

7    result here if this bankruptcy case is dismissed.

8                The result clearly --

9                THE COURT:  But that's not what I

10   perceive, just from what I've read.  What I

11   perceive, it's not even so much the dollar amount.

12   It's having a judgment saying that -- with

13   litigation plaintiffs, what I perceive they want is

14   a Court saying or a jury saying these were untruths,

15   these were falsehoods that were published, and they

16   caused harm.

17               But the first part of it, these were

18   falsehoods.  That's what it appears that they want,

19   and you can't get that through the traditional

20   bankruptcy claims objection process.  We just come

21   up with a dollar amount.  And that's what I am

22   struggling with, in the context of understanding the

23   bankruptcy dynamic here.

24               MR. HOUSTON:  As I said, Judge, number

25   one, in the state court complaint they've asked for

1  money.  They've not asked for some sort of a

2  proclamation of vindication.

3          I'm being a little cheeky here when I say

4  that, but that's what lawsuits are for, is to obtain

5  compensation.  As a byproduct, maybe you're

6  vindicating your position, or maybe the debtor is

7  vindicating his position, but if they're asking for

8  money, they won't get it litigating this case to

9  death, or litigating this company to death.

10          The result will be, the company will have

11  zero assets, there will be zero left on the

12  insurance policy, and an ongoing business that, you

13  know, depending upon your view point, may or may not

14  serve a useful function in our highly charged

15  political environment, will be done, it will be

16  killed.

17          We filed this bankruptcy at this juncture

18  because there is about to become an onslaught of

19  discovery that is going to reduce the policy

20  proceeds substantially.  We have a million three in

21  added value by being in this Bankruptcy Court today,

22  and that million three would be coming from

23  insurance policy proceeds, because whether it goes

24  to lawyers or it goes to the first winner to the

25  courthouse, that policy will be wiped out.  There's

1    no question about that.  And then the debtor will

2    have to utilize its own resources and assets.  That

3    would be the result.

4              The result could be different in this

5    Court.  The $1.3 million could be used for payment

6    of creditor claims.  The debtor's assets could be

7    directed for payment of creditor claims.  The

8    debtor's generation of revenue going into the future

9    could be used to pay creditor claims.

10             THE COURT:  Is that an actual concession

11   that's been made by the insurance company?

12             MR. HOUSTON:  No.  It's an ongoing

13   discussion, Judge, but I would say the rhetoric that

14   I've had with the general counsel is that they

15   recognize that if this goes to litigation, they're

16   going to be out at some point.  So it would have to

17   be a negotiation.

18             And I would say, Judge, I approached one

19   of the litigation creditors' counsel about

20   discussing plan treatment and what assets could be

21   contributed.  He declined to have that discussion

22   until after this hearing was had.  And I understand

23   the litigation point of view.  I know Mr. Furr has

24   reached out to the litigation plaintiffs' counsel to

25   try to get a dialogue going, and of course, they

Page 56

1    have politely declined.  And I'm sure Ms. Leali has

2    been met or would be met with the same sort of

3    result, that they want to see what their shot in

4    litigation is first.

5            So we would like to -- because we think

6    Bankruptcy Court invites and encourages and condones

7    negotiations, settlements and resolutions, rather

8    than litigating again all the assets out of the

9    estate.

10           So, Judge, we think that the bankruptcy

11   process, especially the Sub V process, lends itself

12   to accomplishing the goals that I've mentioned, and

13   we believe that the debtor -- there's no evidence

14   that the debtor filed this for any other function or

15   purpose, other than to try to resolve these things

16   with what assets it has, so it can survive.

17           And those are what the Supreme Court said

18   are the two balancing interests in a legitimate

19   bankruptcy filing, and that is, paying money to

20   creditors, and allowing ongoing businesses to

21   survive.

22           Addressing a couple of the comments from

23   Ms. Strickland, and perhaps Mr. Alexander, the fact

24   that the debtor presented Mr. Burns at the first 341

25   Meeting was not an indication of bad faith.  As I

1    said, it was my judgment call.  And we see this --

2    actually, the Florida Rules of Procedures have just

3    been amended to add the Apex doctrine, that it's not

4    necessarily the head bottle washer that is going to

5    be able to respond adequately to the question in a

6    financial situation or operation situation.

7          That's why I presented Mr. Burns for that.

8    He's been my contact, and always been very

9    responsive to me and responsible.  And so that was

10    on me, and not in any way the debtor skipping the

11    341, and Mr. Hoft taking this lightly in any

12    respect.

13          There's been an argument that the debtor

14    has been very strident in its defense of these

15    various things, and seeking appeals and seeking

16    counterclaims.  And of course, this is a business,

17    much like its compatriot websites and other news

18    outlets that generates a lot of litigation, no

19    different than Facebook or Amazon or other

20    businesses that are controversial in some respect.

21          Mr. Hoft has resided in, as it was said by

22    Ms. Stickland, his newly purchased condominium, that

23    was purchased three years ago in October of '21, and

24    ever since that period of time, has operated this

25    opinion website from that location.  Mr. Hoft is,

1    for lack of a better term, the nerve center.  Where

2    Mr. Hoft resides is where the business resides.

3               Ms. Strickland pointed out, there really

4    is no office to take coffee to, and that's because

5    it doesn't have a traditional sticks and bricks

6    identification.  It's a -- for lack of a better

7    term, a virtual business, you and it resides where

8    the guy that runs it or the guy that is the idea log

9    is located, and that's in Jensen Beach, Florida, and

10   that's why we filed here.

11              Judge, there is clearly a concern that in

12   six months or eight months or ten months, before

13   trial dates, that the insurance policy runs out, we

14   don't have that to deal with, debtor resources are

15   used and can be redirected in a different manner.

16              I now remember the last point I wanted to

17   address, Judge, and that was this Colorado

18   suggestion of bankruptcy.  It was very late in the

19   game that I was advised that there was an

20   application for the Colorado Supreme Court to take

21   certiorari review of the lower court.  I learned

22   that just happenstance speaking to Mr. Burns, and I

23   said, "Well, why didn't we report that on the

24   litigation schedule?"

25              And it's all part of the same litigation,

1    but we did not submit a suggestion of bankruptcy,

2    and Mr. Burns's concern was, "Well, we're really the

3    movant."

4                    And of course, the case law, certainly in

5    this district, and many others, are, even if you're

6    the appellant, if the underlying litigation

7    potentially has adverse consequences against you,

8    that litigation is stayed too, and even the debtor

9    must seek relief from stay if it wants to proceed

10   forward in those kinds of things.

11                   That's why it was submitted so belatedly,

12   Judge, and it was not for any sort of strategic

13   purpose to stop a proceeding.  It's just the law,

14   and it just came to my attention too late.

15                   Judge, I don't need to belabor the point.

16   We'd like to stay in bankruptcy.  We think we can

17   stay in bankruptcy.  We'd ask the Court to deny the

18   motion.

19                   Thank you.

20                   THE COURT:  All right.  Thank you.

21                   Ms. Leali.

22                   MS. LEALI:  Your Honor, Linda Leali, as

23   the Chapter V Trustee.  I don't have anything to add

24   to the arguments that are being made today.

25                   THE COURT:  Thank you.

1           Okay.  Ms. Strickland, I would invite you

2    to reply.  You did file a reply.  As you will come

3    to see, it is my custom to read everything that is

4    filed on the docket.  If you'd like to just offer a

5    couple of closing items, then the Court will

6    conclude and take this matter under advisement once

7    we just cover a few other housekeeping things.

8           MS. STRICKLAND:  Thank you, Your Honor.

9    For the record, Rachel Strickland, Wilkie Farr &

10   Gallagher.

11          I took no liberal licenses.  The fact is

12   that Mr. Hoft was not at the 341 Meeting when it was

13   originally scheduled.  He has been described by

14   counsel as the, A, head bottle washer.  I would

15   submit he is not the head bottle washer.  He's the

16   only one, and if you look at the joint stipulation

17   of facts, Paragraph 5, it says, before and after the

18   petition date the debtor's only employee has been

19   Jim Hoft.  So with that, it's very hard to imagine

20   how, as the nerve center, as Mr. Houston put it, he

21   would not be there.

22          Your Honor asked a question about what are

23   we supposed to do with these claims, and in terms of

24   liquidating them, the answer was, a jury trial.  And

25   yes, if you withdraw the reference and you have a

Page 61

1    jury trial, I would submit that the insurance policy
2    befalls the same fate that debtor's counsel is
3    complaining about.

4              So rather than that artifice, which puts
5    them in District Court, which again, pre-petition,
6    the debtor has already tried to move it to District
7    Court and it was remanded back down, if it's going
8    to go to a jury trial, it might as well for its
9    efficiency stay where it is and continue.

10             There was also a reference to negotiation,
11   which I found fascinating, because when I read
12   Docket Number 27, which is the debtor's pre-status
13   conference report, there's a sentence in Paragraph 6
14   that says, "Efforts have been made to discuss the
15   confirmation of a consensual plan with the largest
16   creditor constituents," plural.

17             I can't imagine who that would be, but it
18   isn't Ruby Freeman and Shaye Moss.  We have received
19   zero outreach from the debtors.  Which again, it's
20   just rich that this would be filed in Your Honor's
21   Court, that it would be stated again today.  It
22   hasn't happened, so that's confusing.

23             Your Honor and Mr. Houston had a back and
24   forth about whether or not, when there's a lawsuit
25   filed, people want a decision that they are right.

1    Well, defamation in particular, the key criteria

2    that must be found in a defamation suit is that the

3    statements are false.  So it is an important

4    element.

5              It doesn't mean we wouldn't take someone's

6    call if they bothered to call us, but the debtor

7    hasn't done that, and the reason they haven't done

8    that, when this was filed on May 21st of 2024,

9    certainly plenty of time to have phone calls, we

10   certainly have had lots of phone calls about the

11   joint stipulation, that's not what they're here for.

12   They're here for delay, and to frustrate my clients.

13             There was a statement made by counsel that

14   insurance might pay general creditors' claims.

15   That's not evidence.  That's not before you.  I've

16   never seen anything to that effect.  So it was a

17   nice throw away statement, but I'm not sure it's in

18   the record.

19             There also was a statement just made by

20   counsel that his client, or the head bottle washer,

21   Jim Hoft, moved to Florida in October of 2021, and

22   has lived here for three years.  That's pretty

23   interesting, because the business, The Gateway

24   Pundit, which is the debtor here, only filed in

25   Florida a week before the petition date.

1          So again, this goes to bad faith, this
2   goes to litigation tactics, and using the bankruptcy
3   process improperly.  If the nerve center is wherever
4   Mr. Hoft is, and Mr. Hoft has allegedly lived in
5   Florida for three years, I go back to the beginning.
6   Why are they paying Missouri taxes for this business
7   in the documents that they filed, and why did they
8   only file a business registration for The Gateway
9   Pundit one week before the petition date?  The nerve
10  center apparently has been living here for three
11  years.

12          So this isn't about proofs of claim, it's
13  not about all that other stuff.  This is about a bad
14  faith filing.  And when I go through the joint
15  stipulation of uncontested facts, not a single one
16  of them -- some of them are neutral.  Mr. Hoft is
17  the only employee.  A filing was made on such and
18  such a date.  But all of the actual evidence in here
19  is about loans to insiders that haven't been paid
20  back, that haven't been documented.

21          I assume that the evidence Mr. Houston was
22  pointing to in terms of their own submission isn't
23  about the Porsche, because there's nothing else in
24  here that would be supportive of the debtor's
25  position.

Page 64

1          So with that Your Honor, unless you have

2   questions for me, we thank you for your

3   consideration.

4          THE COURT:  I do have a question.

5          MS. STRICKLAND:  Sure.

6          THE COURT:  And to play devil's advocate

7   with you, which is what I need to do in order to

8   come to a decision here, many of the facts that

9   you've alleged in your papers would suggest that

10  there is certain pre-petition misconduct that

11  depleted this debtor of assets.  And normally in a

12  bankruptcy case where that type of -- those types of

13  allegations are made, we would see either major

14  creditors or the U.S. Trustee's Office moving for

15  the appointment of a trustee, whether in Chapter 11,

16  or seeking to convert the business and appointing a

17  Chapter 7 Trustee, in order to recover those assets

18  for the benefit of the creditors of the estate.

19         It's somewhat striking to me in reviewing

20  the motions that were filed, that that was not

21  relief that your clients chose to seek.  That is,

22  you sought in the alternative to dismiss, stay

23  relief, but not a request that somebody go after

24  these assets that you claim were improperly stripped

25  from the debtor over the course of years.

1          MS. STRICKLAND:  Certainly, Your Honor.

2    So, one, I take you at your word that you're playing

3    devil's advocate, but nonetheless, I just want to

4    correct the record.

5               They're not allegations, in terms of the

6    strip.  These are in the debtor's own submissions

7    that The Gateway Pundit bought a Porsche for

8    Mr. Hoft.  That's not our allegation.  That is a

9    stipulated fact.

10              The loan to Mr. Hoft to purchase the

11   Florida condominium in the amount of $799,860 is not

12   an allegation.  It's a fact.

13              I'm going T get to your question anyway,

14   because that's the more important part, but I just

15   wanted to start with the premise that the debtors

16   have stipulated that all of these dollars left the

17   house, that they lent the money.

18          THE COURT:  My understanding, just to

19   correct you, from the joint stipulation, is that the

20   car is titled in the debtor's name.

21          MS. STRICKLAND:  That's correct.

22          THE COURT:  It may be driven, as it would

23   have to be, by an individual, which happens to be

24   Mr. Hoft, but it is titled in the debtor's name.

25          MS. STRICKLAND:  Yes, in Missouri.

1          THE COURT:  So that's the point that I'm

2    getting at.

3          MS. STRICKLAND:  Understood.  Correct,

4    Your Honor.

5          We didn't move for a Trustee and we didn't

6    move for an examiner, because we don't believe this

7    belongs here.  We don't believe there is a purpose

8    of the Chapter 11, other than the automatic stay,

9    and to use bankruptcy as a shield and a sword.  And

10   so, our starting premise was, where should these

11   thing be occurring, and we think they should be

12   occurring in Missouri state court.

13          And but for the fact that Mr. Hoft is

14   going to have to sit for a deposition, his brother,

15   the other Mr. Hoft is going to sit for a deposition,

16   we wouldn't be here at all.  So we just think it's

17   improper.

18          The other thing is, if we happen to be

19   here after Your Honor rules, I am almost certain

20   there will be follow up relief in the form that you

21   suggest, as we don't believe that there is actually

22   a steward of this estate.  The admissions in the

23   341, in terms of no one minding the store, a lot of

24   the questions about the economics, not only were

25   they not answered by Mr. Hoft, they also were not

1  answered by Mr. Burns, who's not an employee of the

2  debtor.

3              Instead, they referred to, "You'll have to

4  ask the accountant."  And this is in the 341

5  testimony under oath.  The accountant is someone who

6  is Mr. Hoft's personal accountant, also does work

7  for The Gateway Pundit, hasn't been retained in the

8  bankruptcy, and was referred to as the person who

9  knows stuff.  So I don't think there is a

10  responsible debtor-in-possession, if you will, here.

11              I think that if the case stands for

12  whatever reason, I'm sure we'll be moving for a

13  Trustee or an examiner.

14              THE COURT:  All right.  Thank you,

15  Ms. Strickland.

16              MR. HOUSTON:  May I respond to some of

17  those points, Judge?

18              THE COURT:  Sure.  We've got until --

19              MR. HOUSTON:  I'll be brief.

20              THE COURT:   -- 4:30.

21              MR. HOUSTON:  As far as the issue of

22  transfers, Judge, these are items that are on the

23  debtor's ballot sheet.  These are items that were

24  disclosed in the bankruptcy schedules.  These are

25  items that were discussed freely at the 341 Meeting,

1   one of the two long sessions.

2           This is a company that, for lack of being

3   in the forefront of political controversy, we would

4   call a mom and pop business.  It's not regulated by

5   the federal government or state government in any

6   substantial manner, or by bank covenants on lines of

7   credit or loans.  So, company owners sometimes do

8   borrow money from the company, and they either get

9   bonused out as compensation, distributions, if you

10  will, or they get repaid.

11          Mr. Hoft would absolutely have to be

12  addressed in a plan, to contribute to the payment of

13  the plan.  I can't ignore that.

14          The loan to Joe Hoft is $28,000.  That was

15  the question that someone couldn't answer, is what

16  was that loan for.  It was to Mr. Hoft's brother.

17          As for the deferral of questions to the

18  accountant, there was a very esoteric question asked

19  about owners equity on the balance sheet, and what

20  that owner equity represented.  I've gotten into

21  several intensive accounting cases where those are

22  capital accounts that vary, based upon so many

23  different factors.  It's not highly unusual for a

24  debtor's principal to understand he's making money

25  or he's not, versus, what is the owner's capital

1   account at any given time.

2              And the final point, Judge, is, I stated

3   to Mr. Ochs that I was going -- we were going to

4   retain the debtor's traditional accountant, because

5   she has the history of this debtor for a period of

6   time.  When Mr. Hoft testified at the 341 that she

7   also does his individual accounting, I've abandoned

8   that and told Mr. Ochs we won't be seeking to retain

9   her, because of disinterestedness issues, and

10  instead we retained Mr. Goffman (phonetic), that we

11  intend to present an application to the Court if we

12  get to that point, Judge.

13             Thank you.

14             THE COURT:  Thank you.

15             Mr. Alexander.

16             MR. ALEXANDER:  Your Honor, if I may make

17  two brief reply points to something that was raised

18  by Mr. Houston.  This is Vincent Alexander.

19             One of them is with respect to the

20  suggestion of bankruptcy that was filed, which is

21  Exhibit 26.  Obviously, we think the timing of it

22  was such that given that it was filed two days after

23  the petition for certiorari was due in the Colorado

24  Supreme Court.  But what we found more troubling was

25  the fact that it states that the entire captioned

1    matter is stayed, and that under no circumstances is

2    accurate.

3              And so we believe that that creates

4    confusion, because to the extent the stay applies,

5    it applies to the debtor, not non-debtor parties.

6    And so that was our point with respect to that

7    suggestion of bankruptcy.  So as on file now, it's

8    ambiguous and unclear at best, in terms of what the

9    debtor's intentions were with filing that document.

10             The second point I wanted to address was

11   with respect to what I consider blatant forum

12   shopping.  There was discussion about withdrawing

13   the reference of the claim, possibly to a District

14   Court.

15             The Colorado litigation, governed --

16   entitled to a jury trial, governed by Colorado law,

17   and the debtor didn't attempt to have that litigated

18   in Florida, non-Bankruptcy Court, District Court,

19   and have a Florida jury apply Colorado law, Florida

20   Judge apply Colorado law, on top of the fact that

21   there are multiple other defendants in another

22   litigation.  So that potentially could lead to

23   inconsistent rulings.

24             And again, in terms of judicial economy,

25   efficiency, appropriate forum, it's not here in

1    Florida.   It's elsewhere.

2              With that, Your Honor, I'd rest.

3              THE COURT:   Thank you, Mr. Alexander.

4              Okay, thank you.   All right.   So what I

5    then want to just verify I understand correctly, the

6    parties have agreed that in terms of the facts that

7    the Court should look at, it is what is in the joint

8    stipulation of uncontested facts, ECF 80, the

9    exhibit register submitted by what I'll refer to as

10   litigation plaintiffs, which the debtor doesn't

11   dispute, as well as the supplement to the exhibit

12   register that was just filed earlier today.

13             Those are the facts and exhibits that the

14   Court should be focused on, relying on, for purposes

15   of reaching its decision on this matter; is that

16   correct?

17             MR. HOUSTON:   Correct, Judge.

18             MS. STRICKLAND:   That's correct, Your

19   Honor, although I do believe that if Your Honor

20   wanted to look at the publicly available Internet

21   for a statement of the debtor about the Department

22   of Justice targeting The Gateway Pundit, this is on

23   the debtor's website as we speak, about the U.S.

24   Trustee and about these proceedings, and he thinks

25   that this is egregious and highly relevant, and that

Page 72

1    Your Honor can take judicial notice of it.

2              THE COURT:  Thank you, Ms. Strickland.

3              All right.  The Court will then take this

4    matter under advisement, and will render its

5    decision prior to or on August 2nd.

6              All right.  Thank you all.

7              MS. STRICKLAND:  Thank you, Your Honor.

8              THE COURT:  I appreciate the

9    presentations.

10              MR. HOUSTON:  Thank you, Judge.

11              ECRO:  All rise.

12              (Thereupon, the hearing was concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 73

1                          CERTIFICATION

2

3   STATE OF FLORIDA:

4   COUNTY  OF  DADE:

5

6                  I, HELAYNE F. WILLS, Shorthand

7   Reporter and Notary Public in and for the State of

8   Florida at Large, do hereby certify that the

9   foregoing proceedings were taken by electronic

10  recording at the date and place as stated in the

11  caption hereto on Page 1; that the foregoing

12  computer-aided transcription is a true record of my

13  stenographic notes taken from said electronic

14  recording.

15                  WITNESS my hand this 23rd day of

16  July, 2024.

17

18

19  _____

                        HELAYNE F. WILLS
20              Court Reporter and Notary Public
                In and For the State of Florida at Large
21              Commission No:  HH157788 Expires 8/2/2025

22

23

24

25